# 10 CV 3751

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ X

SITI-SITES.COM, INC.

Plaintiff

v.

VERIZON COMMUNICATIONS, INC., ALLIED
SECURITY TRUST, DANIEL P. McCURDY,

BRIAN HINMAN; CISCO SYSTEMS, INC. and
ERICSSON INC-Sony Ericsson Mobile Communications,
Defendants; and
MLR LLC, as a Real Party in Interest-
Involuntary Plaintiff

_____ X

Case No. __ Civ. ___ ___ ___

COMPLAINT S.D.C. S.D. N.Y.
CASHIERS

DEMAND FOR JURY TRIAL
RE DAMAGES

Plaintiff SITI-SITES.COM, INC. (SITI), by its attorneys Cooper & McCann, LLP, and Lawrence

M. Powers, Esq., for its Complaint based on information, belief and investigation of counsel, except for

information based on personal knowledge of SITI, alleges as follows:

## Nature of the Action

1.    This action is predicated on Section 1 of the Sherman Act, 15 U.S.C. sec. 1, and Sections 4

and 16 of the Clayton Act, 15 U.S.C. sec. 15 & 26, and involves an antitrust "devaluation conspiracy"

targeted at Plaintiff SITI's patent interests. Some of the largest telecom patent owners, licensors and

licensees are conspiring against 50 small patent owners and licensors, including SITI, whom they have

disparagingly called non-producing entities (NPEs), to drive them out of business. Defendants are using a

Trust, Allied Security Trust (AST) as their joint vehicle under a Plan to effectuate the conspiracy herein.

Defendants through use of the AST are preventing small patent rivals from licensing or selling their

patents, at fair market value. The Plan utilizes Defendants'  collective market power to control an

otherwise active, vibrant and open, public licensing market in third and fourth generation (3G-4G)

wireless telecom patents and pending applications (collectively, the patents). The aim of their Plan is to

-1-

obtain ownership and/or control of telecom intellectual property (IP), including SITI's patents, by using relatively minor amounts of capital from titans of wireless technology. Verizon Communications, Inc. (VZ) leads the Plan working through the AST. Defendants have dried-up most of SITI's patent licensing business in the past three years through the use of sham transactions, recently disclosed price-fixing on patent licensing and purchases, with systematic market manipulation downward, and deceptive patent buying practices. Four antitrust causes of action with common facts, arising under Sec. 1 of the Sherman Act are alleged.

Relief sought: A permanent injunction against Defendants' antitrust (AT) torts, recovery of money damages, and recovery of Defendants' and affiliates' collective gains attributable to their continuing violations of Sec. 1 of the Sherman Act.

## JURISDICTION AND VENUE

2.      a) Jurisdiction is conferred upon this Court by Secs. 16 and 4 of the Clayton Act, 15 U.S.C. secs. 26 and 15, for injunctive relief and AT damages caused by each Defendant.      b) Venue is proper in this District pursuant to secs. 16 and 4 of the Clayton Act, where SITI and another real party in interest, MLR LLC (MLR) have conducted their licensing businesses, and benefit by a 2006 settlement contract (the SA), made and enforced by its terms in this District. i) VZ as the parent, and its wireless division VZW have offices, agents, transact business, and are found within this District. ii) VZ is a founding member of AST; both VZ and VZW have, or had, offices in this District at the time of the anticompetitive acts alleged. iii) Defendant Brian Hinman regularly reports to VZ at its offices in this District, and occupied separate offices for AST in this District provided by VZ during 2007-2009 where many AT violations were jointly planned with VZ and carried out. iv) Defendant Daniel P. McCurdy regularly reports to VZ at its offices in this District, and occupied separate offices for AST in this District provided by VZ during 2007-2009, where many AT violations were jointly planned with VZ and carried out. v) Defendants Cisco Systems, Inc. (CISCO), and Ericsson, Inc. with venture partner Sony Ericsson

Mobile Communications (collectively ERICSSON), also have offices, agents, transact business and are found in this District. vi) VZW is a partnership, affected with a public interest. It is regulated under the US antitrust laws and by the Federal Communications Commission (FCC), as are AST, CISCO and ERICSSON. vii) A federal cause of action alleged herein arose, impacts upon SITI and MLR, other NPEs and the public interest protected by AT law—within this District, where each Defendant agreed to, conspired and joined in AT injury to SITI, MLR and other targeted NPEs. Their AT torts restrain, affect and injure international and interstate commerce by SITI, MLR and NPEs.

## PARTIES

3.      Defendant VZ (listed NYSE; symbol (VZ )), with $89 billion (bn.) in market capitalization at 3/30/10, is the parent corporation of Verizon Wireless (VZW). VZW is the largest wireless network in the US and 13th in global wireless subscriber size ( 100 mm. VZW wireless connections at 4/25/10, par. 18), representing 30% of the US population, and 37 % of the US wireless network market. VZW admits to its global ambitions, and has multi-national cartels linked to it by contracts. a) The wireless network is a separate division called VZW, owned 55% by it parent VZ, and is legally described as the "Cellco Partnership". VZW is a key division of VZ, operating in a partnership form. h) Vodafone Group PLC ( U.K., listed NYSE, symhol (VOD)) owns 45% of the Cellco Partnership. VOD is a 72 nation cartel, 2d in global wireless subscriber size, and linked to three large cartels. c) The parent of VZW is a Defendant ( the parent and subsidiary division are collectively called VZ ). VZ sponsors and controls the AST, also a named Defendant. Parent VZ has 100% ownership of its own telecom landline business. d) Offices VZ is a Delaware corporation; its principal offices are at 140 West Street, New York, NY.

4.      Defendant Daniel P. McCurdy (McCurdy), is chief executive officer (CEO) of the AST. AST had offices in 2008, at 488 Freedom Plains Road, Suite 126, Poughkeepsie, NY; its address was changed in 2009 to 80 Lambert Lane, Suite 115, Lambertville, NJ. McCurdy also works in and reports to VZ, in this District.   AST is managed by VZ from New York, NY. McCurdy is author of AST's NPE

"enemies list", listing targets of AST's activities, and co-founder CEO at a litigation advisory company, PatentFreedom.com., employed by AST as an agent and advisor.

5. Defendant Brian Hinman (Hinman) served from March, 2007 through August, 2008, as the first CEO of the AST with its offices in this District. Unlawful AT activities by the AST and by Hinman occurred in this District. Hinman, was appointed VZ Vice President, Intellectual Property, as of September 1, 2008 covering both its wireline business and its mobile wireless carrier business. He works in and reports to VZ, in this District, and also works at a VZ office in Basking Ridge, NJ.

6. a) McCurdy and Hinman are both VZ and AST strategists and co-conspirators as to the AT claims alleged herein. Each of them developed the concepts employed by the Defendant AST, including its organization and structure, its solicitation of member investors, and co-manage its publicity and interviews, including announcements of intentions, its "catch and release" Plan, AST's patent purchases, its licensing to members and outsiders and its resale of patents.

7. AST is a Delaware Trust, located and operating in New York, NY since 2007, with an office in Poughkeepsie, NY through 2008, and since then with an office in Lambertville, NJ. AST is a co-conspirator with VZ and each of the other Defendants in all acts of alleged wrongdoing set forth herein. AST owns and controls Twister Investment Services LLC (Twister), a Delaware limited liability company, with a place of business in AST's offices and in other US locations. Twister is being used to conduct a telecom patent licensing/sales business for AST, and to conduct allegedly illegal antitrust activity related thereto, pursuant to the approval and direction of VZ, AST, McCurdy and Hinman.

8. Defendant CISCO is based in San Jose, CA, and maintains offices at 1 Penn Plaza, New York City, NY. CISCO is a leading global Internet infrastructure maker (routers and servers), operates networks and is a services and operations advisor. It has a market capitalization of $ 152 bn. at 10/28/09. CISCO is a wireless software developer-maker, a carrier by routers and servers for multiple networks, and also makes interactive global meeting devices. It is a "multi-sided platform, intermediary" (an MSP as

defined at par. 83 *infra.*), and needs more wireless patent licenses. CISCO joined the AST in 2008; its representative is on AST's board of directors, CISCO competes with other AST members, and is a co-conspirator with VZ, AST and the other Defendants.

9.      Defendant ERICSSON, is based in Sweden, maintaining offices for its U.S. operations at 1114 Avenue of the Americas, Suite 3410, New York, NY. ERICSSON is a leading global handset and infrastructure maker and manager, and operates Sony Ericsson Mobile Communications (Sony-Ericsson) in the US. ERICSSON (including Sony-Ericsson) is a global services and operations advisor to many wireless telecom networks. ERICSSON is a member of the AST, and also an MSP (cf. par. 83) intermediary, competing with CISCO, VZ and AST, but acting in concert with them against SITI-MLR and other NPEs. ERICSSON has been a patent licensee of MLR-SITI since 2003, and MLR-SITI has been an ERICSSON patent licensee since 2003. ERICSSON and Sony-Ericsson are represented on the AST board of directors; they compete with several AST members, and are co-conspirators with VZ, AST and the other Defendants.

10.      Plaintiff SITI, and MLR as Additional Real Party in Interest–Plaintiff SITI changed its name from Spectrum Information Technologies, Inc. ( Spectrum) in 1999, but it is the same Delaware corporation, with offices at 111 Lake Avenue, in Tuckahoe, New York, publicly held by 12,000 small and large stockholders. Since 2006 SITI has been in voluntary dissolution for stockholders' benefit. It had no outstanding debts, and is conducting a multi-year liquidation of its patent properties and related business interests. Spectrum was in the mobile device, invention, use, licensing business, 1989-1999. Spectrum/ SITI is the founding technology source for MLR's licensing of the patents listed herein at par. 27-31.

11.      MLR is named as an Additional Real Party in Interest, and Involuntary Plaintiff, pursuant to Rule 19 F.R.C.P. because of its interest in the patents. a) MLR was organized in 1999, to buy the Spectrum (SITI) patents, pending applications and its issued licenses and client lists, all of which occurred by phone discussions, document execution and personal discussions within this District. MLR is a

Virginia LLC its principals organized to license and develop the patents further. MLR's principal place of business is now 6524 Truman Lane, Falls Church, Va. The several owners of MLR LLC's equity are limited partners, taxed as a partnership. MLR functions like a corporation. b) MLR negotiated its patent interests and purchased them from SITI at SITI's offices in this District. MLR later enforced and settled many of its patent licenses based on such interests, negotiating with licensees in New York, NY. c) MLR's key partners-managers assigned to SITI its current patent interests and business, settling a 2003 SITI lawsuit in a New York State court, making factual disclosures throughout, and negotiating the settlement in New York City in 2006. All of SITI's activities since 2006 have emanated from its office in this District. Venue is proper in this District as to SITI, all Defendants and MLR. d) MLR's primary licensing executive, its patent counsel and its inventors/engineers worked for nearly 10 years at Spectrum (SITI) in its offices in this District, under employment and retainer contracts, wherein 100% of all patents plus intellectual property (IP) invented, plus all licensee customers, were business assets owned by Spectrum (SITI). Such principals have since worked 10 more years on what is now SITI's and MLR's joint licensing business and IP, based in this District as to SITI.

## FACTS

12. SITI invented and practiced its patents in house 1989-1999, spending millions of its own capital, relying on MLR's present managers and inventors. Spectrum (renamed SITI) negotiated several major licenses to telecom market leaders in the 1990's. SITI/Spectrum has a 20 year continuity of property and business interest, in the patents from 1989 into 2010, which have resulted in a total of 45 separate licenses. During this period, the same portfolio ( of patent families expanded by related mobile wireless inventions) earned millions in (1990's-2010) proceeds for SITI and MLR, at earlier and lower levels of Internet and wireless telecom development, and their related license values. MLR continues activities in inventions and infringement enforcement identical to what its principals did at SITI 1989-

-6-

1999, but at higher "fair market value" license valuations in 2010. The same principals are now acting for MLR in a venture with SITI under the Settlement Agreement (SA).

13. SITI and MLR each have Standing to Sue because their patent interests are based on the SA, a gross revenue sharing contract. a) MLR purchased the Spectrum patents and licenses from SITI between 12/18/98 to 9/30/99, for a nominal sum, during the period that SITI was winding down its patent activities, with most of its patents written-off to zero, and while MLR's principal owners were SITI's patent attorneys and employee-marketers, acting as SITI's agents. b) After a heated dispute in 2003 and litigation, SITI and MLR executed the SA in February, 2006, which by its terms, provided that SITI be paid a substantial cash amount, and that SITI become an "assignee-owner" of a defined portion of Gross Proceeds from the future exploitation of the "present and future patents", under the SA.

14. The SA provides: "Additional Settlement Amount-Assignment of Gross Proceeds …MLR hereby irrevocably assigns and transfers to Siti-Sites an additional settlement amount consisting of the 'Applicable Percentage' of all Gross Proceeds MLR receives after the 'Effective Date'[ February, 2006], and MLR shall cause the same to be paid to Siti-Sites. Such assignment is for value received by MLR and other Defendants in this Agreement and is not subject to any counterclaims, defenses, set-offs, recoupments, equities or the like arising or acquired after the date hereof among any of the Parties." SITI's defined interest is permanent. It is neither "callable", "redeemable" nor "defeasable" by MLR. It is an agreed property interest, based on SITI's prior ownership, of an established licensing business.

15. SITI's assigned share, payable off the top from gross revenues, amounts to a split of approx. 60% to MLR: 40% to SITI, on defined Gross Proceeds. MLR is required to pay all expenses and costs (mostly outside legal costs) required to generate each installment of Gross Proceeds earned; MLR can recoup costs only from its own 60% share thereof (costs can consume 40% of such share annually). a) SITI's assigned share of Gross Proceeds is neither callable nor redeemable nor reducible by MLR successors. b) If there is a patent sale, or sale, merger or change of control in MLR, prior notice plus full

disclosure to SITI and "reasonable provisions protecting SITI-Sites business, property and financial interests in the Gross Proceeds and other provisions" of the SA, are required.

16.    a) SITI is not, and has never been, an MLR owner, limited partner nor investor. b) SITI has never been a lender to, nor financier or licensor to MLR. c) SITI has never been an MLR licensee of the patents. As a permanent assignee of a "property or business interest" impaired by AT violations, SITI has independent Clayton Act standing to sue. d) The AT violations alleged herein have resulted in an 84 % decrease in licensing frequency, and its cash flow to SITI and MLR, from March, 2007 through March, 2010, reducing the value of their respective interests continuously, *infra.* at par. 89-90.

17.    Market Definition. The relevant product market for purposes of this action is the worldwide Market for licenses or sales of patents relating to mobile wireless telecom. The relevant geographic market includes the United States (US) because all Defendants sell products or services here, and may require US patent licenses or ownership for their activities. a) VZ and AST have admitted in numerous public statements that they intend to force NPEs out of business ( VZ has stated "the intent is to dry up this whole practice", par. 69, 34-39 ), in wireless patent invention and licensing. AST has 16 present members while planning for 40 members (a $210 mm. budget plan), and has 4 related network cartels, comprising over 150 global affiliates. b) AST members and affiliates operate within an active, domestic and international, private and public, mobile wireless patent licensing, and patent buying, market. This overall Market includes several auction markets. Defendants VZ, AST, CISCO, ERICSSON, and 13 additional AST members, and 4 related cartels, compete directly with SITI-MLR and other NPEs in this Market. Each Defendant is a i) potential SITI-MLR license purchaser, or ii) potential licensing vendor to SITI-MLR, or iii) potential patent purchaser from SITI-MLR, or iv) potential patent inventor or owner competing with SITI-MLR. In these potential patent transactions, Defendants and other AST members-cartels linked with the AST, are operating in a horizontal relationship, competing with MLR-SITI on licensing, purchases, ownership, use and control, of mobile wireless telecom patents.

-8-

18.     Economic Scale of VZ  VZ is a US and global network leader in wireless technology, and has 100 mm. growing US subscribers and wireless connected devices, a 37% share (twice.com/article/print/ 451802-Data_ Revenues-Drive-q1-Verizon-Gains.php 4/25/10); New York Times (NYT) 7/16/09 A9; Wall Street Journal (WSJ) 2/5/10 B-1, cf. 3Q. 2009 charts-re leading US networks.) a) AT&T, VZ's nearest mobile wireless competitor, has 82 mm. subscribers (30 %); together their subscribers are approx. 67 % of an estimated 273 mm. US subscriber/wireless market (4/23/10 pcmag.com/article2/0, 2817,2362977,00.asp). Their two smaller competitors have 82 mm. subscribers, or 30 % (Sprint-Nextel and T-Mobile USA), for a total of 97 % in four firms.  b) VZ is outpacing AT&T in connection quality and capacity. The WSJ predicts that AT&T is "going to see a huge [subscriber] exodus to Verizon" as VZ gets announced distribution rights on Apple's new series iPhone in 2010, WSJ 3/31/10 B-1 "AT&T Preparing Network for Battle". c) Besides VZ users through 16 AST members, VZ is linked with global cartels increasing overall subscribers to a total of 1.3 bn., 30 to 40 % of approx. 4 bn. wireless users.

19.     Scale of VZ Global Cartel Partners:  a) VZ's partner **VOD** (Vodafone, stock on NASDAQ; its debt is listed on NYSE) is the world's largest mobile telecommunication network company, based on revenue, and has a market value of about $140 bn. The WSJ reported Moody's valuing **VOD's** 45% stake in VZ at $ 80 bn., making it difficult for VZ to buy-out, because of cash flow declines from VZ's wireline business, WSJ 4/19/10 C-8; "Verizon needs the cash from wireless more than Vodafone, which can afford to wait". "Cash Is Turning Into a Hang-Up for Verizon", *ibid.*  b) Currently **VOD** has operations in 31 countries and partner networks in a further 41 countries. Based on subscribers, it is the world's second largest mobile phone network behind China Mobile.  **VOD** has approximately (approx.) 430 mm. subscribers, in 31 markets across 5 continents.  **VOD** has teamed-up with partner VZ to feature and sell Microsoft's new "Pink" handsets globally, WSJ 2/13/10 B-5, and upon information and belief, received wireless licenses from AST and members including VZ.  AST has, and will continue to share

wireless IP technology, with **VOD** and its related cartels. c) AST now owns patents held solely for licensing purposes and sales, through among other entities, its Twister (par. 7b) unit. Upon information and belief, AST has or will instruct Twister to license **VOD** and its related cartels.

20.     **VOD's** venture partner is Telefonica S.A. (NYSE, symbol **TEF**), 3rd in global subscriber size (157 mm.) TEF is *de facto* part of the VZW-VOD cartel. VZ/AST's market power also increases through VOD's partner: "Telefonica and archrival Vodafone..agreed to start sharing.. network infrastructure across Europe to help save 'hundreds of millions of euros' over the next decade'.." VZ and these cartels (VOD, TEF) have a total (at year-end 2009) of approx. 580 mm. subscribers.

21.     VZ partner VOD also owns an equity interest in China Mobile, Ltd. (listed NYSE, symbol **CHL**), number one in China and in global wireless subscriber size, with 470 mm. subscribers.

22.     VOD partner **TEF** also owns equity in China Unicom, the 2d largest phone group in China with millions more subscribers (2009, NYSE, symbol **CHU**). **CHL**+ **CHU** have a total of approx. 710 mm. subscribers; both are controlled by the Chinese government. TEF made an increased investment in **CHU** in '09 to become its largest outside investor, and **CHU** cross-invested in TEF to deepen their strategic alliance--VOD-TEF each invested billions in stock of CHL and CHU, list on the NYSE to finance in NYC, and also to sell China-made "smart phones" in the US. By late 2009, AST and these global cartels represented a total subscribers' base of 1.3 bn., and still rapidly growing.

23.     VZ's Announced Global Intentions: Chairman/CEO of VZ, Ivan G. Seidenberg, has described VZW's global expansion operations--linking its wireless networks with joint venture partner VOD and its affiliate CHL (recorded at 6/22/09 in a 35 minute filmed interview by "Charlie Rose", NYC PBS 13). VZ is a global "brand", building on its US and its IP leadership. "Verizon Moving From Landlines" ; stated Seidenberg, as to mobile telecom and the Internet, "We don't look any different than Google [ an AST member]... eliminating central offices and call centers..", (9/21/09 NYT B6).

-10-

24. <u>Cartel Offices</u> a) VOD does business in the US through partner VZW; VOD's main offices are in the U.K. b) TEF's main offices are in Spain, doing US business from a Miami, Fla. office for its large cartels in Latin America. c) CHL does business in mainland China, Hong Kong and Pakistan. d) CHU is in China, Macao, and now buying into millions of subscribers in many African countries, competing vs. Indian, Dubai, South African, Egyptian networks, and VOD in Ghana and elsewhere, WSJ 2/17/10 B-1; cf. Africa is "One of the Last Frontiers for Customer Growth", WSJ 4/24/10 B-5.

25. <u>AST Has Strategic Controls Over Members, Affiliates and Co-Conspirators by Written Agreements.</u> The AST's power over members, strategic actions and buyer-licensor "sanctions" against breach of AST rules, <u>has to be</u> in <u>written</u> documents, which are evidence of a "<u>contract, combination or conspiracy</u>" (sec. 1, of the Sherman Act) <u>because</u> many AST members are NYSE or NASDAQ listed corporations--Their size, skilled counsel and auditors, and US listing agreements require written documentation for AST members-affiliates, under US SEC auditing and disclosure rules. The legal and audit groups of the AST members also require SEC style, annual reports, proxy statements and quarterly disclosures in English, at home and in the US, as well as the need for US-IRS form 1099s or other forms necessary for each member's US tax returns. They also need them for defense in IP litigation <u>among members, and their competitors, including mobile telecom infringement claims and their other patent disputes.</u>

26. The Defendants herein, directly or through a division, parent, subsidiary, co-conspirator or agent, have had actual knowledge of, and knowingly participated, in the conspiracy to fix prices for licenses or purchases of wireless patents, and any related activity to devalue NPE wireless patents or other unlawful aspects of the AST Plan. The AST and VZ actions charged as attributable to all Defendants were authorized, directed and performed by their respective officers, employees, agents, members or representatives while actively engaged in the management, direction, control or transaction of the business and/or affairs of each of the Defendants, the AST and the AT conspiracy alleged herein.

27.     SITI-MLR Patents—Their Core Concepts a) The SITI-MLR patents cover "multi-band" (radio spectrum bandwidth) and "multi-mode" (multiple criteria, for alternative mobile telecom connections), in mobile handsets for 3G-4G wireless telecom. The patents described are fundamental to existing 3G and to higher speed, higher volume 4G, wireless Internet transmissions. b) The use of "packet transmission" of messages and data is the recognized method and apparatus basis for global Internet traffic—E.g.-Examine a five paragraph e-mail letter to be sent over the Internet: It is digitally scanned, and separated into about five separate transmission packets. It is then sent separately over various routes to reach the addressee, where its software translates the coded digital packets in order, re-printing the whole letter online. The packets may have gone through various software protocols, i.e. GSM in Europe, CDMA in the western US and Asia, etc., and over electronic routes varying by thousands of land miles. Thus the ability of the software chips in the mobile handset to jump from one message protocol to another [ multi-mode, e.g. from GSM to CDMA and then back to GSM on delivery ] is very important for speed, accuracy, cost, and quality in large volumes of message and data transmissions.

28.     Next there is the need for shifting from one radio spectrum band to another in the course of a message transmission, to ensure speed and continuity of each packet's electronic journey, with searching for available spectrum bands, regardless of the radio spectrum available [ multi-band tracks]. MLR-SITI patents cover both needs, and are unique—and embodied in 45 licensing agreements, in part or in whole. The core concepts are being embodied in newer chipsets under development by the global leaders in chip design and manufacturing, including Intel, Qualcomm and others. These concepts and conveniences are a necessity to global carrier networks, to most chip makers, or router-server makers, to other infrastructure-equipment suppliers, and to all mobile handset makers, vendors and users. This includes the Apple-AT&T iPhone (2007) and the Apple successor that VZ will market in 2010, then the Motorola-Verizon Droid handset ( 2009) and the Google Android (2010) handsets, as well as increasing numbers of social network direct users, and makers of routers, switches, servers and modems. Hundreds

-12-

of new potential MLR-SITI licensees are involved; E.g. Egyptians call their families in the US and MLR-SITI patents smooth the way for such calls globally. SITI believes interference with these patents by Defendants' concerted activities alleged herein, encourages infringement, reducing the license or sales value of SITI-MLR patents, and impedes development of the Internet's "Long-term Expansion" (LTE).

29. The patent history in SITI-MLR's US Patent No. **6,961,584** filed in the patent office (PTO) 2001, issued 2005, is entitled *"Tiered Wireless, MultiModal Access Device and Method"*: "BACKGROUND OF.. INVENTION "For a number of years, telecommunication systems have been evolving from a vast array of disparate independent networks into a single interconnected telecommunication grid including ...systems such as public telephone systems, private PBS systems, cable networks, internet trunklines, local area networks, broad area networks and ... wireless systems including specialized microwave, satellite, cellular, PCS, Specialized Radio, television, radio, etc. The isolation of these systems... is disappearing...Integrative technologies [advanced chipsets] have become available that will allow users, of certain types of wireless networks, automated access to any one of the available wireless services... U.S. Pat. No. 5,854,985 [ a 1998 Spectrum (SITI)-MLR patent] describes an omni-modal wireless access device that allows automated access...on a user programmed criteria for selecting the service that best meets the user's needs. The concepts disclosed in the '621 patent [ No. 5,761,621, another 1998 Spectrum (SITI)-MLR patent] are being broadly adopted in modern cellular handsets commonly referred to as multi-mode, multi-band phones because they are able to access anyone of...available wireless networks using different frequencies [multi-band] and different communication protocols [multi-mode].. AMPS, TDMA, CDMA, GSM, ..). Re-allocation of scarce radio spectrum through reassignment of wireless users to disparate systems has been suggested but will require the wide adoption of omni-modal wireless access devices of the type described in the '985 [Spectrum (SITI)-MLR] patent....Such access devices and spectrum sharing methods will have the effect of further integrating the...infrastructure that links...to sources of information, entertainment and various goods and services.

-13-

...this...will greatly expand the capacity of the radio spectrum to handle the ever growing demand for information flow over the finite radio spectrum… "SUMMARY OF THE INVENTION   "While the '621 and '985 patents [ Spectrum (SITI)-MLR 1998 patents] disclose concepts…these patents do not go far enough in making the entire range of telecommunications systems and services available with a minimum of effort nor …provide for automated techniques …that best meets the functional desires of the user   such as highest speed,   highest clarity,   highest security,   least cost,   least likelihood of interruption, or other qualities or a combination of such qualities."   The PTO material quoted above reflects the invention dates, and continuity of development in the SITI-MLR patents.

30.    Cf. SITI-MLR's US Patent No. **US RE40,540 E** filed 2003, and reissued in 2008, entitled *"Apparatus and Methods For Networking Omni-Modal Radio Devices"*:    "ABSTRACT   " A network and method of operating a network of wireless service providers adapted to interact with a plurality of omni-modal wireless products within a given geographic area in a manner to permit the wireless service providers 'to borrow' radio frequencies from other wireless service providers within the same geographic region…Implementation of this method broadly within a given geographic region will have the effect of insuring  that the available radio spectrum is used to its maximum capacity to serve the needs of the wireless users on a real time basis.."

31.    Several other wireless-related patents, and earlier SITI-MLR "data-connectivity" patents, have their own fields of use and users.  a) A 2006 total of 25 patents+pending applications were listed in the SA  ( its Ex. C chart, p. 1-2 filed publicly in the PTO, recording SITI's permanent interest in Gross Proceeds therefrom).  The list grows by IP "accretion" and is still growing ( a few early patents expired in 2009); and 14 US Patents, 4 foreign patents, 4 Pending US Applications and 8 Pending Foreign Applications remain on a current list (30 entries) referred to with new licensees.  b) An "after-acquired properties" clause in the SA, includes the assigned grants to SITI, when any Gross Proceeds to SITI are earned.  SITI's "Additional Patent Rights", are further defined in the SA as "MLR Existing and Future

-14-

Patents". c) This 2006 list, in effect, states that SITI shares with MLR in antitrust "property or business" interests, defined by Congress in Sec. 4 of the Clayton Act. SITI's interests with MLR's thus grow organically.

32. a) SITI and MLR's Existing Business SITI and MLR invented and patented (in the US, Canada, Mexico, Europe, Hong Kong ), 35 inventions on: i) mobile data connectivity; and ii) also by wireless "multi-modal" and "multi-band" connections of wire and radio, combined with spectrum sharing, over all types of telcom networks. b) The patent property portfolio began by several 1990's inventions at SITI alone. i) The MLR founders-inventors next pursued their own licensing business. ii) SITI's 2003 lawsuit to recapture Gross Proceeds was resolved in 2006, par. 11-15. c) The same MLR executives are still licensing portions of this SITI portfolio They negotiated SITI licenses to the old AT&T trust (now Avaya-Nortel, US/Canada), Lucent (now Alcatel-Lucent, France/ US, and the old "Baby Bell" carriers), as well as Motorola, Compaq (merged into Hewlett Packard), Nokia, ERICSSON and others. Each licensee has some of the SITI-MLR patent rights, but not always all such rights in its license, e.g. because of a licensee's refusal to pay extra therefor, or later patent accretions adding value, but expressly excluded from the license negotiation; or in corporate restructuring by a merged or acquired licensee, that did not preserve its rights in earlier licenses.

33. SITI-MLR's "reasonable business behavior" in licensing is amply demonstrated by the 45 major patent infringement negotiations, mostly led by MLR executives when employed at SITI or in MLR, with recognition of the value in the SITI patents/IP. Settlements occurred after legal scrutiny of their validity in US+foreign patent offices, during many federal actions, involving extensive discovery, and "Markman hearings", with numerous defendants. These facts evidence: a) SITI-MLR's "economic efficiency", and also "reasonable transaction costs" in patent market dealings by SITI-MLR; and b) their competitive "alignment" as inventor-licensors with users who are global leaders. c) The MLR/

-15-

SITI patents have *de facto* been validated through these licensing agreements, after adversarial scrutiny in federal courts. That scrutiny is relevant evidence in all subsequent PTO filings thereon.

## Recent Facts Admitted in News Releases by Key Defendants

34.     In June, 2008, the news media published a summary of a deliberately misleading Press Release from AST titled: " Tech Giants Join Together To Head Off Patent Suits" "Several tech-industry heavyweights are banding together to defend themselves against patent-infringement lawsuits. Their plan: to buy-up key intellectual property before it falls into the hands of parties that could use it against them, say people familiar with the matter…The new Allied Security Trust aims to buy patents that others might use to bring infringement claims against its members. Companies will pay roughly                  $ 250,000 to join the group and will each put about $5 million into escrow with the organization, to go towards future patent purchases …To head off such concerns, companies in the new group will sell the patents they acquire after they have granted themselves a nonexclusive license to the underlying technology. …' "It will never be an enforcement vehicle,' said the group's chief executive, Brian Hinman … It isn't the intent of the companies to make money on the transactions". He declined to confirm who the group's member companies are… 'Mr. Hinman said the group doesn't face any antitrust issues…" (Quoted at IPBiz     "Coalition for Patent Fairness Morphs into Allied Security Trust"     **6/30/08** at ipbiz.blogspot.com/ 2008/06/coalition-for-patent-fairness-morphs., by Lawrence Ebert. Ebert updated his article **7/02/08** by a reported EE Times interview of Hinman entitled "Patent pools may flow in wake of latest alliance" ( at eetimes.com.show Article.jhtml; sessionid.. )

35.     On **8/13/08** VZ also issued a press release "..Brian Hinman is joining the company as vice-president-intellectual property groups. Effective Sept. 1, Hinman will be responsible for leading the intellectual property strategy for the corporation, including both its Verizon Telecom and Verizon Wireless business groups…Brian brings the expertise to maximize the impact of our IPR [intellectual property resources] on Verizon's success.", newscenter.verizon/2008/brian-hinman-joins-verizon-as..

36. On **8/13/08** AST also issued a press release: "Former Lucent, IBM… executive will lead industry-wide effort.. "Allied Security Trust (AST) announced today that Daniel P. McCurdy will replace Brian Hinman as CEO. Mr. McCurdy was previously President, Lucent Technologies' Intellectual Property Business, Vice President of IBM ..and founder and Chief Executive Officer of PatentFreedom. In this new role, Dan will continue to serve as Chairman of PatentFreedom[.com]. The article goes on to recite more misleading propaganda, Mr. Hinman will be leaving the Trust to become the Vice President, Intellectual Property at Verizon Communications… "With eleven current worldwide members, AST provides an effective mechanism to help operating companies share the cost of acquiring licenses to patents being sold on the market at a much lower cost than if the company were to purchase the patents by itself. As will be demonstrated herein, the article then articulates a fundamental deceptive slogan adopted by AST's management, "AST maintains a "catch-and-release" commitment that returns to the market in a timely manner patents acquired on behalf of Trust members after licenses are secured." (Sanjose.bizjournals.com "Companies share patent pools to head off costly IP litigation" Reuters. comarticle/pressReleaseidUS208534+13-Aug-2008)

37. The format of these reported, same-day announcements, indicate that a) AST executive appointments are coordinated and made by or through VZ. b) After organizing AST, Defendant Hinman was charged with responsibility for all VZ IP strategy. Buying and licensing activity at AST from '07-'10 was in large measure directed by Hinman for the benefit of VZ, *inter alia,* and led by VZ as per Hinman's announced role. c) These facts find additional support in the appointment of McCurdy in 2008 (a former IBM colleague of Hinman), the two executives' coordinated statements, and the actions of AST, which, as alleged below, evidence VZ's ongoing *de facto* control of AST 2008-2010.

38. Between the press releases heretofore described, the EE Times interviewed AST's first CEO Hinman, **7/02/08**; Hinman described AST strategies embodied in the par.34 EETimes article : "Allied's members include [Verizon, Cisco, Ericcson, Google, Hewlett-Packard [Compaq], Sun

-17-

Microsystems] and other companies <u>who do not want to be named</u>" ...<u>EE Times</u> quoted Hinman as saying a) "Allied <u>works with a network of 38 patent brokers</u> who compile a weekly list of patents that Allied circulates to its members.".. b) "<u>Allied's name was deliberately generic to provide a degree of confidentiality</u>", and.. c) "The company creates an independent legal entity when it buys and sells patents to further obscure its identity so that buyers and sellers <u>do not realize its big-company backing</u> and raise or lower prices accordingly" .. (par.36, Reuters.comarticle 13-Aug-2008 *supra.*)

39.     Hinman in referring to AST told <u>Evan Coblentz</u> at *Wireless Week*, **8/19/08**, <u>he would rather it stayed secret, in an article entitled</u> "Tech Patent Alliance Recruits Heavyweights to Fight Trolls" "This started back in March 2007," said Hinman. "The concept was developed by the four founding companies," which were Hewlett-Packard, Motorola, Sun Microsystems and an undisclosed member. Hinman hopes to recruit another half-dozen companies by the end of this year ['08] but said "<u>he has already acquired a few sizable patent portfolios</u>. We tried to keep this thing as secret as long as we could. <u>So we'd been preparing for damage control for some time</u>," he said. Earlier in the **8/19/08** *Wireless Week* article, author Coblentz noted:     "Brian Hinman likes secrecy. As CEO of the vaguely named Allied Security Trust, his job is to acquire potentially valuable patents on behalf of some of the world's largest technology companies <u>while garnering as little attention as possible</u>." <u>Hinman said</u> "We <u>don't want companies to know</u> that it's the Allied Security Trust buying the patents. We have a structure that we present which keeps our identity anonymous, ...", with his picture above the caption: "<u>Hinman:</u> *Members of the Allied Security Trust pay for protection.*" Buying up of wireless patents followed for 18 months, with low-price licenses to members, followed next by an AST notice as to wireless patent license pricing, and purchase pricing, by AST early in 2010.

40.     AST issued a press release **1/26/10** at alliedsecuritytrust.com titled **"**Allied Security Trust Announces Availability of Major Patent Portfolio: <u>Providing Opportunity for Anyone To Take a License Prior to the Upcoming Portfolio Sale</u>". "Source: Allied Security Trust ... January 26, 2010, "Allied

-18-

Security Trust (AST) announced today that Crescent Moon LLC, a company affiliated with AST, will sell 286 patents it purchased in 2009 from NEC Corporation. AST operates under a 'catch and release' model that is unique among defensive patent organizations. AST members purchase patents for defensive purposes, secure the necessary licenses to ensure freedom of operation, and then return the patents to the marketplace for sale. These sale proceeds help to reimburse AST members for their investment in acquiring a license. Under the rules of Trust, AST or its affiliated companies seek to sell all acquired patents within one year of the date of acquisition."

41.     The 1/26/10 release then states: " This is the first time since our formation that we will make licenses available to companies outside AST before instituting a portfolio sale", said Dan McCurdy, CEO of AST. "This is a special case…but given the unique size and scope of this portfolio [ 286 patents bought from NEC in mid '09], AST and its members decided it was appropriate to give others in the industry an opportunity to 'inoculate' themselves."

42.     "We are making the patent license available at a price significantly less than the highest price paid by a contributing AST member company to demonstrate the purpose of AST—to enhance freedom of action and minimize patent threats, rather than to profit from patent purchases. That said, there are other members of AST that paid significantly less for their license than the price now being made available to outside companies," continued McCurdy." "We are hopeful AST's actions will encourage other companies to consider joining AST"… *ibid.*

43.     "..Licensees can obtain a license for a price of US $1 million per lot, or US $3 million for all four lots [ 286 varied patents are being licensed at approx. $10,000 per patent]..Licenses will be available beginning immediately through April 15, 2010..and the portfolios will be sold on or before July 31, 2010." *ibid.* AST said in this release "To date, it [AST] has invested US 40M to purchase 400 patents".

44.     Of the 400 patents AST purchased through 1/26/10--a) 308 (77%) came from buy-ups from two AST "friends"--22 from Microsoft (MSFT) and 286 from NEC Corporation (NEC). b) The 22

from MSFT were resold to a Linux-Open Invention Network (OIN) 9/09. The NEC patents being licensed, then auctioned by July 31, 2010 are being sold through an AST broker-adviser, RedChalk.com.

45.    VZ Connections  NEC is one of Japan's largest industrial companies.  NEC is a significant supplier to VZ and other AST members. NEC gave a Technical Achievement Award to VZ, 10/21/09, with a joint public release. NEC America is one of VZ's key US suppliers. NEC is respected for its inventions and patents. AST's buy-up from NEC was not an arms-length transaction, and NEC is not an NPE.

46.    AST says in the release **1/26/10** "... 82% of the money originally invested by Trust members to purchase patents is returned to them at the time patents are sold, making the Trust by far the most economical collaborative mechanism in the world for members to obtain licenses to patents that may otherwise fall into the hands of an adversarial party"..

47.    VZ Connections to carry out the Plan, omitted from the AST press release: MSFT was also an ally using the 22 Linux patents as "partial currency" in a $650 mm. investment to assist VZ and not incidentally, sell MSFT behavioral marketing ads to companies in the mobile telecom industry ( AST members), replacing Google who had been in a similar discussion with VZ. The payment in kind in July 2009, for VZ "contract favors" was camouflaged by reducing the patent purchase price to AST; thus AST's transaction with MSFT was not an arms-length purchase, and MSFT is plainly not an NPE-- because it is global leader in design and marketing of its own inventions. Not coincidently, MSFT is now a vendor-source of handsets to both VZ and its 45% wireless partner VOD ( par. 19).

48.    AST patent purchases from unstated sources: At least 92 were made at an average purchase price of $100,000 each, as part of the 400 disclosed patent purchases listed on AST's webpages ( cf. Hinman at par. 39, speaking August '08 without correction).

49.    VZ Connections to carry out the AST Plan  a) In July '09 AST bought ownership from MSFT of the described bloc of 22 software (Linux-open source) patents. They were invented at Silicon

-20-

Graphics Corp, a small company, with a $70 mm. enterprise value at 12/09/09. MSFT had paid a publicized $63 mm. for them in 2002, buying from a vendor named Seven Circle, LLC. ( whose name is on the AST website. The list of 22 formerly MSFT-owned, Linux patents is on the AST.com website under "Portfolios that AST has Purchased/Owned at one time" ). MSFT had sued a few Linux user companies for infringement, and after inconclusive results, dropped its infringement project. b) MSFT sold them to AST in July '09 at a $61 mm. loss, embodied in a larger concurrent marketing transaction with VZ (par. 47, 50). c) Back in 1/26/09 AST agreed to buy the Linux patents from MSFT finally paying $2.2 mm. for them in July '09, in a private MSFT auction, ($100,000 per patent, by the AST 2010 release, par. 44).

50.     VZ had to approve use of AST funds to make the purchase, by the rules of its Trust, and because it was not an AST arms-length transaction. VZ also needed Linux patent licenses on patents bought from MSFT (in July '09) for its secret new "Droid" ™ phones, a "game-changing" new handset being jointly designed and made for VZ by Motorola (MOT), an AST member needing a license. But VZ used AST as its purchase/re-licensing vehicle for the Linux patents, as the "most economical collaborative mechanism in the world for members", par. 46.

51.     Interlocking VZ Connections   MSFT is a contract partner of VZ. MSFT, upon information and belief, is also an undisclosed partner or friend to AST in future "behavioral marketing" for all AST members and affiliates, by targeted ads and sharing of ad revenues. A database advertising contract for VZ occurred in the same month as MSFT's "bearish" loss of $61 mm., on sale to AST (at $2.2 mm.) of its 22 Linux patents, with VZ's required approval under the rules of the AST. MSFT thus paid VZ and AST in order to replace and supplant competitor Google ( a powerful AST member) in VZ's behavioral marketing, which was a topic of publicized Google discussion with VZ in early '09. This was the VZ "contract favor" to MSFT identified at par. 47.

-21-

52.     The proximity of the MSFT ad marketing 7/09 deal with VZ, to the MSFT sale of Linux patents to AST 7/09 at a large loss, raised questions of "reality" to a Cnet.com reporter, when he noted that "Microsoft..claims the patents were not important" after AST's resale in 6 weeks to the Linux-Open Invention Network (OIN). Cnet.com Newsman Matt Asay also said, 9/9/09: "Did the OIN get value or garbage? ... If Microsoft didn't care about the patents, why should OIN?"

53.     AST Licenses:  In six weeks, AST had licensed the 22 Linux patents from MSFT to undisclosed AST members, on a variable "most-favored nation" (MFN) basis at extra-low prices first revealed in AST's 1/26/10 press release, quoted par. 40-46; non-members receive almost bargain prices without joining.

54.     VZ-Motorola (MOT) were co-designers of the VZ Droid handset with special new features in early '09, trying to improve upon the AT&T-Apple "iPhone" invention (2007), giving rise to VZ's $100 mm. marketing effort for "Droid" vs. the AT&T-iPhone.  This first major selling effort for the secret Droid was launched in September '09 and focused largely in 2009.  MOT-VZ needed the MSFT-Linux licenses; and AST complied on request in July '09 before reselling the Linux patents to OIN as a new owner.  AST members MOT and VZ appear to be the most immediate beneficiary of the AST purchase; other AST members may be licensees too, while Hinman's "love of secrecy" stays unrequited, par. 39.

55.     MOT also licensed the latest MLR-SITI patents, purchasing a renewed and extended MOT license.  MOT signed it, late February '09, and paid MLR-SITI the agreed-upon license fee, adding their newest patents (par. 27-31) to an existing SITI-MLR license to MOT dating from 1997.  ( The license from MLR-SITI was consummated by MOT in early '09 because of an MLR-SITI infringement action on such grounds pending against MOT.)  Then MOT either granted to VZ "pass-through" rights for its Droid marketing, or otherwise met such goal, as a part of their joint designer-supplier relationship on the Droid handset.

-22-

56.     MFN Treatment six weeks after purchase  AST had licensed the 22 Linux patents from MSFT to AST members, at low prices, subject to adjustments downward on a "most-favored nation" (MFN) basis--a fact revealed in AST's 1/26/10 press release aimed at non-members, showing (par. 42-43) insider AST members were granted a price-fixed Linux license at much less than \$10,000 per patent.

57.     Six weeks after its purchase of Linux patents from MSFT, AST resold them (9/09) to a Linux patent licensing agent, the Open Invention Network ( OIN.com), which is a network of 6 more telecom giants ( 3 of whom, promptly joined AST paying in \$15.8 mm. in capital ). OIN had publicly protested: Why as a Linux open-source specialist, was it not even invited to MSFT's "auction"? The answer was a quick AST sale on unrevealed terms; "Pro-Linux Group nabs Microsoft patents" (news.cnet. com 9/08/09).

58.     OIN's hostility to NPEs was publicly stated on its website, and affirmed by its CEO in his public statement as the resale deal with AST was closed. The implications of the avowed hostility undoubtedly was reflected in an attractive price to OIN and its members. With others, AST's "collusion base" by 2010 has 16 members; (a \$210 mm. ultimate budget)+ a members' hurdle of "over \$1 billion in product revenue", and \$5.25 mm cost (\$250,000 to join, plus \$5mm. paid in for IP purchases).

59.     Despite Hinman's saying AST had no intent to make money on patent buy-ups, AST did not charitably "catch", or charitably "release" the Linux or the NEC patents to the marketplace--it raised funds to spend as it sees fit, presumably on patents and pay overhead + incentives to Hinman, McCurdy and AST agents. AST also was paid an undisclosed amount by OIN, while linking AST with OIN, and receiving \$15.8 mm. in new investment capital from 3 new AST members derived directly from OIN. Hence the sale was, in part, tied to a membership buy-in to AST by three OIN members.

## AST'S COLLUSIVE INTERLOCKS FOR PURCHASES AND PATENT LICENSES

60.     IBM, ERICSSON and Sun Microsystems ("Sun") were AST members in 2009. IBM, Sony (an ERICSSON partner) and Sun are also members of OIN. The three new AST members from OIN,

-23-

are giants Royal Philips Electronics NV of Holland (" Philips"); Research in Motion("RIM"), Canada; Avaya Inc.(" Avaya" ); and Sun's new owner--giant Oracle, which by merger, acquired membership *de facto* in both AST and OIN. AST's collective Market Power (cap. value., revenues, subscribers-users) is fairly easy to add-up online as to disclosed members, and it is very imposing for just 2/3rds of all 16 members, without the cartels for 1/3 to 1/2 the world's subscribers added-in.

61.     AST CEO Hinman said, back on **8/19/08** ( par. 39), that "he has already acquired a few sizable patent portfolios" --Upon information and belief, AST has bought more than the first "few" portfolios, licensed them to AST members, cartel allies, and resold them to interlocked allies 2007-2010. Neither NEC, MSFT, ERICSSON-Sony, nor OIN are NPEs. Nevertheless AST has grouped these transactions with their 23 % of purchases from, presumably 92 independent owners, and have listed all of them on ASTs' webpages—with the clear intention of making it appear that they have effected a reduction in the market value of 3G and 4G mobile wireless IP. But each of the listed entities is a VZ/AST ally in the transactions described at par. 40-59.

62.     AST's Plan was recognized and criticized as an abuse of Market Power on **7/5/08**, just after AST's first press release, by critic Jim Moore, at Harvard Law School, who said: "Allied Security Trust [AST] formed by large companies as a way to crush small companies and individual inventors.. "Large companies use these pools to keep small, emerging companies out of their markets and/or to force small companies to sell out to large companies before becoming a threat ... Patents are a way for a small company to protect itself from predatory large firms while the small company remains small..Eventually, the well-protected small company grows to the point that it can sustain market attacks from large ones. This is the nightmare scenario for large firms. The motivation of ...the Allied Security Trust [AST]...is to protect the oligopoly positions of their large member firms. The largest firms in the IT space... They are not in competition with existing firms so much as with 'companies unborn' who may--and probably will-- disrupt their markets as profoundly as they disrupted their predecessors'...What large companies are

afraid of is innovation by small companies and individual inventors...Allied Security Trust..are mechanisms invented by large companies to make them safe from small, disruptive newcomers..[that] enable large companies to buy up patents that might pose potential threats, and get them out of the hands of small firms and individuals ...The great fiction is that large companies mostly compete with each other. Not true. Large companies work out arrangements with each other. " by Jim Moore; "Innovation..Public Policy," blogs.law.harvard.edu/jm/2008/07/05/.

63. Market Power; and the Global Players in Licensing and Purchasing Patents a) There is an active private and public market in wireless patent licensing and sales, with many sources of information, and auctions. b) Cf. activities at the public auction-patent valuation advisory house "Ocean Tomo. com". At its website, activities are listed; and also at auctions, seminars, and gatherings where OceanTomo experts lecture on "Best Practices" for buying, selling, licensing patents. Patent Broker and Litigation Support firm, Red Chalk Group in Illinois and Munich, Germany, manages sales and licensing activities for the AST. It is a second such advisory-litigation support firm to McCurdy's own PatentFreedom.com; Twister (par.7b) does the same thing for AST. c) On the Internet, "Spectrumbridge. com.spec.ex" is an emerging exchange facility for spectrum-sharing, a key subject of SITI-MLR's patents (par.27-30). Cf. the list at Google.com/ search, "Results 1-10 of about 46,400 for "Brokers and advisors in licensing or selling wireless patents". The Internet has more sources of license-sales and royalty data and tactics, but is not an organized, regulated commodity market. AST's members are patent "pros", using weaknesses in emerging markets as they share their industry and litigation knowledge, useful for their price fixing, strategy and collusion. They hold US and global market power far beyond the smaller NPEs. Each AST member can sit on its board of directors; and "as such makes all major decisions about the AST operating model," says Alliedsecurity trust.com at p.1, membership. d) AST also works by 68 brokers' to act against patent owners (par. 38) plus Twister's semi-secret brokers (par.7b)), and "catch and release" price-fixing controls (par. 39, 101). e) Beneath this surface there is a

synthetic structure by AST, designed to make normal license and sales pricing go downward for all NPEs including SITI-MLR. Respected companies MSFT, NEC and OIN appear as pawns in the transactions used by AST (with VZ control and approval) for its own devaluation tactics.

64. Other Collusive Affiliations: CEOs McCurdy and Hinman are both IP alumni of AST member IBM. McCurdy was also President of IP at Lucent (born from Western Electric-Lucent, as old Bell system spin-offs ), by which Lucent, and AST members ERICSSON (plus Sony) and MOT, each obtained access (1997-2010) to SITI-MLR's book of wireless patents as three licensees, paying for licenses after lawsuits and negotiation, easily keeping tabs on its public, and its recent PTO portfolio. In concert with other VZ/AST members owning SITI-MLR licenses, they have knowledge + networking links, informal (e.g. CTIA. com, a Wireless Association group), and formalized in AST, for action in concert alleged herein.

65. VZ is managing a Plan within the AST by Hinman, and AST's CEO McCurdy, replacing normal arms-length licensing by a 4-firm oligopoly (see the WSJ chart, par. 18 ). a) The two 68 % leaders VZ +AT&T have price fixing power because of their subscriber size. b) VZ has 37 % on its own, without counting the 16 AST members' individual size, or the four cartels' market power. AT&T is also facing an exodus, about to lose many subscribers to VZ over capacity-quality problems, par. 18-19.

66. The Second Circuit recently stated that price coordination is likely to arise from any situation of 50-80 % market dominance. It stated that in such fact situation "noncompetitive pricing is likely to appear" __F.3rd at p. __, a comment 1/14/10 (slip opinion online) in the recent 2d Cir. opinion in "Starr v. BMG…Digital Music Antitrust Litigation".

67. Much of the anticompetitive activity of VZ arises from its need for more wireless patent rights. "Carriers Eye Pay-As-You-Go Internet Amid Government Push to Open Networks—"Some See Cover for Pricing Based on Usage" VZ spent $350 mm. in '08 to get a few licenses from Nathan Myrhvold's "Intellectual Ventures" (IV, a patent aggregator, cf. par. 85-86). "The big patent players see

...[ patent pools like IV ..] as a very inexpensive way to protect themselves"; spawning.. "defensive patent aggregators looking to take good IP off the open market". Another critic: "High-tech titans are banding together to fight trolls—or are they just building fortresses?...the result is that the tech giants reinforce their dominant positions in the marketplace".." Nerac.com, by Kevin Closson, in 9/08, p. 2.

68.     Yet at 12/28/09, global cellphone titans rush to sue one another, "..as competition has intensified, companies are trying to put up barriers to protect their positions.." NYT 12/28/09 B3.. "nearly all cellphone makers are suing or being sued over their patents..As cellphones become more like tiny computers, intellectual property will take on increasing importance to equipment makers in their quest for market advantage." E.g. "Apple sues Nexus One maker HTC" NYT 3/3/10 B1 on "touch screen" devices, actually aiming at HTC's customer Google, who gave its design and business to HTC for its new touch screen handsets to compete with Apple. VZ did it too, designing the touch screen "Droid" handset as a new business for MOT, restructuring to overcome earlier, unappealing products ( par. 55).

69.     Injury to SITI-MLR and the Public Interest  VZ/AST admitted "private patent police" intentions in Fortune Magazine. A VZ spokesman said, referring to law firms and others that pursue settlements and license fees rather than develop products, "the intent is to dry up this whole practice", (Money.cnn.hu/ 2008/06/30/ technology/patents.Fortune/index.Htm.) AST CEO McCurdy's PatentFreedom.com 2008 website p.4-10, and his 2009 version, admits his hostility towards small patent competitors. So do the websites of new colleagues RedChalk.com and OIN. Their public policy is to "to obtain licenses to patents that may otherwise fall into the hands of an adversarial party". "Catch and release" can be made to appear workable, but not without flexible allies like MSFT, NEC, OIN (par. 39-60) plus adroit price-fixing in multi-tiers, used by VZ/AST to attract members and capital.

70.     Industry Trends; Wireless Market Subscribers  a) Two former Baby Bell networks (VZ leads, then new AT&T) in a two firm oligopoly. VZ and AT&T aim for the feature rich, more profitable parts of wireless, by advanced handsets--e.g. press-on icons using special "Apps" on a tiny screen on both

the Apple-AT&T "iPhone", and VZ-MOT's Droid, using giant Google's "Android" system. Apple now has 150,000 application packages (Apps), growing daily, to reach out from the iPhone. Google already has 30,000 new Apps running on its comparable Android system (WSJ 3/30/10 B-4) that VZ-MOT have embraced, with strong Internet reviews and $100 mm. in '09 ads. The press-on feature by one finger, avoids need for a PC "mouse" to navigate the Internet for short messages, games and entertainment. NYT 12/14/ 09 B1 states "People will look back on the iPhone as a turning point in the industry.. remembered as the first true handheld computer". b) All makers, networks and users want handsets and Apps that work on others' operating systems—e.g. GSM, CDMA, TDMA, AMPS or ANDROID ( cf. SITI-MLR's patents at par. 28-31). NYT and WSJ, 12/14/09, both say a revolution is at hand, and a plethora of new competing products is in process in 2010, but circulating on a first look basis to VZ and AT&T, because they own the Market Power.

71.    "Creating a Phone, Google takes on Apple", the "Nexus One", Google's competing "game changer" of its own design. NYT B1, 4/28/09. a) "Apple's Game Changer, Downloading Now" NYT B1, 11; 12/06/09 by Jenna Wortham. b) Google's own new phone as game changer, NYT 12/14/09 B1,11; WSJ 12/14/09 A-1,6. c) Next MSFT and Nokia join ("To vie in Smartphones, Tech Giants Start Anew", NYT 2/16/10 B1) to blunt the advance of Apple and Google. VZ and cartel VOD are joined in supporting MSFT's new "Pink" handsets expected in 2010, NYT 2/13/10 B5. d) Intel, long MSFT's preferred source, has teamed up with Nokia against MSFT. e)"New Sony Gadgets [handsets] Take Aim at Apple" WSJ 3/5/10 B-1,8 *ibid.* f) Cf. "Software Directs Mobile Industry", at recent Barcelona mobile telecom conference; the giants are colliding; "there is no love here", reports the WSJ 2/16/10 B-6.

72.    MLR-SITI and Network Competition for Spectrum a) Spectrum is a useful "pearl of great price". Most US spectrum is owned by telecom, and TV cable, networks or is reserved for US, state, local-legal use. But barely 12% of spectrum available is actually used. Cf.. "Buried Treasure In Your TV

Dial" NYT 2/28/ 10 B7 by Professor <u>Richard H. Thaler</u>, in Economics, University of Chicago urging the FCC to require small, local TV channel groups to surrender their outdated federal spectrum leases (cheaply replaced by cable and satellite TV) for better public use by the Internet. He says it would raise \$100 bn. in FCC auctions held to re-allocate and better use spectrum in the public interest. <u>Respected WSJ op-ed analyst L. Gordon Crovitz says nearly the same in the WSJ, 3/22/10 A-19--Spectrum is going to waste in unused government (state, local and federal) and TV hands, stating the history.</u> Issues of "data guzzling", and network blockages multiply. The FCC encourages markets for sale or leasing of spectrum. But spectrum trade-offs on a <u>real-time, short term basis</u>, have hardly begun. MLR-SITI's patents (par. 27-31) feature spectrum-sharing, just coming into its own in the new markets. Cf. "Local TV Stations in Venture For Mobile Programming...Preparing to follow as television migrates to portable devices", a venture with NBC, Fox News Corp. and 10 other local groups, "The companies said they would contribute broadcast spectrum for the service." <u>NYT4/14/10 B5</u>    b) <u>Defendant Internet leader CISCO (an AST member)</u> stated "Today, a market transition toward consumer-driven technology is spurring CISCO to focus on developing seamless IP support for data, voice, and video across the <u>14 billion devices</u> CISCO expects will connect to the internet by 2010... "Although you seem to be connecting to <u>one network, you're actually rolling seamlessly from one network to the next.</u>" Cisco CEO Chambers, Harvard Business Review (HBR) interview, 11/08 p.75. CISCO gets into homes by wireless networks, TV cable boxes, routers and infra-structure network servers.

73.    <u>Infringement Rising as 3G becomes 4G</u>    a) With each generation (G) of wireless, new inventions for seamless operation have been patented.  b) Few messages now go through VZ (or elsewhere) that do not require wireless (by cell towers, mobile 'blue-tooth", wi-fi, wi-max ) at either the sending or receiving end, and in-between. ".. <u>New Systems to Supplement Wi-Fi, Cellular Signals..</u>" are on the way. <u>All</u> wireless needs spectrum, whether <u>owned</u> or <u>leased, long-term</u> or leaping radio bandwith boundaries <u>on a brief real-time basis</u>---with fair payment, respect for lessors' needs, and brief movement

into unused radio spectrum open spaces, then withdrawal, all under the watchful eye of the FCC. The Crovitz-WSJ article, par.72a), cites Nobel Laureate Ronald Coase (Chicago University, Professor of Economics) as authority for these principles back in 1960. SITI-MLR patents on spectrum-sharing are at par. 27-31.

74.     The old network concept changes with new Internet user sites and Apps. VZ and cartel partners make wireless site transmissions in the billions, expanding as they evolve into multi-sided marketing platforms—MSPs (par. 83, e.g. VZ, Google, Cisco, Ericsson). New users are sidestepping older internet carrier networks, for direct handset links to multiple website connections "rolling seamlessly from one network to the next" by pushing an icon button on the screen of their smart handset, with less need for existing networks' presence, cf. "For Wireless Carriers, iPad Signals Further Loss of Clout" WSJ 1/28/10 B-6 "Apple wrested away control over handsets with the iPhone. Now, another of its hot devices [the new iPad] could diminish carriers' control even further.." describing Apple's inventor and maker "..coup that further erode the wireless.. carrier-centered model.." The Ronald Coase theorem (at par.72a)) "says that in the absence of transaction costs or regulatory barriers, resources will flow to their most valuable use."

75.     a) New social websites as license candidates for MLR-SITI increase. All social websites had 750 mm. global participants in 2008. But Facebook alone now has nearly 400 mm. regular users, NYT 3/7/10 B4, with over 100 mm. in the US. The 4/13/10 en.Wikipedia.org/wiki/ "List_of social_ networking_ websites" (11 pages) has approx. 3 bn. global users. The users often live in exotic foreign places with multiple languages. But for example, DirectTV satellite service (affiliated with VZ), is replete with European and Asian countries having their own language stations, catering to immigrant communities in the US and EU, and others likely in most of the world's population centers, with subtitles in English or other major languages, where immigrant groups have congregated. TV cable stations make similar offerings (many Eastern-European stations are based in New Jersey). b) But global growth of

social websites in multiple languages makes carriers less useful, and Internet access bills easy to avoid by direct calls and handset designs. If foreign language stations broadcast, e.g. into the US, UK or Germany, they want to sell local ads too. Thus they need to comply with local Internet and Patent laws, i.e. buy licenses. Their world, often focused on language issues in the first generation users, needs its own advertisers + familiar products for sale transitionally, par. 87-88.

76.     "Smart Phones as Modems..help consumers turn..[ Apple's iPhone, and Google's Android] into modems [transformers] for their computers, a function many smart phone owners want but U.S. mobile phone carriers have been reluctant to allow...The function.. 'tethering' takes advantage of a smart phone's always-on Internet connectivity. When the device is tethered to a laptop or desktop PC a user can surf the Web via the phone's wireless connection,". Inter-linked networks, Modem, App, Browser makers (e.g. NYT 4/14/10 B5); and Cable/Satellite TV networks are all SITI-MLR license candidates.

77.     The basic control by networks are long-term contracts from a subscriber for a bargain handset with cost penalties for leaving. The FTC is investigating carriers' penalty systems, for basic unfairness, or "sham charges by mistake". WSJ 6/19/09 B-4; NYT 9/07/09 B1; WSJ 12/05/09 B-6 "Verizon Wireless Fees are Probed by FCC"....Wireless carriers say they need to charge the termination fees to help recoup the costs of offering free or discounted handsets to subscribers..The fees help them hold on to consumers..loath to pay extra to get out of a contract early.." But economic facts of 3G-4G life go far beyond market power "retention" ideas now being applied by VZ/AST.

78.     McCurdy at his 2008 website PatentFreedom.com (p.10) listed most of the wireless NPEs, 35 with 167 families--I.e. a likely 1,600 patents are still under AST's assault. The collateral damage from Defendants' AT violations extends to the many new items for mobile telecom that may otherwise be introduced (par. 72-77), being subject to delay or obstruction.

-31-

79.     Proximate Cause of SITI's Damages:     Licensing just the SITI-MLR patents in par. 27-31, to large network users with billions of current infringements lasting many years, is a potential aspect of SITI-MLR's business; other new potential licensee groups are listed below. The mobile telecom industry is full of large and mini-networks and cartels needing licenses, but AST doesn't want licenses for itself. Its Plan is to buy any useful patents outright for VZ and its other members, then to dispose of the technology as it sees fit, either by selling non-exclusive licenses, or by trading it to an enforcer/adviser/ agent of its choosing ( OIN, Twister, Red Chalk.com, Crescent Moon, PatentFreedom.com), with built in price protections, then discriminatory rebates for licensed members ( par.42). It is in this VZ/AST controlled atmosphere that SITI-MLR have approx. 150 global licensees in waiting, with an estimate of $ 260 mm. in license fees at risk, well before new users of great variety take root in an expanding marketplace for licenses. VZ/AST have orchestrated multiple devices to exert their Market Power.

80.     VZ boycotts or concerted refusals by traders to deal with other traders, have long been a *Per Se* AT category. Boycotts/refusals to deal negate traders' freedom to sell or license by their own judgment, DOJ 1995 IPGuidelines (at par. 105), and DOJ AT Investigation primer (at par. 117 ). Refusals to license to induce only cheap, price-fixed, buy-out of patents from NPEs is a boycott.

81.     Scope of the 2010 market emerging: The above definition of "who" would be infringers, applies to many potential MLR-SITI licensee groups: a) Each global wireless, cable or satellite, carrier network or handset maker; b) any search/portal/software or other network; c) AST, CISCO, ERICSSON and other infrastructure titans that supply and make linked networks work together and need spectrum-sharing ; and to d) "free" social networks, really "gated Internet communities", with clients messaging directly by wireless "Wi-Fi or Wi-Max" signals, or direct Internet transmissions, and with millions of users ready to accept ads for free, or cheap access to the Internet. (NYT 9/21/09 B6)

82.     The retail market for social website users alone, amounts to hundreds of millions in MLR-SITI patent license value. As social networks grow--75 sites, 750 mm. users in late 2008; and by early

-32-

2010, grown to approx. 3 billion users; they will try to bypass old media, and their telecom or cable carriers. E.g. Facebook, Twitter and others supply photo news feeds into Canada and the US direct from riots in Iran, without a telecom carrier. Wireless hot-spots that go right onto the Internet exist at many hotels, bars, cafes, airports. In business recessions, all users young and old want reduced telecom overhead.

83. VZ CEO Seidenberg admits "We don't look any different than Google.. eliminating central offices and call centers", par. 23. AST members CISCO and ERICSSON-Sony, and other technology leaders are now in the same MSP category, as AST member Google. Each is reaching out from a marketing platform in many directions. A Harvard Business Review (HBR) article in April, 2009 discusses website merchandise-service vendors and other Internet operators based on MSP Google, and by inference, other Multi-Sided Platforms : The article states "An MSP can use its power to take control of your customers, greatly reducing your ability to extract value." at p.78, HBR 4/09 ..."Think twice before you join a popular platform..MSPs are moving targets ..today's player can become tomorrow's platform. Until the iPhone was invented [ by Apple], most cell phone companies were players on.. platforms of cellular networks". (Co-Author David Yoffie is Professor of International Business Administration; Sr. Associate Dean, Harvard Business School) The VZ network and MSFT are trying hard to "catch-up" with Apple and Google, as are CISCO, ERICSSON, and all new marketers in the "mobile Internet space" within a 3G-4G renewal process.

84. By normal licensing, SITI-MLR would still own their patent properties and business as new groups arise, build hot-spots, attract millions of visitors, or link globally with or without current carriers. VZ's efforts to drive down Market Prices for licensing or sale by fixing low-prices as alleged, is Conversion, by Market Tampering--the 'but for' cause of SITI's injuries through VZ/AST agents.

85. VZ has "Unclean Hands" VZ was born in the 1984 AT breakup of the Bell Trust. a) VZ's wireline business is evaporating according to several published reports/opinions. Though

committed primarily to wireless, VZ spent $350 mm. in 2008 for wireless licenses ($100 mm.), coupled with a "right" to invest ($250 mm.) in their owner, Intellectual Ventures' (IV) and its huge portfolio largely unrelated to wireless, and not relevant to VZ/ AST's key business. See NYT "Turning Patents Into an 'Invention Capital' Market" 2/18/10 B1,10). IV is solely a business licensing patents, and deserves the respect it enjoys. IV is listed by McCurdy ( 2008 Patent Freedom.com website) as a "non-practicing entity" (NPE). IV owns 30,000 diverse patents, investing $5 bn. from giant supporters, returning $1 bn. to investors, and gaining in license fees and 650 employees. ( NYT *ibid.*) IV was founded by Myrhvold as a distinguished former chief technologist at MSFT--his investors include VZ, MSFT, Intel, Nokia, Sony. IV is independent, but its relationship with VZ adds to VZ's market power, which is at the core of the AT case herein. As shown at par. 34-66, VZ/AST have played fast and loose with anybody's wireless patents that can be maneuvered into their control (MSFT, NEC, OIN). The purpose is to drive down their market value, affecting NPEs adversely by repeatedly demonstrating low valuation. b) Connections to AST: Myrhvold was mentor and partner (and likely still a partner) in two patent infringement defense firms that AST CEO McCurdy helped found and finance; one is still run by McCurdy, a "patent police unit" PatentFreedom.com. aimed at NPEs. c) "Tech Guru Riles the Industry By Seeking Huge Patent Fees."..."Myrhvold ..facing resistance from companies he targets for licenses, but his inventory gives him leverage to extract settlements..." d) VZ invested in Myrhvold's IV in 2008 ($250 mm. + its $100 mm. for useful patent licenses). IV is the largest NPE, while VZ/AST led by CEO McCurdy is trying to destroy all other NPEs. The hypocrisy of an embrace, investing $250 mm. in an ownership interest in one NPE, while seeking destruction of most others, stems from VZ/AST's ultimate aim of "drying up value" of independent wireless patent owners, in order to exert even more control over the future development and practice of wireless IP. This market power control+abuse was demonstrated by AST with Twister ( authorized by Hinman, McCurdy and VZ), in the Limelight Networks example at par. 94 *infra.*, in March, 2010.

-34-

86.     The latest twist for VZ/AST is that affiliate IV is now litigating to market its licenses, just like all small NPEs. IV is using shell companies to acquire IV patents, to then sue for infringement and induce licensing.   a) McCurdy has now disclosed that AST has appointed "Crescent Moon LLC, a company affiliated with AST" to handle sales of 286 eviscerated patents from NEC ( first licensed to AST members only, and then even strangers, par. 41-42 ).   Allied Security Trust I.com lists the Crescent Moon-NEC IP as AST owned.   b) AST is now copying IV's enforcement system.   IV and investors (like VZ) retain a share in any proceeds of the IV shell owner's efforts, by licensing or litigation, Law.com. 9/1/09. c) Crescent Moon must do the same for its client AST, and AST Trust members.   Thus VZ and AST are each NPE patent enforcement sponsors with their left-hand, and crusaders vs. small NPEs with their right hand.     e) While it is apparent that no single entity can control all wireless IP, collaboration between several large amalgamators can result in the degree of control necessary to VZ/AST for control of the wireless space, in order e.g. to impose differing charges on users for high-volume data transmissions, and for heavy use of spectrum-sharing IP. (SITI-MLR patents par. 27-31)

f) The extent of VZ's relationship with IV and its implications was exposed on  2/26/10:  "..for the first time [IV] assigned one of its members a patent to use as ammunition in a lawsuit.  Verizon…, which agreed to pay IV as much as $350 mm. in a 2008 deal, is using one of IV's patents to strike back at Tivo in a patent fight," described as a "First for Intellectual Ventures", Z. Elinson, at Law.com 2/26/10. Without buying the patent it needs, VZ borrows it as a litigation weapon.  The ongoing abuse of VZ/AST market power makes its own rules, with its intentions becoming more and more transparent as the interlocking relationships are exposed.

87.     The Economic Driving Force for The AST  The main business of the Internet is evolving into support for consumer marketing businesses. A business much larger than selling handsets, and heavy internet use through a network carrier, underlies the AT violations described herein.  a) VZ, AST, its members+the cartels ("AST & Co.") have databases that are marketing assets worth billions—They are a

"basket of golden apples" for all vendors in the public's quest for new networks, search, Internet entertainment, leading to focused marketing tools based on style, taste, schools, jobs, social nets--called "behavioral marketing". Revenue potentials multiply. Harvesting this value drives VZ and AST & Co's Plan to first monopolize all wireless patent IP, or at least exercise a high degree of control of the IP, in order to discourage other Apple iPhone (game-changing) surprises. As leader VZ/AST upgrades to 4G heavy-duty networks (e.g. using MLR-SITI + other NPE patents), they widen their markets for ad clients, and ultimately control an increasing share of the flow of information and data on the Internet, including huge markets for ads and sale of goods/services to billions of targeted customers. To that end, VZ/AST are, in fact, creating a Wal-Mart type chain, but of "virtual" stores, selling everything, and operating online globally. The economics herein transcend cheap patent purchases or licenses.

88.     Profit logic to VZ/AST, MSFT, Yahoo and Google is all positive by "Metcalfe's Law" -- VZ/AST/ members +linked cartels, know this "law" of networks--As Internet "nodes" (user clusters) grow, indexed by purchases, habits, age, economic class, ailments, nations, religions, regions, languages, music, then each transaction and user App online compounds into geometric growth by more transactions closing. It works like travel terminals, TV, radio-Internet networks, and shopping or medical centers, but on a global Internet basis. AST members cannot pass-up chances to refine and monetize their databases, in linkage by advertising "pros", new Apps and database business from other giants.     Recent reports/analyses are extensive; MSFT has spent hundreds of millions with VZ and Yahoo to get started.

89.     Damages; Trend of Licenses is Sharply Down. The trend of NPE licenses since 2006 is downward since the announcement of the AST Plan. a) Specifically, the pace of licensing transactions has dwindled by 84 % in the 36 months since March, '07, the start-date of the AST Plan, not publicly announced until June 6, 2008. b) Before 6/08/08, MLR-SITI had accrued a total of 38 licenses on their portfolio of patents. 18 of them occurred after the SA in February, 2006 (par. 13-16); thereafter MLR-SITI were working to help each other wherever possible. c) Between the dates 6/8/08 and 4/30/10, as

-36-

AST's battery of announcements and publicity against NPEs was ramped up, just 7 licenses were signed for a revised total of 45 licenses. Of the 7 in the heavy decline period, only two were with large company users of the patents; 7 in a total of 45 is merely 15.6 %, representing an 84% decline. Despite continuing efforts, no licenses were concluded in the eleven months May, 2009 until March 20, 2010. The decline in frequency of licenses, and their falling secular trend, is a "material adverse" reversal in SITI and MLR's license business at the height of the global 3G to 4G expansion of mobile broadband wireless. d) VZ/ AST is impairing a market for SITI-MLR patents, after conducting 20 years of a lawful licensing business by "drying up" the business of NPEs'. License charges are a function of use, and multi-billion transaction "users". Actual and potential patent use ( items produced, or Internet messages covered by the patents) also raise the reasonable license price substantially. e) Losses To generate Proceeds under the SA, SITI and MLR each had to spend millions in separate costs and legal fees—and injury continues from the MLR-SITI licensee prospects (a "hockey stick" declining curve) impaired by the VZ/AST Plan.

90. But for the AST actions since March, 2007, SITI would have earned considerably more on its Clayton Act "property interest or business". The patents are worth hundreds of millions for SITI's share in an outright sale. Licensed 150 times to large and small users-infringers, then spread over new license prospects, continuing damage to SITI is much greater, because licensing over time, with claims made on a heretofore reasonable schedule (with legal costs) means greater revenues. With MLR's claims, overall damages nearly double, plus costs and recovery of Defendants'/Affiliates' illegal gains from AT violations.

91. The facts alleged embody several *Per Se* violations of the AT laws. They are also not reasonable under the AT *Rule of Reason*, established by proof if required.

92. Injury to Competition The Plan in the anticompetitive agreements described, establishes tactics for price-fixing, circulating negative data to condition a market downward in buying or license

-37-

transactions, unlawful exclusivity, with tying-bundling demands, concerted refusals to deal on patent licensing, the deception of patent sellers, and spoliation of licensing at arms-length fair market valuations.

93. Defendants' restraints of trade have affected commerce within and outside the United States. The injury and damages to Plaintiff SITI is continuing, and is without adequate remedy at law.

### Recent Market Power Abuse by AST with its agent, Twister Investments

94. Forced licenses AST has recently demonstrated its intention by embarking on a campaign of intimidation of emerging Internet companies by making unlawful threats to compel them to buy licenses from AST and its new patent depositary Twister Investments LLC. (Twister, par.7b)) a) Limelight Networks, Inc. (Limelight), based in Tempe, Arizona, is publicly traded and has about $133 mm. in annual revenues. It owns a content delivery network adaptable to all new mobile telecom, cable or TV devices, streaming videos, movies, TV shows, etc.)—it was contacted by a broker engaged by AST and/ or Twister, to induce Limelight to buy four AST patents assigned and sold to Twister in April, 2009, or if not, to license them. The marketing "pitch" was made along with a presentation on the AST broker's website, claiming Limelight was an infringer and would owe Twister large damages. Limelight provides Internet content delivery services by a "robust content delivery network" ( in competition with VZ and AST), for "entities with the need to transmit large amounts of content over the Internet quickly, efficiently and reliably." b) AST and Twister allowed their broker to make an Internet presentation, saying that the seller of its patents had by April, 2009 filed infringement suits against several large Internet caching and content delivery networks ( corporations Akamai, Novell, Volera, Cacheflow and Inktomi ), and to boast of significant settlements, including one for $1.1 mm. for a license to Inktomi Corp. c) When Limelight refused their demand for payment, AST and Twister stated that they would assert the patents against Limelight, or sell the patents to a Limelight "litigious competitor". The series of threats occurred in February-March, 2010. Limelight brought a declaratory relief action vs. AST and Twister. The VZ/ AST broker's "persuasive devices" also included a website presentation publicizing the claimed infringements

-38-

by Limelight on the Internet.  d) Limelight eventually bought a license to settle the case, and repeated Internet comments ensued on allegations in the suit and the settlement with AST and Twister.  e) AST and Twister controlled by VZ are in <u>horizontal competition</u> with NPEs like MLR-SITI and small new software developers like Limelight or Brightcove ( see Google.com/Limelight and Brightcove as competitors in video management software).  f) Twister's portfolio being invoked by AST has 15 US patents all in the area of "caching" (storing online) and Internet operations technologies. It is the most apparent manifestation of VZ/AST's overt competitive position vis-a-vis plaintiff  SITI-MLR, other NPEs and small company inventors—This portfolio serves as a clear demonstration of Defendants' Plan to acquire patents for the sole purpose of controlling the telecom patent market by AT churning activity, selling out cheaply and enforcing AST patents by suing thereon with <u>neither</u> "Catch <u>nor</u> Release" intended.

AS AND FOR A FIRST CAUSE OF ACTION

Collusion With Allies to Achieve Devaluation of SITI-MLR Patents

95.       SITI realleges and incorporates by reference each allegation in paragraphs 1 through 94 with the same force and effect as if set forth in full herein.

96.       a) MSFT cared about the price of its Linux patents as did <u>AST</u>. But AST deliberately structured the transaction as low price "patent activity"–"churning" a market by interlocking AST press release.    b) Concurrent announcement of an AST <u>patent licensing offer</u> to non-members, of four blocs of NEC patents at $10,000 each, for 286 patents, and their summer 2010 auction announced, are evidence of systematic sham activity by VZ/AST, in continuous process for unlawful gain since March, 2007.

97.       a) The concurrent, July '09 <u>sale to</u> and <u>purchase from</u> MSFT is analogous to what Stock Exchange and SEC rules call "painting the tape", a manipulative device to depress a stock near the closing bell—market rigging by a few strategic low price sales. The cheap NEC license offering to non-members of AST to lure them into membership is taken from the same play book--AT "market tampering", tending

-39-

to depress the overall market price for telecom patent properties, which is an announced goal and strategy for AST, par. 69. b) But AST has not built a patent ownership-resale business of substance in its 36 months of existence. As of 1/26/10 VZ/AST's steady, deceptive publicity is simply a form of market pressure to devalue the overall price of telecom patents by using suppliers, allies and brokers as AST pawns. The facts reveal that 77% of the "catch and release" trades in AST wireless patents at low prices between 2009-2010 are simply displays of the VZ/AST's market power, intended to discourage NPEs (mostly small, like MLR-SITI) from licensing patents, and discourage AST members and non-members from seeking arms-length licenses by their negotiations with NPEs, in court or outside court.

98.    A lesser motivation is that AST needs to demonstrate patent buying activity in order to raise money from new members and hold onto its existing members' escrowed investments--Hinman and McCurdy are IP executives at bay, who must now perform. The quick sale to OIN of Linux patents brought in $15.8 mm. from three new members, and a measure of AST control over the OIN group in any resale to others. Allies condemning the same business enemies is useful to AST, and their manipulation is cheap and easy because "no decent person likes NPE 'Trolls' ". Whatever motivation drives AST on any given day, the effect is the same--a devalued and depressed market for MLR-SITI's licenses.

99.    Current license values A value comparison between typical AST licenses to date, and those of SITI-MLR is useful: a) AST values each of its licenses issued at almost $10,000 each —400 licenses to its giant members 2007-2010 at a total price of $4 mm. b) SITI-MLR's license price was in a zone of $ 500,000 to $ 2.5 mm. per license for each one issued to small and large users ( mostly mobile handset makers selling their products in the US), comparable to some AST members, over the period of 1997 until 2010. c) Almost every large user 1997-2010 is larger in 2010, because of the growth of mobile telecom, and there are many more large global patent users ( par. 27-31) charging more to sell licensed devices. d) The foregoing analysis of free-market licensing, at competitive pricing, does not include other

-40-

users of omni-modal and spectrum-sharing patents, such as: e) The newly emerging router, server and special chip makers; the new laptop-reader-handset devices with press-on icons ( e.g. WSJ 4/01/10 D-1 by Walter Mossberg, "iPad Is a 'Game Changer' That Makes Browsing and Video a Pleasure; Challenge to the Mouse") at higher prices than a handset alone; f) the multiplying social websites, and next, g) the cable and satellite TV networks absorbing the video streams available through 3G-4G handsets onto subscriber TV sets, and their feeders of new software. The time it takes for 3G to 4G migration, or minor license charges incurred do not matter, because if an arms-length license market is re-opened by injunctive relief, there is much new MLR-SITI licensing business ahead. h) AST's motive is to cause devaluation of SITI-MLR's properties and business, and that of other small-scale innovators.

100. 3G Wireless systems do not work that well in 2010. "Overall customer satisfaction with cellphone services have been rising, but it varies between cities and carriers. VZ customers [US] tend to be happiest with their service, while AT&T and Sprint customers were less satisfied.."; "3G Phones Exposing Networks Last-Gen Technology", and now–"Customers [are] Angered as iPhones Overload AT&T". All smart phones are big city 'data guzzlers' eating up capacity with 'dropped calls, spotty service, delayed text and voice messages and glacial download speeds ... the world is changing...' 'We're just starting to scratch the surface of these issues that AT&T is facing'". (NYT 3/14/09 B1 by Matt Richtell; NYT 9/03/09 B1; Cf.-WSJ 12/29/ 09 B-1 "IPhone Snafu Stirs Network Concerns"; AT&T, VZ, Sprint, T-Mobile are facing "the limit of spectrum" since 2009.

101. Forced sales The AST Trust is demanding full patent ownership only, resisting traditional licensing with the express intention of forcing outright patent sales at reduced prices, then licensing to members, cartels and new IP market entries. The patent licensing and sales market is dramatically undermined by Defendants' efforts to impose low prices on IP from many directions. The AST Trust is enforcing its demand by use of the interlocking relationships of its members, their influence over affiliates/partners throughout the global market and the US, and their power over cheap sub-licenses,

through giant cartels, with AST post-sale control of the IP through allies by agreement on patent resales, or licensing.

102.    Market Power Barriers   The AST activity, disclosed and evolving, is a formidable barrier with patent market devaluation effect on SITI-MLR.   Mounting Damages   As a result of Defendants' collusion, price fixing and market rigging, MLR and SITI have suffered and will continue to suffer damages in an amount to be determined at trial, but in no event less than $ 500 mm. All the violations alleged are *Per Se* violations of the antitrust laws, but they also are not reasonable under the AT *Rule of Reason*, to be established by further proof as required. Recapture of unlawful gain by the Defendants is implicit in each cause of action herein, demonstrated in more detail in the Second Cause of Action.

## SECOND CAUSE OF ACTION

### Exclusivity--Tying and Bundling of Patent Products for Purchase

103.    SITI realleges and incorporates by reference each allegation in paragraphs 1-102 with the same force and effect as if set forth in full herein.

104.    Exclusive Licenses by Market Power.   The VZ/AST group is based upon a refusal to license, and only buy-in whole patents. It is 'foreclosure', the old sin of "cornering a market" on the buy-side. a) AST's format vs. patent owners equals "exclusive" licensing. Each patent is "foreclosed" from reaching (in AST's view) the "wrong hands", by being taken off the market--bought by a group of giants, at a low-priced IP feast. b) "Catching and releasing" eviscerated IP--already licensed wherever VZ/AST, members and the named global cartels want, is anti-competitive. It is achievable only by abuse of their market power. c) Exclusive licensing is functionally equivalent to "tying or bundling" transactions on the buy side --the use of market power to prevent a license that could still be subdivided by the owners/ inventors, and convert it into the rigidity of a patent assignment, with no exceptions or further use by the owners. VZ and AST are conducting a sham campaign against NPEs, by drying up their businesses, without even buying them out. E.g. par. 94 reveals a subterfuge of buy-out by AST-Twister, when a

license sale is all it wanted despite the bald threats and injury by market power. Hinman laid out the buy-side conspiracy in living color at par. 34-39. d) Exclusivity in Perspective The First Cause of Action says in substance: AST's 36 months of publicity is just a form of market devaluation-erosion using friendly suppliers, and any patents it can find a way to control. Economists call that a "destabilization device", saying 77% of the 400 wireless patents, traded by allies and a few NPEs to AST, at low prices, were controlled and manipulated downward for anti-competitive purposes. OIN is a fourth pawn like Twister, MSFT and NEC, in VZ/AST's control ploys. VZ/AST are "gaming" the patent market in an artificial "patent pool" against NPEs and inventive new companies, by tricks or devices only global market power can create, since 2007 with a buy-side conspiracy. The devices are an attack on Competition, not just competitors of VZ/AST in a defined patent marketplace ( par.17).

105.    DOJ 1995 Antitrust Guidelines for the Licensing of Intellectual Property (4/6/95), criticize such use, stating that "Exclusive" licensing is an arrangement that can deter or discourage patent developers "from engaging in research and development, thus retarding innovation". a) When the exclusive license is to a horizontal competitor of SITI-MLR, e.g. like the AST, "members of the pool have to share their successful research and development and each of the members can free ride on the accomplishments of other pool members", p. 29, 1995 DOJ AT-Guidelines. The "free riding" herein is more extensive than the 1995 Guidelines. b) E.g. AST fosters more pressure on the licensors like MLR-SITI by starting a license or sale offering to non-members, bolting more market power onto the AST, during a liquidation sale rigged for members-potential members only ( par. 40-43).

106.    DOJ Guidelines as public policy. The landscape of US wireless telecom IP cannot be left to two former Baby Bells at 67 % US market share, with VZ gaining wireless share beyond its 2009—37 %--as VZ/AST's two IP executives are fixing license and sale prices low enough to devalue the whole patent invention-licensing market, with "special offers" and illusory patent schemes created with allies.

The 1995 Guidelines are a policy statement to encourage innovation, as opposed to chilling it by Exclusivity, demanded through VZ/AST's use and abuse of market power.

107.     a) VZ's 37 % US market share is leveraged by 500 mm. to 1.3 bn. subscribers in related cartels, using global, broadband spectrum and forms of SITI-MLR's omni-modal features--needing patented IP and its progeny by reasonable licenses. Cartel VOD is a natural merger partner for VZ nearly ready to sell or spin-off its sick wireline business to others, (WSJ 4/24/10 C-12 ). Cartels TEF, CHL and CHU are onboard with VOD and VZ living together as 45%-55% partners. The 16 giant AST members+4 related cartels dwarf AT&T and all other US competitors, combined. b) AST has co-opted members of OIN as new, malleable members for $ 13.8 mm., and wrote a sales talk at 1/26/10 to attract more controlled licensees and members, par. 42-43 aiming at about 40 members overall on a $210 mm. budget. c) The injury complained of herein, on both the buy-side and the licensing side, is injury to Competition---There is no other purpose to the formation of the AST and its activities but injury to Competition, admitted by Hinman/McCurdy in par. 34-50, "to give others in the industry an opportunity to inoculate themselves" and to "encourage other companies to consider joining AST". AST is a single purpose Trust in all of its activities, none of which veer away from "drying up" all NPEs.

108.     US law on Tying-Bundling also goes beyond *de facto* Exclusive licensing by abuse of market power. It is founded on a seller or buyer's use of market power over a specific user need, to then dictate terms of sale or purchase for the tied-in product. a) A most glaring example of AST's tying-bundling activity is in par. 42. The condition to obtaining AST licenses routinely issued at its lowest prices (par.42) is to become a member—i.e. saying to global giants, you can't get the really good deals on licenses without joining for $5.25 mm ( and having at least $1bn.in revenues). AST is massaging the sell and financing side of its Plan, concurrently with its pressure on NPE's on the buy side ( to just give up and sell-out). b) AST hopes its invitation "is an offer, that about 35 giant Patent Market players outside AST, cannot refuse", but it is unlawful tying on its face. The offer is being used as a concurrent device against NPEs like MLR-

SITI to increase Market Power in AST, by unlawful tying of membership to preferential licenses—a typical AT conspiracy.

109. <u>A 4-point US legal test for "tying" is readily applied</u>, items 1)-4) on both the licensor's end ( SITI-MLR), and on the AST sub-licensees' end (vs. 35 potential new members): 1) E.g., Forcing your buyer of a PC printer to buy ink cartridges (tied item) only from you, is "tying"—forcing users to buy a product <u>they do not want</u> (obtainable cheaper elsewhere in most cases), as a condition to purchasing a product <u>they do want</u>. The potential new $5.25 mm. member of AST is the buyer of a right to recurring cheap licenses, available only to full-fledged members. 2) The same tying principle shelters <u>sellers</u> in the case law, and MLR-SITI want to remain <u>licensors</u> to AST and all its potential members, but face being forced into an <u>unwanted seller position</u> for parts of their patent portfolio. The AST "offer to NPEs they can't refuse" is the VZ/AST "cold shoulder as to traditional licensing", then dividing its fruits obtained by *hubris and power,* with members. It doesn't matter what the barriers are, or in which direction they aim ( license side or buy side, as to patents or other IP), if they are designed by a huge market force like VZ/AST to impede further Competition, with 16 willing, sophisticated member participants and 4 cartels signed-on for the "built-in proceeds" of VZ/AST's illegal moves.

110. <u>In SITI-MLR's case, ownership vs. licensing of patents are two separate patent</u> <u>"products"</u> for separable market uses (tying and tied products), akin to full ownership <u>vs.</u> leasing cooperatives in real estate. In SITI-MLR's patent business and in VZ/AST's same world--owning is always preferred to licensing--owning saves a patent's potential for "slicing and dicing" in emerging future use, and ensures continuity for the user licensing it. The <u>real estate</u> analogy is in selling one apartment as a "co-op" or "condo", or in leasing it. 3) Each form of property has a different market use, preservable only <u>by the owners</u> so they can use it as their varying economic needs or markets require, or the leasing/license needs of new customers grow. VZ/AST has the market power to force a patent sale, and

-45-

bar any MLR-SITI licenses, foreclosing a substantial amount of commerce in the wireless telecom patent market.

111. VZ /AST dominate in key areas of <u>network</u> and <u>MSP</u> (multi-sided platform) market power, as patent developer-owners, buyers and as licensor or licensee, competing with the small NPEs in the market, defined at par.17. Separation of the forms of patented IP products is necessary to a market for technology innovation, because inventors cannot predict where an invention will fit, years after its patenting ( social websites rapid growth dates from '06), and early sale or licenses can go too cheaply. A successful license business, however, justifies more research/development, a basic goal of patent law, yielding more IP progeny for the betterment of industrial arts and the citizenry.

112. Just publicizing economic power tactics, even if it is a VZ/AST ruse, "vaporware" like that shown in the First Cause of Action, is enough to cripple a patent marketplace populated by small patent holders, into a downward spiral of manipulation. 4) The Auctioneer-Buyer AST, by agents, <u>has his</u> <u>thumb on the scale in his own favor,</u> to drive down license or purchase prices, and control any resale to friends. VZ/AST and VOD, as dominant players in 4 affiliated Cartels, cannot arbitrarily decide globally that their buying-up is the only way allowed for SITI-MLR's IP realization. Yet VZ/AST now behave like a global supra-government--VZ/AST demand sale of both products, full ownership, with exclusive licensing rights, or no financial transaction will occur. The tied sale hurdle engrafted onto AST policy by 1/26/10 ( press release, par. 40-43) is expensive AST membership for any potential <u>licensee</u> of NPEs, including MLR-SITI, which have seldom charged \$5.25 mm. for license rights to any one user. There is no reasonable basis for such automatic AST charges. The other hurdle to Competition is forcing a <u>licensor</u> (MLR-SITI) to sell out each patent it has, at a manipulated low price (exclusivity).

113. <u>Most-favored nation (MFN) devices</u> One remark by CEOs Hinman or McCurdy to a new AST member: "Don't worry, nobody is going to get a patent license cheaper than you" is all it takes, whatever the AST written contracts say, to attract and hold putative licensees as members. Internal

license price discrimination for control as between largest, and disobedient member-users, is implicit. Par. 42 warns new putative members of this fact; "there are other members of AST that paid significantly less for their license than the price now being made available to outside companies", continued McCurdy. "We are hopeful AST's actions will encourage other companies to consider joining AST." VZ/AST's announced Plan ( Hinman, par. 37-38), resembles an "edict" within a "command-control economy". VZ/AST can invoke sanctions against a member's $5 mm. escrow, or delay cash return as patents are resold, or use MFN practices on license fees charged, regardless of patent use by the licensee, tailored to suit the VZ/AST group's current tactical giveaway or other disciplinary goals ( Starr v. BMG, 2d Cir., at par. 66 condemns MFN devices ). VZ/AST market power creates a one size suit "that fits all".

114.    Anatomy of a Sham  a) AST's Plan states it does not have any antitrust problems, denying coercive intent. Yet SITI-MLR's, and other NPE's market value dries up, after cheap AST patent buys ( buy-side tying) + cheap, user sublicenses ( sell-side for membership-promotional tying). b) A perpetual "going out of business sale" and "join up now" bargains tend to persuade small inventor groups not to bother affiliated giants with new inventions. The patent "Bazaar" tone of AST's 1/26/10 press release (par. 40-46) speaks louder than its words of "not seeking a profit" out of its Plan. AST is a double-barreled hoax, for a single purpose--to expand market power by more members, in order to dry up MLR-SITI's and other NPE's established licensing businesses.

115.    Collusion *Redux*  The three link chain of purchase-sublicense-disposal buy-sell transactions, also evidence collusion in VZ and AST in the July '09 private "auction of MSFT Linux patents". Secondary + tertiary boycotts by AST, then OIN, with billions of member-customer clients compounds Sec. 1, Sherman Act violations. Their patent needs and business strategies are converging into one stream, as handhelds, iPad tablet-reader type PCs, and next Apps for TV+cable-satellite video and DVD dial-ups by cellphones, all require easier-cheaper content access.

116.    The exclusivity-tying (or bundling) forecloses US competition by an arbitrary package to dominant buyers VZ/AST and related cartels. OIN said it acquired the patents to try and help Linux-based companies "avoid becoming more targets for legal action", news.cnet.com/8301-13860_3-10346838, Ina Fried. AST and OIN both want the mantle of charity status. The AST-broker and the threats ( par. 94) in the Limelight affair, however, were far from charitable.

117.    The AST Members' revealed business interlocks are equal to bidders' collusion at auctions—a)E.g. NYC Art dealers' faking low bids for (Mark Rothko) paintings, in a devaluation conspiracy; or power grid, oil, gas, spot/futures market traders with "cornering" scams, raising prices by conspiracy (Enron), and global auctioneers conspiring on fees (Christie's-Sotheby's)--All have colluded in decided cases, to lower or increase bids or inflate commissions to fix their market "spread", violating AT law and faced restitution of illegal proceeds. b) The AST admits it had 38 buy-in brokers as of August '08 standing behind any patent seller ( par.38) to betray his "hand" to the large players--the brokers are AST "market saboteurs", hiding their "forestalling" collusion with VZ/AST's "catch and re-license" system. VZ/AST is inviting victims into what seems friendly, but is really a rigged poker game, because established market power makes it the only game in town. 2003 DOJ Guidelines for Investigating AT violations, a field work primer, include bid rigging. Cf. IIIB, Areeda-Hovenkamp, par. 768, p. 173 ( 2008, AT Treatise), on "foreclosure"-cornering in patent markets by open-ended licensing: "As a result there is no "capacity constraint" on the number of times that a particular piece of..computer software can be licensed. Thus market-dominating software is particularly useful for foreclosure because the number of licenses can always be infinitely expanded taking an entire market." c) All the proceeds of the unlawful AT acts proven are recoverable by the victims thereof in a just format the Court determines, and the proceeds of wrongdoing include $400 mm. gathered in from AST members as capital to finance illegal acts, the further recovery of costs on patents resold into the market, and returned to AST members ( 82% under the AST admission in par. 46) who had no recovery rights as participants in an AT conspiracy, plus

AST license fees recovered thereon from members, cartels and affiliates, and non-members, in multi-million dollar amounts, and AST gains on patents sold by at least 92 NPEs to AST, licensed to members before their re-sale, etc. Equity would normally leave any proven wrongdoers where it finds them. Ill-gotten gains from an AT scheme would all be added together under standard principles of recovery for conversion of property value ( its highest value until converted values are repaid; see the Mark Rothko market-rigging case, etc. at par. 117a)).

118.    As a result of the Defendants' exclusivity-tying and bundling activity, MLR/SITI property interests and business have suffered considerable damages in an amount to be determined at trial, but in no event less than the amount in issue in the First Cause of Action, with damages and recoverable conversion proceeds increasing as exclusivity and tying-bundling violations of Sec. 1 of the Sherman Act continue.

### THIRD CAUSE OF ACTION

#### Concerted Refusals to Deal and VZ Control of Dealings with Licensors

119.    SITI realleges and incorporates by reference each allegation in paragraphs 1 through 118 with the same force and effect as if set forth in full herein.

120.    AST emphasizes that it will not buy licenses from targeted NPEs. Yet McCurdy admits that NPEs selling licenses "*is perfectly legal*" (See Patent Freedom.com; caption "Background"; "What is an NPE"). Refusal to "deal" however, by license, backed by 16 AST members+4 cartel affiliates is never "perfectly legal" particularly when AST members, each with AST director status, have also signed on and expect to receive cheap sub-licenses from AST, under AST's Plan.

121.    AST member ERICSSON-Sony prefers only licensing in its patent license pool. It decided to push for 'fair, reasonable and non-discriminatory" (FRAND) license terms for patents related to next generation [4G] wireless networks ( FRAND is an EU efficiency concept, for large manufacturers on products (chips, devices) for several patents needed in one fabricated item, Gigaom.com/2008/04/14.

122.    But the AST members, each with AST director status, also know the system and expect cheap sub-licenses from AST, in lieu of total ownership under AST's Plan.

123.    The 286 NEC patents now offered for license by AST at $10,000 apiece are 4 unrelated, odd lots of NEC patents, apparently "old-stock", items for e.g. conventional TV sets, far removed from wireless network carriers, Internet infrastructure makers, or 3G-4G handset makers in AST—They would go to radically different users, and be difficult to sell or license, judged by the descriptions and prices in AST's 1/26/10 press release, par. 40,43 and the disconnected lists at AST's website under agent "Crescent Moon, LLC". So AST through McCurdy now licenses them to non-members in separate lots, or licenses the total at fire-sale prices--$3 mm. for a license on 286 NEC patents, i.e. less than $10,000 each. The mix of NEC patents (listed by type and name, under affiliated AST owner Crescent Moon, par. 40) is diffuse and barely applicable to the needs of 3G-4G expansion. SITI sampled the list by the patent names. AST resembles a NYC "job-lot trading company" licensing or selling distressed goods.

124.    Boycotts continue - Control sanctions are built into the AST plan. a) Foreseeable AST barriers to negotiations prevent undercutting AST price-fixing, by a "maverick member" ignoring it, or handling his own license, or paying "too much" for his license. Use of unlawful bargaining heft over members, and any patent sellers, is a required part of the AST conspiracy, as per Hinman in his 2008 admissions (par. 39). Selective use of boycotting power against small patent owners is AST's template: "Financial persuasion" of members-allies stays in VZ/AST's control. b) AST also has optional pressure to apply by claims on a $5 mm. escrow for patent purchases per member, at risk for any member's refusal to abide by an AST Plan or its fixed price. c) There is little motive for licensees to deal directly or to complain, if they can afford to wait for the AST to buy patents cheap, and distribute similar licenses.

125.    Defendant AST member CISCO is a leader in internet backbone--routers, switches and servers (the plumbing, and traffic lights of the world's Internet), and WLAN (wide/local/area networks). VZ is an important customer to CISCO. CISCO has a stock market cap. of $140 bn., more than VZ (at

10/23 /09 ). It too is a Multi-Sided Platform (MSP, par. 83), acquiring "Starent" and "Tandberg" in October '09 for $6 bn. The US based Starent makes software and equipment to manage data traffic for wireless devices, and Norway's Tandberg makes small multiple video conferencing set-ups, that work on PCs. Both are typical SITI-MLR license candidates.   a) CISCO's MSP strategy is in an interview with CEO John Chambers ( Harvard Business Review 11/08): <u>His 1990s advice to two major telecoms was</u> <u>that their revenues from wirelines would vanish</u>: ".. We thought everything would converge to the internet …the network was capable of changing everything…from health care to education to how you connect with … friends… watching a sports event, even if you're hundreds of miles apart. We saw...we could <u>tie</u> <u>disparate networks together</u> architecturally.. "   <u>CISCO is now another emerging MSP network, acquiring</u> <u>innovative equipment makers, needing more patents, and competing as to licensing directly with VZ/</u> <u>AST.</u>  CISCO warned VZ of the loss of its mobile wireless network edge, just as it lost its former wireline network advantage.  b) But <u>VZ's competitive view is remembered:</u> "What isn't so good..is the prospect of.. reconstitution of the former Ma Bell.  That monopoly was notorious for high prices, stultified thinking and an aversion to changes that would spur competition… customer service, support and innovation will not be as robust", <u>USA Today, Money</u> 2/14/05.

126.   a) Yet AT injury to SITI-MLR and to Competition arise by AST boycott in a converging tide of new MSP networks, "smart" handhelds, "readers" or "notebook" mini-PC's, for travel, offices, schools, hospitals, social groups; pre-paid wireless; and for new TV sets as smart as AT&T iPhones or VZ's Droid, by App. "widgets", made downloadable by cable/satellite networks.  SITI-MLR and other NPE patents would normally be in the thick of this wireless convergence of telecom and TV, licensing patents as needed;  instead their business is down, par. 89-90.  b) VZ/AST seek convergence control by its patent buy-up Plan, because with key patents in hand, infringement claims ahead, then VZ as an MSP network ( par. 83), can create a complex bill, sue for infringement, rebuff all NPEs or "reach an arrangement". (par. 62)

127.    Convergence of telecom and TV technologies erodes networks, further motivating the boycotts by VZ/AST of MLR-SITI and other NPEs. a) SITI knows that some Defendants are familiar with its patents (par. 27-31), and eager to force a sale of them to AST, because they need them now, not after a lengthy infringement case that they lose or finally settle (e.g. MOT at par. 55). b) Defendants want to force these patents into the open market at low prices, so they can more easily compete against one another, and freely advance the technology as they see fit. This holds true for other global makers of all the new designs of handsets in the wind, that need omni-modal efficiency selection features, and real-time spectrum-sharing on a chipset—without paying MLR-SITI every time they try to invent around its patents, regardless of how reasonably its licenses are being sold in a free market (par. 27-31).

128.    Defendant AST member ERICSSON-Sony is fourth in the MSP cabal (par. 83)--two world leaders in 3G-4G devices. ERICSSON is already VZ's choice for some of its new 4G handsets. VZ is a significant ERICSSON customer in several areas. ERICSSON with 76,000 employees, makes equipment and routers powering 85% of all wireless networks, +handling operations for several networks--another CISCO type MSP branching out. Interlocks:    a) ERICSSON is VOD's agent for network management. ERICSSON will try to hold VOD clients linked to VZ ( TEF, CHL, CHU) as VZ goes more global.

129.    Special SITI-MLR SA history—ERICSSON-Sony had to assign certain of its key patent claims to MLR, recognizing SITI's early priority rights, in order to obtain a 2003 MLR license, after losing a PTO priority case, based on SITI-MLR's spectrum-sharing/omni-modal patent rights, par. 27-31. The prevailing patents began at SITI (Spectrum) back in 1998. The PTO Interference success won by MLR in 2003 was settled--by an ERICSSON cash payment, + its "assigning valuable conflicting patent claims" to MLR. Such claims are now in SITI's "proceeds-sharing list" with MLR under the SA, Sec.V, par.C.1.., "all patents and patent applications purchased from Siti-Sites, ...the Ericsson patent,.. and all US and foreign patents claiming priority therefrom..". ERICSSON-with Sony, also bought a reasonably priced cross-

license from MLR-SITI c) While joining AST, ERICSSON has its own patent license pool (par. 106)—operating solely in a licensing format with partner Sony; Siemens and Nokia have since joined it. d) Yet ERICSSON was one of the founding members of AST, joining a conspiracy to drive other IP holders into a position of relinquishing their license business through use of various artifices, and encouraging a boycott or infringement of IP, lawfully acquired by MLR-SITI under license contracts with ERICSSON.

130. As a result of defendants' concerted refusals to deal with NPEs, MLR-SITI property interests and business have suffered considerable damages in an amount to be determined at trial, but in no event less than the amount in issue in the first two Causes of Action, increasing as long as concerted refusals to deal and other violations of Sec. 1 of the Sherman Act continue, with unlawful gains therefrom.

## FOURTH CAUSE OF ACTION

Deceptive Price-Fixed Bids "at much lower costs" ( par. 36 ) are in process vs. MLR-SITI and NPEs.

131. SITI realleges and incorporates by reference each allegation in paragraphs 1 through 130 with the same force and effect as if set forth in full herein.

132. CEO Hinman admitted on 7/3/08 that VZ/AST planned to deceive each patent seller (NPE) with respect to the identity of the actual bidder on the purchase of IP (par. 37-39)—scores of broker-buyers are lined-up; a list of patents are first circulated to AST members and brokers who then rig prices and persuade patent NPEs to sell their IP at reduced prices in accordance with the "fixed" market price, in feigned confidence, without giving the actual buyer's name, making low buy-out bids consistent with the prearranged price. Indeed, some of the 92 sellers reflected on AST's website ( if not fictitious shells) are likely victims of this AST deception.

133. Hinman admits that selection of AST's name is "to obscure AST's identity…so that.. sellers do not realize big-company backing and raise.. prices accordingly". Hinman's remarks amount to admission of a corporate intent to defraud sellers in the defined patent marketplace. It is unlawful for a dominant buyer/bidder in a market to deceive sellers through agents' concealed identity with gross

-53-

conflicts of interest. Each misled seller or licensor is dealing with a type of economic government (VZ/AST, members, and four cartels), as the "friendly" commission broker deceives it.

134. "Acts done to give effect to the conspiracy may be in themselves innocent. [ a licensing "oil well pump monopoly" ] "Yet if they are part of the sum of the acts relied upon to effectuate the conspiracy ...the statute forbids, they come within its prohibition". The VZ/AST buy/license, resell is "part of the sum of the acts", permeating the AST.

135. Hinman admits that another, second name is used for actual purchase of each patent: "The company [Allied] creates an 'independent legal entity' when it buys and sells patents to further obscure its identity". Hinman's secrecy from March 2007 forward to June 2008 manifests a deliberate deception which occurred for 15 months before, as expressed by Hinman: "We tried to keep this thing as secret as long as we could. So we'd been preparing for damage control for some time," (par. 39). But purchase results after nearly three years of deceit in lockstep by various purchase shells, still had to be recorded in the US PTO or in foreign patent offices, all in fictitious names. Given Hinman's 2008 and AST's 2010 admissions, SITI presumes that this "ghost buyer" device continues. Each "catch and release sham" needed to recover the patents into AST's name later for accurate licensing to members, then resale with a good title for use and registration by a new owner. Apart from the AT violations in which this artifice is used, it is also likely that many NPEs have been duped by the AST brokers, that the AST's deception continues and is mutilating US PTO and global patent records.

136. "Ethics in the PTO.." The PTO requires stating under oath who is the real patent owner and real inventor. Both must consent for patent family filings, or changes in title or liens. "The US PTO imposes a duty of candor and good faith on the applicant and the patent attorney, including an obligation of full disclosure of information material to patentability...an examiner can request information about the development of the invention and prior activities of the inventor and others related to the invention," ("PLI Patent Prosecution Workshop '09", 7/23-24/09). Concealed ownership evades the PTO's system

-54-

of truthful inventors and owners in a proof of "non-obviousness", "predecessor patents", "priority of invention", and "existence of licenses" as to value. It, of course, bars false statements to US, foreign patent offices or courts where AST owned patents are on file or in litigation.

137.    VZ/AST by Hinman, admits to a system of PTO business that is "inequitable", a key term of art in patent prosecution or litigation. Abuses often lead to patents held unenforceable, cancelled or losing priority. E.g. D. Del. Action re Rambus memory chips: "patents were unenforceable because ... [owner] destroyed documents... 'conduct obstructive' at best, misleading at worst". [ But Rambus has strong patents, and in 2010 settled one case with a disclosed $ 900 mm. payment by Samsung; yet the rules of fair play for infringement and trial proof must still be upheld, regardless of substantive merits]

138.    PTO/SEC disclosure duties of the AST giants are US duties; most have US patents or licenses and stock market listings in the US. They owe duties of good faith and fair dealings assumed in listing, for the right to be traded here. Use of 2d layer "ghost entities" by brokers, to create deniability for a real buyer, or in post-fraud "lulling" is anticompetitive, if used in a sham.

139.    Price-fixing alone, but with deception too, is a *Per Se* antitrust violation. DOJ 1995, AT IP Guidelines, and the 2003 DOJ Investigators' AT Primer (at par.105, 117 ). Each patent purchase is made to be followed with low-cost AST sub licenses. AST even boasts (par. 42) about its cheaper licenses to some old members to raise money from new members, or to sell licenses to non-members, a) saying "the group... isn't a profit-making venture and its members don't actually own patents--they just grant themselves a license to use them"—This is puffery voiced by a group too large and powerful. b) Publicly held companies are fiduciaries for shareholders. But VZ/AST fixes a low buy-out price by broker deception, engages in a ghost-buyer sham, and falsely poses publicly as a tax-free foundation. AST's methods in its conspiracy are "illegal means", designed to reach "illegal ends". c) AST then takes the benefits of illegality, paying the lowered fixed price, licenses the IP property to members and cartels, leaving a devalued, hollow shell for controlled resale. Any business that needs a license has to come to

-55-

AST or Twister to get one, hopefully before the sale, or go to an affiliated successor owner like OIN. d) The result is approx. 150 global sub-licenses within 4 cartels (countries where VOD, TEF, CHL and CHU operate), then to many new Internet players/social websites, each of which get contracts no more reliable as <u>licenses</u>, than AST's deceptive <u>purchase contracts</u>. Conversion does not yield a good title to anyone in the chain of ownership and licenses; and the remedy for conversion is tracing its illegal gains.

140. AT case law says: An organization cannot "buy a good..in which the buyer was..a sham organization seeking only to combine..buyers...to suppress their otherwise competitive instinct to bid up price." The AT violation has targeted the unique patented property of MLR-SITI and others for buy-out. Cf. IIIB <u>Areeda-Hovenkamp, 2008 AT Treatise</u> (par. 768b5 p.173), *supra.* which recognizes the market power abuse implicit in gathering up a bloc of patented software: "..particularly useful for foreclosure, because ... licenses can always be infinitely expanded to take up the entire market". Licenses can also be withheld to fence-off the market to a single dominator or a collusive group.

141. <u>Defendants'</u> actions are intended to foreclose entry and participation in the broadband licensing arena, corralling most of the global market, and resulting in damages to MLR/SITI in an amount to be determined at trial, but in no event less than amounts in the first three Causes of Action. All violations alleged are *Per Se* violations of AT laws, but also are un-reasonable under the AT *Rule of Reason.*

## INJUNCTION AND DAMAGES FOR VIOLATION OF THE SHERMAN ACT

142. SITI realleges and incorporates by reference the allegations of paragraphs 1 through 141 hereof with the same force and effect as if fully set forth herein.

143. <u>Injury to Competition</u> The Plan in the anticompetitive agreements described, establishes tricks and devices for price-fixing, circulating data to condition a market downward in buying or in licensing, exclusivity with tying-bundling demands, concerted refusals to deal on patent licensing, deception of patent sellers, and spoliation of licensing at arms-length fair market valuations. <u>Defendants' restraints of trade have affected commerce within and outside the United States.</u>

**WHEREFORE** Plaintiff SITI demands (1) judgment declaring that Defendants engaged in a contract, combination or conspiracy which is a _Per Se_ violation of Sec. 1 of the Sherman Act, or is Unreasonable in its effect under such law; and demands (2) a permanent injunction, prohibiting the Defendants from continuing the AT violations; (3) a judgment in favor of Plaintiff SITI and against all Defendants, for actual and treble damages in an amount to be determined at trial; (4) an award of pre-judgment interest in favor of Plaintiff SITI against Defendants, jointly and severally; (5) judgment in favor of SITI for attorneys' fees, expenses and costs, and other relief the Court deems just. Dated: New York, New York

     May 3, 2010

                                    Respectfully Submitted,

By: _____
          LAWRENCE M. POWERS (LMP 9068)
          Lead Counsel for Plaintiff
          SITI-SITES.COM, INC.
          47 Beech Road
          Englewood, N.J. 07631
          201 567-4904
          lmp2@bellatlantic.net

          COOPER & MCCANN LLP

By: _____
          GARY G. COOPER (GGC 4942)
          Attorneys for Plaintiff
          SITI-SITES.COM, INC.
          197 Coligni Avenue,
          New Rochelle, NY 10801
          914 636- 5824
          gcooper13@hotmail.com

## VERIFICATION

Lawrence M. Powers, Chief Executive Officer of plaintiff, Siti-Sites.Com, Inc., hereby affirms under penalty of perjury and pursuant to N.Y. Civil Practice Law and Rules Section 2106, that I have read the contents of the foregoing complaint and the contents thereof are true of my own knowledge, except as to matters therein stated on information and belief and as to those matters I believe them to be true.

Dated: New York, New York
       May 4, 2010

Lawrence M. Powers, CEO
SITI-SITES.COM, INC.

CIVIL ACTION NO.:
_____

THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

SITI-SITES.COM, INC.

Plaintiff

-against-

VERIZON COMMUNICATIONS, INC., ALLIED SECURITY TRUST, et al.

Defendants

- - - - - - - - - - - x
_____

## COMPLAINT
_____

COOPER & McCANN, LLP
Attorneys for the Plaintiff
Siti-Sites.Com,Inc.
197 Coligni Avenue
New Rochelle, New York 10801
(914) 636-5824

_____
_____

## CERTIFICIATE PURSUANT TO 22 N.Y.C.R.R SEC. 130-1.1a
_____

Gary G. Cooper hereby certifies that pursuant to 22
N.Y.C.R.R SEC. 130-1.1a the foregoing Complaint is not
frivolously presented.

_____
GARY G.COOPER

COOPER & McCANN, LLP
Attorneys for the Plaintiff
Siti-Sites.Com,Inc.
197 Coligni Avenue
New Rochelle, New York 10801
(914) 636-5824