UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

SITI-SITES.COM, INC.,                                          Case No. 10 Civ. 3751 (D.Cote,J.)

                              Plaintiff,

              v.

**AMENDED COMPLAINT**
**DEMAND FOR JURY TRIAL**

VERIZON COMMUNICATIONS, INC., ALLIED
SECURITY TRUST, DANIEL P. McCURDY,
BRIAN HINMAN; CISCO SYSTEMS, INC. and
ERICSSON INC-Sony Ericsson Mobile Communications,
                              Defendants; and

MLR LLC, as a Real Party in Interest-
                              Involuntary Plaintiff.

_____x

        Plaintiff SITI-SITES.COM, INC. (SITI), by its attorneys Cooper & McCann, LLP, and Lawrence

M. Powers, Esq., for its Amended Complaint ( C) based on counsel's information, belief and investigation,

except for information based on personal knowledge of SITI, alleges as follows:

## NATURE OF THE ACTION

        1.      This action is predicated on Section 1 of the Sherman Act, 15 U.S.C. sec. 1 (trade restraints

by agreements, combinations and conspiracies), and Sections 4 (standing to sue) and 16 (injunctive relief)

of the Clayton Act, 15 U.S.C. sec. 15 & 26. The suit involves an antitrust "devaluation conspiracy"

targeted at Plaintiff SITI's patent interests, and those of similar patent licensing businesses, in the cutting-

edge field of spectrum-sharing and omni-modal features in handsets, reading devices, servers and routers.

(C 17, market definition) Some of the largest telecom patent owners, licensors and licensees are conspiring

against an estimated 50 small patent owners and licensors, including SITI, whom they have disparagingly

called non-producing entities (NPEs), to drive them out of business. Defendants are using a Trust, Allied

Security Trust (AST) as their joint vehicle under a Plan to effectuate their agreement and conspiracy

herein. Defendants (Def.) through use of the AST, are preventing small patent rivals from licensing, or

1

selling their patents, at fair market value. The Plan utilizes Defendants' (Def.) collective market power to control an otherwise active, vibrant and open, public licensing and sales market in third and fourth generation (3G-4G) wireless telecom patents and pending applications (C 34-39), collectively, "the patents", as there described ). The collective market power being applied in violation of antitrust (AT) rules of law is overpowering in the defined market, (C26). The aim of Def. Plan is to obtain ownership and/or control of telecom intellectual property (IP), including SITI-MLR's patents, by using relatively minor amounts of capital from titans of wireless technology. Verizon Communications, Inc. (VZ) leads the Plan working through the AST. Def. have dried-up most of SITI's patent licensing business in the past three years through the use of sham transactions recently disclosed, price-fixing on patent licensing and purchases, with systematic, repeated market manipulation downward, and deceptive patent buying practices with similar effect. This is a war of the powerful tech giants against "disruptive innovation", a phrase coined by right-of-center thought-leader David Brooks, New York Times, (NYT) 8/27/10 A21, in his op-ed column. It was foreseen in 2008 at C 68 by Jim Moore at Harvard Law School, saying AST was "formed by large companies as a way to crush small companies and individual inventors". The stream of innovative Internet inventions, as will be shown, is being blocked by the AST.

Three antitrust causes of action with common facts, arising under Sec. 1 of the Sherman Act are alleged. Collusion of AST with Allies to achieve devaluation of the patents, Concerted Refusals to Deal, and Deceptive Price-Fixed Bids ( at C 99, 107,118) are the three causes of action.

MLR LLC (MLR) is joined as a real party in interest-involuntary plaintiff herein, injured by multiple AT violations concurrently with SITI. It is working with SITI on their sensitive, licensee confidentiality issues by stipulation 8/13/10; after a review and inputs from Def., to be submitted for a Court order.

SITI and MLR have suffered AT injury, and been repeatedly damaged from 2007 through 2010, as the allegations below will show.

2

Relief sought: A permanent injunction against Def. antitrust (AT) torts attacking the SITI-MLR and other NPE licensing/sales businesses, recovery of money damages, and recovery of Def. and affiliates' collective gains resulting from their group's violations of Sec. 1 of the Sherman Act.

## CENTRAL LEGAL ISSUES OF THE CASE

2.    SITI's Standing to Sue under the AT Laws. Section 4 of the Clayton Act, 38 Stat. 731, is a key issue. It provides a treble damage remedy to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," 15 U.S.C. § 15. SITI must show it has a "business and/or property Interest", in the patents described herein (at C 10-25, 34-39). Siti's interest in the patents is embodied in a settlement agreement summarized below ( C 10-25), which acknowledges the basis of SITI's interest, quantifies it and, in accordance therewith, provides for distribution of gross proceeds to SITI and MLR from long-term commercialization of the patents.

3.    SITI's Injuries SITI alleges measurable AT injury to its business and/or property interest, an 84% decline resulting from Def. conduct (C 25, 34-39, 93-97, 131-132), and alleges collective price-fixing and related AT violations. MLR is alleged to have suffered equal damage on its own.

4.    The enormous market power alleged herein is as suspect under sec. I of the Sherman Act as it is under sec. 2 thereof (justifying either *per se* and/or *rule of reason* procedures at trial). The market power resides in VZ, AST, its 18 giant members, and 4 global cartel affiliates, with billions in assets and wireless infrastructures, market value, and billions of mobile wireless subscribers, alleged to be intertwined in the AT violations claimed. The Def., AST members and the cartels described below are involved therein.

## JURISDICTION AND VENUE

5.    Jurisdiction is conferred upon this Court by Secs. 16 and 4 of the Clayton Act, 15 U.S.C. secs. 26 and 15, for injunctive relief and AT damages caused by each Defendant. b) Venue is proper in this District pursuant to secs. 16 and 4 of the Clayton Act, where SITI and another real

3

party in interest, MLR have conducted their licensing businesses, and benefit by a 2006 settlement contract (the SA), made and enforced by its terms in this District. i) VZ as the parent, and its wireless division VZW have offices, agents, transact business, and are found within this District. ii) VZ is a founding member of AST; both VZ and VZW have, or had, offices in this District at the time of the anticompetitive acts alleged. iii) Defendant Brian Hinman regularly reports to VZ at its offices in this District, and occupied separate offices for AST in this District provided by VZ during 2007-2009 where many AT violations were jointly planned with VZ and carried out. iv) Defendant Daniel P. McCurdy regularly reports to VZ at its offices in this District, and occupied separate offices for AST in this District provided by VZ during 2007-2009, where many AT violations were jointly planned with VZ and carried out. v) Defendants Cisco Systems, Inc. (CISCO), and Ericsson, Inc. with venture partner Sony Ericsson Mobile Communications ( collectively ERICSSON), also have offices, agents, transact business and are found in this District. vi) VZW is a partnership, affected with a public interest. It is regulated under the US antitrust laws and by the Federal Communications Commission (FCC), as are AST, CISCO and ERICSSON. vii) A federal cause of action alleged herein arose, impacts upon SITI and MLR, other NPEs and the public interest protected by AT law—within this District, where each Defendant agreed to, conspired and joined in AT injury to SITI, MLR and other targeted NPEs. Their AT torts restrain, affect and injure international and interstate commerce by SITI, MLR and NPEs.

## PARTIES

6.    Defendant VZ (listed NYSE (VZ )), with $89 billion (bn.) in market capitalization at 3/30/10, is the parent corporation of Verizon Wireless (VZW). VZW is the largest wireless network in the US and 13th in global wireless subscriber size ( 100 mm. VZW wireless connections at 4/25/10, par. 18), representing 30% of the US population, and about 37 % of the US wireless network market. VZW admits to its global ambitions, and has multi-national cartels linked to it by contracts.

4

a) The wireless network is a partially owned subsidiary called VZW, owned 55% by VZ, and is legally described as the "Cellco Partnership". VZW is a key business unit of VZ, notwithstanding its partnership form.

b) Vodafone Group PLC ( U.K., listed NYSE, symbol (VOD)) owns 45% of the Cellco Partnership. VOD is a 72 nation cartel, 2d in global wireless subscriber size, and linked to three large cartels. c) The parent of VZW is a Defendant ( the parent and VZW are collectively called "VZ" herein ). VZ sponsors and controls the AST, also a named Defendant. Parent VZ has 100% ownership of an extensive telecom landline business.    d)    VZ is a Delaware corporation; its principal offices are at 140 West Street, New York, NY.

7. Defendant Daniel P. McCurdy (McCurdy), is chief executive officer (CEO) of the AST. AST had offices in 2008, at 488 Freedom Plains Road, Suite 126, Poughkeepsie, NY; its address was changed in 2009 to 80 Lambert Lane, Suite 115, Lambertville, NJ.  McCurdy also works in and reports to VZ, in this District.     AST is managed by VZ from New York, NY.  McCurdy is author of AST's NPE "enemies list", listing targets of AST's activities, and co-founder CEO at a litigation advisory company, PatentFreedom.com., employed by AST as an agent and advisor.

8. Defendant Brian Hinman (Hinman) served from March, 2007 to September 1, 2008, as the first CEO of the AST with its offices in this District. Unlawful AT activities by the AST and by Hinman occurred in this District. Hinman, was later appointed VZ Vice President, Intellectual Property, covering both its wire line business and its mobile wireless carrier business. He works in and reports to VZ, in this District, and also works at a VZ office in Basking Ridge, NJ.

9. a) McCurdy and Hinman are both VZ and AST strategists and co-conspirators as to the AT claims alleged herein. Each of them developed the concepts employed by the Defendant AST, including its organization and structure, its solicitation of member investors, and co-manage its publicity

5

and interviews, including announcements of intentions, its "catch and release" Plan, AST's patent purchases, its licensing to members and outsiders and its resale of patents under the Plan.

b) AST is a Delaware Trust, located and operating in New York, NY since 2007, with an office in Poughkeepsie, NY through 2008, and since then with an office in Lambertville, NJ. AST is a co-conspirator with VZ and each of the other Defendants in all acts of alleged wrongdoing set forth herein. AST owns and controls Twister Investment Services LLC (Twister), a Delaware limited liability company, with a place of business in AST's offices and in other US locations. Twister is being used to conduct a telecom patent licensing/sales business for AST, and to conduct allegedly illegal antitrust activity related thereto, pursuant to the approval and direction of VZ, AST, McCurdy and Hinman.

10.     Defendant CISCO is based in San Jose, CA, and maintains offices at 1 Penn Plaza, New York City, NY. CISCO is a leading global Internet infrastructure maker (routers and servers), operates networks and is a services and operations advisor. It has a market capitalization of $ 152 bn. at 10/28/09. CISCO is a wireless software developer-maker, a carrier by routers and servers for multiple networks, and also makes interactive global meeting devices. It is a "multi-sided platform, intermediary" (an MSP as defined at C 83 ), and needs more wireless patent licenses. CISCO joined the AST in 2008; its representative is, upon information and belief, on AST's board of directors. CISCO competes with other AST members, and is a co-conspirator with VZ, AST and the other Defendants.

11.     Defendant ERICSSON, is based in Sweden, maintaining offices for its U.S. operations at 1114 Avenue of the Americas, Suite 3410, New York, NY. ERICSSON is a leading global handset and infrastructure maker and manager, and operates Sony Ericsson Mobile Communications (Sony-Ericsson) in the US. ERICSSON (including Sony-Ericsson) is a global services and operations advisor to many wireless telecom networks. ERICSSON is a member of the AST, and also a multi-sided marketing platform (MSP, cf. C 83), an intermediary competing with CISCO, VZ and AST, but acting in concert with them against SITI-MLR and other NPEs. ERICSSON has been a patent licensee of MLR-

6

SITI since 2003, and MLR-SITI has been an ERICSSON patent licensee since 2003. ERICSSON and Sony-Ericsson are, upon information and belief, represented on the AST board of directors; they compete with several AST members, and are co-conspirators with VZ, AST and the other Defendants.

**Standing to Sue ; Jurisdiction and Venue as to SITI and MLR as Co-Plaintiffs**

12.     Plaintiff SITI, and MLR as Additional Real Party in Interest--Plaintiff SITI changed its name from Spectrum Information Technologies, Inc. ( Spectrum) in 1999, retaining its original organization structure, citizenship and corporate governance history, as a Delaware corporation, with offices at 111 Lake Avenue, in Tuckahoe, New York, publicly held by 12,000 small and large stockholders. Since 2006 SITI has been in voluntary dissolution for stockholders' benefit, established by stockholder vote. This group of stockholders established by 2006 shareholder vote, are represented by their corporation SITI as a *de facto* Trustee in liquidation. SITI had no outstanding debts, and did not need the aid of bankruptcy proceedings.   SITI is conducting a multi-year liquidation of its patent properties and related business interests, extended in December, 2010 through 2015, by the Chancery Court in Delaware. Spectrum was in the mobile device, invention, use, licensing business, 1989-1999. Spectrum/ SITI is the founding technology source for MLR and SITI's patent licensing business with respect to the patents described herein at C 34-39. SITI as a real party in interest, continues to act as a trustee for stockholders in liquidation, who are its sole beneficiaries.

13.     MLR is named as an Additional Real Party in Interest, and Involuntary Plaintiff, pursuant to Rule 19 F.R.C.P. because of its interest in the patents. a) History  MLR was organized in 1999, to buy the Spectrum (SITI) patents, pending applications and its issued licenses and client lists, all of which occurred by phone discussions, document execution and personal discussions within this District. b) MLR is a Virginia LLC its principals organized to license and develop the patents further. MLR's principal place of business is now 6524 Truman Lane, Falls Church, Va. The several owners of MLR LLC's equity are limited partners, taxed as a partnership; c) MLR control persons negotiated for

its current patent interests and "purchased" them in 1999 from SITI for \$27,000 at SITI's offices in this District. SITI's 1998 prior management ( with technical encouragement by key employees', who later became MLR's principals) had written the patents off, down to zero value, publishing this fact in SEC filings, announcements furnished, and statements to the new control stockholders buying in.    d) But MLR principals were soon enforcing and selling licenses on the patents, and filing many new patents after 1999 based on such interests, litigating against multiple global infringers simultaneously, and negotiating with licensees in New York and elsewhere, all yielding millions in license revenues to its principals between 2000 and 2003;   e) New SITI management first discovered these facts in 2003, leading to investigation and a suit for damages and equitable relief under the New York laws of fiduciary duty and conversion of property.

14.    SITI spent two years of effort and new equity capital, to re-establish ownership of its portfolio by "equitable tracing" in a bitter, but successful litigation in New York State Court.

a) SITI is a full partner with MLR in ownership rights for the patents since 2006. SITI now works cooperatively with its former employees who manage and control MLR. SITI justly extols their business and inventive abilities in this Amended Complaint (e.g. C 34-39). Wise judicial enforcement of tort common law generated fair, productive results for all parties to SITI's portfolio, and MLR "paid its late dues" to become SITI's venture partner in 2006. SITI, however, spent millions in legal costs to recover its property and business interests.

b) In fact and in equity, SITI never lost its interest in their present joint "property" and/or "business".

c) A productive settlement for both Siti and MLR with related defendants therein was incorporated in a judgment still enforceable in New York. MLR's key partners-managers permanently assigned to SITI its current patent interests and business, settling  the 2003 SITI lawsuit in New York

Supreme Court, with strict confidentiality covenants (beyond necessary SEC public disclosures) binding on the defendants therein, including MLR, and also binding on SITI.

            d) Venue The settlement and form of judgment was negotiated and executed in New York City in February, 2006. All of SITI's activities before and since 2006 have emanated from offices in this District. Venue is proper in this District as to SITI, all Defendants and MLR. MLR's primary licensing executive, its patent counsel and its inventors and engineers worked for nearly 10 years at Spectrum (SITI) in its offices in this District, under employment and retainer contracts, wherein 100% of all patents plus intellectual property (IP) invented, plus all licensee customers, were business assets owned by Spectrum (SITI). Such principals have since worked 10 more years on what is now SITI's and MLR's joint licensing business and IP, based in this District as to SITI.

        15.     SITI invented and practiced its patents in house 1989-1999, spending millions of its own capital, relying on MLR's present managers and inventors. SITI/Spectrum has a 20 year continuity of property and business interest, in the patents from 1989 into 2010. During this period, the same portfolio ( of patent families expanded by related mobile wireless inventions) earned millions in (1990's-2010) proceeds for SITI and MLR, at earlier and lower levels of Internet and wireless telecom development, and their related license values. MLR continues activities in inventions and infringement enforcement identical to what its principals did at SITI 1990-1999, but at higher "fair market value" license valuations in 2010 although adversely affected by the AT violations alleged herein, (C 93-94). The license business activity stems from the greatly expanded market for mobile wireless devices, and the market need for certain key patent licenses. These principals are now acting in furtherance of MLR and SITI's business and property interest under the terms and conditions of their Settlement Agreement (SA).

        16.     After the equitable tracing dispute in 2003 and two years of litigation, SITI and MLR executed the SA dated as of February 21, 2006. The SA says "Whereas settlement terms were agreed upon and placed on the Court record before Justice Richard Lowe on January 20, 2006", but the

refinement of the fine points, and confidentiality of the SA, were then further negotiated for several weeks. The SA provided that : a) SITI be paid a substantial cash amount derived from Gross Proceeds from the patents, 1999-2006, and that, b) SITI become an "assignee-owner" of a defined portion of Gross Proceeds from the future exploitation (post 2/21/2006) of the "present and future patents", described and listed as an exhibit under the SA.

17. The SITI Property a) The SA provides: "Additional Settlement Amount-Assignment of Gross Proceeds …MLR hereby irrevocably assigns and transfers to Siti-Sites an additional settlement amount consisting of the 'Applicable Percentage' of all Gross Proceeds MLR receives after the 'Effective Date' [ 2/21/ 2006], and MLR shall cause the same to be paid to Siti-Sites. Such assignment is for value received by MLR and other Defendants in this Agreement and is not subject to any counterclaims, defenses, set-offs, recoupments, equities or the like arising or acquired after the date hereof among any of the Parties." (emphasis supp.) b) SITI submits to the Court that its defined interest is thus permanent and not subject to any defenses, making it transferable, saleable and available for pledge or mortgage financing by SITI. It is an agreed business interest in future patent development, licensing and/or sale. It is also a property interest in monies derived from licensing, sale, or other transactions in money or securities affecting SITI (C 15).

18. SITI's assigned share, payable off the top from gross revenues, amounts to a split of approx. 60% to MLR: 40% to SITI, on defined Gross Proceeds. The SA says: 15% on the first $10 million (mm.) in Proceeds after 2/21/10; 20% on the next $10 mm., then 25% on the next $10 mm. and on all Gross Proceeds thereafter. The business and property may continue for several years. Over time in a current, ascending market for use of the patents, large sums are involved. The amounts mean much to SITI and MLR, for their constituencies of many recipients, and for injunctive relief on behalf of SITI and MLR.

10

19.     MLR is required to pay all expenses and costs (mostly its outside legal costs) required to generate each installment of Gross Proceeds earned. Under the SA, MLR can recoup costs only from its own 60% share thereof ( MLR costs are estimated by SITI to have been consuming 40% of such share annually).

20.     Under the SA, SITI's assigned share is neither callable nor redeemable nor reducible by MLR or its successors, and thus not a debt. Financiers would describe it as an equity ownership interest in the patients, enforceable by SITI as trustee.

21.     If there is a patent sale, or sale, merger or change of control in MLR, prior notice plus full disclosure to SITI and "reasonable provisions protecting SITI-Sites interests in the Gross Proceeds and other provisions" of the SA, are required.  SITI submits that these provisions in the SA establish a permanent Sec. 4, Clayton Act "business" and/or "property" interest" in the patents.

22.     a) MLR is not a debtor and owes nothing to SITI under the SA, until license and/or sales fees for the patents are earned.  Gross Proceeds owed SITI if they occur, are owed until paid or provided for, operating through an escrow of MLR counsel dealing with SITI counsel, and remitting proceeds. But thereafter MLR owes nothing to SITI until another covered Gross Proceeds event (licensing, or sale, or change of control) stated in the SA occurs again. And any license, or any partial or total sale may never occur again. b) SITI may have to deal with MLR successors if there is a patent sale, or sale, merger or change of control in MLR, but Siti's business interest remains intact.  MLR is free of any future liability in such event, provided it complies with the SA.  c) SITI submits that this covenant supports an inference that SITI has neither a creditor, lender, financier, nor investor relationship with MLR.

23.     There is no known claim of any non-payment, default or wrongdoing between these two venture partners in owning the future gross cash flow from their patent interests and each is free to go its own way as to its respective property interest in the patents. Each can sell, pledge, encumber, or otherwise

11

commercialize the property that they have under the SA. The patent property, is in effect a defined claim on cash indefinitely under the SA.

24.     SITI is not, and has never been, an MLR owner, limited partner nor investor; a) SITI has never been a lender to, nor financier or licensor to MLR; b) SITI has never been an MLR licensee of the patents; c) As a permanent assignee of a "property" or "business interest" impaired by AT violations in this case, SITI submits that it has independent Clayton Act standing to sue, as does MLR.

25.     AT Injury The Def. agreement, combination and conspiracy alleged, represents a clear restraint of trade and have substantially contributed to the reduction in Siti/MLR licensing frequency, and related reduction in revenues between March, 2007 and March, 2010 and are direct injury to SITI and MLR.

a) The AT violations alleged herein have resulted in an 84 % decrease in licensing frequency, and its cash flow to SITI and MLR, from March, 2007 through March, 2010 (the AST's time frame), and a direct injury to SITI and MLR, entitled to AT protection, proximately caused by the Def., reducing the value of their respective interests continuously, alleged at C 93-94.   b) But SITI still owns an uninterrupted, irrevocable interest since 1999 in a growing body of patents and patent values described as "present and future patents and patent rights" (C 38b), with no defenses to MLR or to its successors under the SA allowed (C17). i) SITI's market risk in the patents is neither MLR stock nor debt, nor part of any MLR debt instrument. It is as valuable as growth and innovation in the underlying Internet and wireless business (C 26, 30), now mushrooming in size as alleged below.

26.     Market Definition. The relevant product market for purposes of this action is the worldwide Market for licenses or sales of mobile wireless-related patents owned by those who only license them, and do not use them in their business. Those who do use them in their business would usually be licensees from MLR-SITI or other NPEs with pivotal patents. The licensor category under AT attack by the Def. involves those firms with an established license track record with global companies in the telecom

12

and Internet industries, having patents useful to mobile wireless telecom, expressly focused on spectrum-sharing and omni-modal transmission of voice and data, by software chips, modems, PCs, telecom handset devices, Internet reading devices, TV, Cable, Satellite-Internet connecting devices, and related routers and servers, whether embodied in any such devices, or manufactured or used within such devices, whether now in use or invented in the future for such purposes. These are the basic uses covered by the SITI-MLR patents described herein, and AST along with def. McCurdy's Patent Freedom.com keep a growing list (some 1,600 patents of such NPEs) available on their websites. The relevant geographic market includes the United States (US) because all Defendants have offices, sell products or services here, often made in Asia or Europe, and require US patent licenses or ownership for their activities.

a) All of the parties herein operate within a broader, domestic and international, private and public, mobile wireless patent licensing, and patent buying, market, including several auction markets. Defendants VZ, AST, CISCO, ERICSSON, and 13 additional AST members, and 4 related cartels, compete directly with SITI-MLR and other NPEs in this broader Market.

b)    However, within the more narrowly defined market, each Def. is a ( i) potential SITI MLR license purchaser; or (ii) potential licensing vendor to SITI-MLR; or (iii) potential patent purchaser from SITI-MLR, or (iv) potential patent inventor or owner competing with SITI-MLR.

c)    Def. and other AST members and cartels linked with the AST, are operating in a horizontal relationship, competing with MLR-SITI on licensing, purchases, ownership, use and control, of mobile wireless telecom patents. Together defendants and their respective interlocking partners, and affiliates represent and control a substantial portion of the broader patent market relating to mobile wireless technology , including that portion of the market in which MLR-Siti operate.

### Economic Scale of VZ, Affiliates and Network Competitors

27.    a) VZ is a US and global network leader in wireless technology, and has 100 mm. growing US subscribers and wireless connected devices, about a 37 % share currently (see twice.com/

13

article/print/ 451802-Data_ Revenues-Drive-q1-Verizon-Gains.php 4/25/10); NYT 7/16/09 A9; Wall Street Journal (WSJ) 2/5/10 B-1. Cf. 3Q. 2009 charts-re leading US networks.)

b) AST had 16 members in 2009 while planning for 40 members (a $210 mm. budget plan); it now has 18 members, and is linked through influential member VZ with 4 related network cartels described below, comprising some 150 global affiliates.

c) VZ's Network Competitors AT&T, VZ's nearest mobile wireless competitor, has 82 mm. subscribers (30%); together their subscribers are approx. 67 % of the US subscriber/wireless market (4/23/10 pcmag.com/article2/0, 2817,2362977,00.asp). Two smaller network competitors have 82 mm. subscribers, or 30 % (Sprint-Nextel and T-Mobile USA), for a total of 97 % in four firms.

d) VZ is outpacing AT&T in connection quality and capacity, despite AT&T's temporary "exclusivity" contract with Apple. The WSJ predicts that AT&T is "going to see a huge [subscriber] exodus to Verizon" as VZ gets announced distribution rights on Apple's new series iPhone in 2010, WSJ 3/31/10 B-1 "AT&T Preparing Network for Battle".

e) Besides VZ users through 16 AST members, VZ is linked with global cartels increasing overall subscribers to a total of 1.3 billion (bn.), 30-40 % of approx. 4 bn. wireless users, with many emphasizing US business. One patent valuation firm, Ocean Tomo values the licensing market to the 4 networks, plus the media, cable and cartel licensing markets, together at $500 billion See the WSJ 8/28/10 A-1 at A-4, describing the 300 Internet patents being enforced for infringements, in a suit by Paul Allen, a Microsoft co-founder, and Interval Research, his invention laboratory (now defunct), against current Internet giants, including AST member Google, for taking what they developed 10 years ago. (C 69)

28.     Scale of VZ Global Cartel Partners: The significance of the cartels and affiliates described here is that they joined up with each other and VZ to make money on their own patent

portfolios and those of their affiliated cartels, aware of many NPEs like SITI-MLR, owning patents the giants would need to license for 3G-4G wireless growth. Discovery as to their operative role is essential to SITI-MLR's case. It is inferable that they have advanced technical and wireless marketing knowledge from operating in so many countries. The largest cartels become a magnet for guidance to their global affiliates, and this means access to US patents and technical knowledge from US leaders, is a "trading currency" for cartels to use with smaller affiliates.

a) VZ's 45% partner **VOD** (Vodafone, stock on NASDAQ; its debt is listed on NYSE) is the world's largest mobile telecommunication network company, based on revenue, and has a market value of about $140 bn. The WSJ reported Moody's valuing **VOD's** 45% stake in VZ at $ 80 bn., making it difficult for VZ to buy-out, because of cash flow declines from VZ's wire line business, WSJ 4/19/10 C-8; "Verizon needs the cash from wireless more than Vodafone, which can afford to wait". "Cash Is Turning Into a Hang-Up for Verizon", *ibid.*

b) Currently **VOD** has operations in 31 countries and partner networks in a further 41 countries. Based on subscribers, it is the world's second largest mobile phone operator behind China Mobile. **VOD** has approximately (approx.) 430 mm. subscribers, in 31 markets across 5 continents. **VOD** has teamed-up with partner VZ to feature and sell Microsoft's new "Pink" handsets globally, WSJ 2/13/10 B-5, and upon information and belief, received wireless licenses from AST and members including VZ. VZ and/or AST inferably have, and will continue to share wireless IP technology, with **VOD** and its related cartels; otherwise the VZ/VOD 45 : 55% joint venture has little long-term purpose beyond its first financial input from VZ and VOD.

c) AST now owns patents held solely for licensing purposes and sales, through its Twister unit. Thus AST can, has or will instruct Twister or another controlled licensor to license **VOD** and its related cartels.

15

29.     **VOD's** venture partner is Telefonica S.A. ( NYSE, symbol **TEF**), 3rd in global subscriber size (157 mm. )  TEF is *de facto* part of the VZW-VOD cartel.  VZ/AST's market power also increases through VOD's partner: "Telefonica and archrival Vodafone..agreed to start sharing.. network infrastructure across Europe to help save 'hundreds of millions of euros' over the next decade'.."  VZ and these cartels (VOD, TEF) have a total (at year-end 2009) of approx. 580 mm. subscribers.

21. VZ partner VOD also owns an equity interest in China Mobile, Ltd. ( listed NYSE, symbol **CHL**), number one in China and in global wireless subscriber size, with 470 mm. growing subscribers.

30.     a) VOD partner **TEF** also owns equity in China Unicom, the 2d largest phone group in China with millions more subscribers (2009, NYSE, symbol **CHU**).  **CHL+ CHU** have a total of approx. 710 mm. subscribers; both are controlled by the Chinese government. TEF made an increased investment in **CHU** in '09 to become its largest outside investor, and **CHU** cross-invested in TEF to deepen their strategic alliance--VOD-TEF each invested billions in stock of CHL and CHU, list on the NYSE to finance in NYC, and also to sell China-made "smart phones" in the US.

        b)  By late 2009, AST and these global cartels represented a total subscribers' base of 1.3 bn., and still rapidly growing, atop a pyramid of suppliers who likely need MLR-SITI innovations in their patents. 45 licensees so far strongly suggest MLR-SITI own property and a business of increasing material value.

31.     VZ's Announced Global Intentions:  Chairman/CEO of VZ, Ivan G. Seidenberg, has described VZW's global expansion operations—a) linking its wireless networks with joint venture partner VOD and its affiliate CHL (recorded at 6/22/09 in a 35 minute filmed interview by "Charlie Rose", NYC PBS 13). VZ is a global "brand", building on its US and its IP leadership. "Verizon Moving From Landlines" ; stated Seidenberg, as to mobile telecom and the Internet, "We don't look any different than Google [ an AST member]… eliminating central offices and call centers..", (9/21/09 NYT B6).

16

b) Cartel Offices ( i) VOD does business in the US through partner VZW; VOD's main offices are in the U.K. ( ii) TEF's main offices are in Spain, doing US business from a Miami, Fla. office for its large cartels in Latin America. (iii) CHL does business in mainland China, Hong Kong and Pakistan. ( iv) CHU is in China, Macao, and now buying into millions of subscribers in many African countries, competing vs. Indian, Dubai, South African, Egyptian networks, and VOD in Ghana and elsewhere, WSJ 2/17/10 B-1; cf. Africa is "One of the Last Frontiers for Customer Growth", WSJ 4/24/10 B-5.

32. AST Exercises Strategic Controls Over Members, Affiliates-Suppliers and Co-Conspirators by Written Agreements and agreements by and between the members to take all necessary steps to destroy NPEs through whatever means necessary, including boycotts, deceptive bid rigging, and collaboration and cooperation in driving down the market price for relevant patents, including withholding individual bids for such patents in favor of AST and its brokers and in foregoing necessary patent acquisitions in favor of AST's acquisition thereof on behalf of the combination and conspiracy thereby inherently driving down the market prices . The AST's assurance of member cooperation has to be reflected in written documents, partially published or kept secret, which are evidence of a "contract, combination or conspiracy" (sec. 1, of the Sherman Act) because many AST members are NYSE or NASDAQ listed corporations and few high-tech executives would choose to publish their agreed set of rules to avoid AT challenge (except for Hinman at C 40-46), but their corporate size, skilled counsel and auditors, and US listing agreements require written documentation for AST members-affiliates, under US SEC auditing and disclosure rules and the legal and audit groups of the AST members also require SEC style, annual reports, proxy statements and quarterly disclosures in English, at home and in the US, as well as the need for US-IRS form 1099s or other forms necessary for each member's US tax returns. They also need them for defense in IP litigation among members, and their competitors, including mobile telecom infringement claims and related patent disputes. E.g. see Oracle v. Google in a recent case between AST members (WSJ 8/13/10 B-1).

17

33.     The Def., directly or by a division, parent, subsidiary, or agent, had actual knowledge of, and/or knowingly participated, in the conspiracy, among and between each other to fix prices for licenses or purchases of wireless patents, and all of the other overt related acts alleged herein intended to devalue NPEs' wireless patents. . The AST actions charged as attributable to all Def. were authorized, directed and performed by each of their respective officers, employees, agents, members or representatives while actively engaged in the management, direction, control or transaction of the business and/or affairs of each of the Def.

## EXPLAINING THE CORE CONCEPTS IN THE PATENTS IN ISSUE HEREIN

34.     SITI-MLR Patents-Their Core Concepts :

a)      The SITI-MLR patents cover "multi-band" (radio spectrum bandwidth) and "multi-mode" (multiple criteria, for alternative mobile telecom connections), in mobile handsets for 3G-4G wireless telecom. The patents described are fundamental to existing 3G and to higher speed, higher volume 4G, wireless Internet transmissions.

b)      The use of "packet transmission" of messages and data is the recognized method and apparatus basis for global Internet traffic—*e.g.*-Examine a five paragraph e-mail letter to be sent over the Internet: It is digitally scanned, and separated into about five separate transmission packets. It is then sent separately over various routes to reach the addressee, where its software translates the coded digital packets in order, re-printing the whole letter online. The packets may have gone through various software protocols, i.e. GSM in Europe, CDMA in the western US and Asia, etc., and over electronic routes varying by thousands of land miles. Thus the ability of the software chips in the mobile handset to jump from one message protocol to another [ multi-mode, e.g. from GSM to CDMA and then back to GSM on delivery ] is very important for speed, accuracy, cost, and quality in large volumes of message and data transmissions.

18

35. Next there is the need for shifting from one radio spectrum band to another in the course of a message transmission, to ensure speed and continuity of each packet's electronic journey, with searching for available spectrum bands, regardless of the radio spectrum available [ multi-band tracks]. MLR-SITI patents cover both needs, and are unique—and embodied in 45 licensing agreements, in part or in whole. The core concepts are being embodied in newer low-power use chipsets (for small devices) under development by the global leaders in chip design and manufacturing, including Intel, ARM Holdings of the UK (a key software source licensing to the giants), and Infineon Technologies of Germany, that Intel has agreed to buy for $1.7 bn. to obtain a foothold in Smartphone wireless chip design/production capability ( NYT 8/31/10 B3). These concepts and conveniences are a necessity to global carrier networks, to most chip makers, or router-server makers, to other infrastructure-equipment suppliers, and to all mobile handset makers, vendors and users. This includes the Apple-AT&T iPhone (2007) and the Apple successor that VZ will market in 2010, then the Motorola-Verizon Droid handset ( 2009) and the Google Android (2010) handsets, as well as increasing numbers of social network direct users, and large and small makers of routers, switches, servers and modems like CISCO and ERICSSON. Hundreds of new potential MLR-SITI licensees are involved. SITI believes interference with the patents by Def.'s concerted activities alleged herein, encourages misuse in foreign countries or their provinces where patent suits are strange, difficult to get to trial, and are wrongs without remedies. Theft or copying of valuable IP is a way of life many places, and difficult to trace among several parts suppliers. Difficulties at SITI in the 1990's in collecting volume or sales royalties over time from some large US companies, led MLR years ago to focus largely on single payment cash licenses, in lieu of periodic volume or sales royalties.

36. The patent history in SITI-MLR's US Patent No. **6,961,584** filed in the patent office (PTO) 2001, issued 2005, is entitled *'Tiered Wireless, MultiModal Access Device and Method'*: "BACKGROUND OF.. INVENTION "For a number of years, telecommunication systems have been evolving from a vast

array of disparate independent networks into a single interconnected telecommunication grid including
…systems such as public telephone systems, private PBS systems, cable networks, internet trunk lines,
local area networks, broad area networks and … wireless systems including specialized microwave,
satellite, cellular, PCS, Specialized Radio, television, radio, etc. The isolation of these systems… is
disappearing…Integrative technologies [advanced chipsets] have become available that will allow users, of
certain types of wireless networks, automated access to any one of the available wireless services… U.S.
Pat. No. 5,854,985 [ a 1998 Spectrum (SITI)-MLR patent] describes an omni-modal wireless access
device that allows automated access…on a user programmed criteria for selecting the service that best
meets the user's needs. The concepts disclosed in the '621 patent     [ No. 5,761,621, another 1998
Spectrum (SITI)-MLR patent] are being broadly adopted in modern cellular handsets commonly referred
to as multi-mode, multi-band phones because they are able to access anyone of…available wireless
networks using different frequencies [multi-band] and different communication protocols [multi-mode]..
AMPS, TDMA, CDMA, GSM, ..). Re-allocation of scarce radio spectrum through reassignment of
wireless users to disparate systems has been suggested but will require the wide adoption of omni-modal
wireless access devices of the type described in the '985 [Spectrum (SITI)-MLR] patent….Such access
devices and spectrum sharing methods will have the effect of further integrating the…infrastructure that
links…to sources of information, entertainment and various goods and services. …this…will greatly
expand the capacity of the radio spectrum to handle the ever growing demand for information flow over
the finite radio spectrum… "SUMMARY OF THE INVENTION. While the '621 and '985 patents [
Spectrum (SITI)-MLR 1998 patents] disclose concepts…these patents do not go far enough in making the
entire range of telecommunications systems and services available with a minimum of effort nor
…provide for automated techniques …that best meets the functional desires of the user such as highest
speed, highest clarity, highest security, least cost, least likelihood of interruption, or other qualities or a

20

combination of such qualities." The PTO material quoted above reflects the invention dates, and continuity of development in the SITI-MLR patent.

37. Cf. SITI-MLR's US Patent No. **US RE40,540 E** filed 2003, and reissued in 2008, entitled"*Apparatus and Methods For Networking Omni-Modal Radio Devices*": "ABSTRACT " A network and method of operating a network of wireless service providers adapted to interact with a plurality of omnimodal wireless products within a given geographic area in a manner to permit the wireless service providers 'to borrow' radio frequencies from other wireless service providers within the same geographic region…Implementation of this method broadly within a given geographic region will have the effect of insuring that the available radio spectrum is used to its maximum capacity to serve the needs of the wireless users on a real time basis.." The quoted language was written at SITI in the late 1990's, amended and updated 1999-2010, and comes from the innovative expertise of MLR principals which became full partners with SITI in the patents.

38. Several other wireless-related patents, and earlier SITI-MLR "data-connectivity" patents, have their own fields of use and users. a) A 2006 total of 25 patents pending applications were listed in the SA ( its Ex. C chart, p. 1-2 filed publicly in the PTO, recording SITI's permanent interest in Gross Proceeds therefrom). The list grows by IP "accretion" and is still growing ( a few early patents expired in 2009); and 14 US Patents, 4 foreign patents, 4 Pending US Applications and 8 Pending Foreign Applications remain on a current list (30 entries) referred to with new licensees. b) An "after-acquired properties" clause in the SA, includes the assigned grants to SITI, when any Gross Proceeds to SITI are earned. SITI's "Additional Patent Rights", are further defined in the SA as "MLR Existing and Future Patents".

39. SITI and MLR's Existing Business SITI and MLR invented and patented (in the US, Canada, Mexico, Europe, Hong Kong ), 35 inventions on: i) mobile data connectivity; and ii) also by wireless "multi-modal" and "multi-band" connections of wire and radio, combined with spectrum sharing,

over all types of telcom networks. The patent property portfolio began by several 1990's inventions at SITI alone; iii) The MLR founders-inventors next pursued their own licensing business; and iv) SITI's 2003 lawsuit to recapture its just share of Gross Proceeds was resolved in 2006.

## RECENT FACTS ADMITTED IN NEWS RELEASES BY KEY DEFENDANTS

40.     In June, 2008, the news media published a summary of a deliberately misleading Press Release from AST titled: "Tech Giants Join Together To Head Off Patent Suits" "Several tech-industry heavyweights are banding together to defend themselves against patent-infringement lawsuits. Their plan: to buy-up key intellectual property before it falls into the hands of parties that could use it against them, say people familiar with the matter…The new Allied Security Trust aims to buy patents that others might use to bring infringement claims against its members. Companies will pay roughly $ 250,000 to join the group and will each put about $5 million into escrow with the organization, to go towards future patent purchases …To head off such concerns, companies in the new group will sell the patents they acquire after they have granted themselves a nonexclusive license to the underlying technology. …' "It will never be an enforcement vehicle,' said the group's chief executive, Brian Hinman … It isn't the intent of the companies to make money on the transactions". He declined to confirm who the group's member companies are… 'Mr. Hinman said the group doesn't face any antitrust issues…" (Quoted at IPBiz "Coalition for Patent Fairness Morphs into Allied Security Trust?" 6/30/08 at ipbiz.blogspot.com/ 2008/06/coalition-for-patent-fairness-morphs., by Lawrence Ebert. Ebert updated his article 7/02/08 by a reported EE Times interview of Hinman entitled "Patent pools may flow in wake of latest alliance" ( at eetimes.com.show Article.jhtml; sessionid.. )

41.     On 8/13/08 VZ also issued a press release "..Brian Hinman is joining the company as vice-president-intellectual property groups. Effective Sept. 1, Hinman will be responsible for leading the intellectual property strategy for the corporation, including both its Verizon Telecom and Verizon Wireless business groups [emph. supplied]….Brian brings the expertise to maximize the impact of our

IPR [intellectual property resources] on Verizon's success.", newscenter.verizon/2008/brian-hinman-joins-verizon-as..

42. On **8/13/08** AST also issued a press release: "Former Lucent, IBM... executive will lead industry-wide effort.. "Allied Security Trust (AST) announced today that Daniel P. McCurdy will replace Brian Hinman as CEO. Mr. McCurdy was previously President, Lucent Technologies' Intellectual Property Business, Vice President of IBM ..and founder and Chief Executive Officer of PatentFreedom. In this new role, Dan will continue to serve as Chairman of PatentFreedom[.com]." The article goes on to recite more misleading propaganda, Mr. Hinman will be leaving the Trust to become the Vice President, Intellectual Property at Verizon Communications... "With eleven current worldwide members, AST provides an effective mechanism to help operating companies share the cost of acquiring licenses to patents being sold on the market at a much lower cost than if the company were to purchase the patents by itself. As will be demonstrated herein, the article then articulates a fundamental deceptive slogan adopted by AST's management, "AST maintains a "catch-and-release" commitment that returns to the market in a timely manner patents acquired on behalf of Trust members after licenses are secured." (Sanjose.bizjournals.com "Companies share patent pools to head off costly IP litigation" Reuters.comarticle/pressReleaseidUS208534+13-Aug-2008)

43. The format of these reported, same-day announcements, indicate that a) AST executive appointments are coordinated and made by or through VZ. b) After organizing AST, Defendant Hinman was charged with responsibility for all VZ IP strategy. Buying and licensing activity at AST from '07-'10 was in large measure directed by Hinman for the benefit of VZ, *inter alia,* and led by VZ as per Hinman's announced role. c)These facts find additional support in the appointment of McCurdy in 2008 (a former IBM colleague of Hinman), the two executives' coordinated statements, and the actions of AST, which, as alleged below, evidence VZ's ongoing *de facto* control of AST 2008-2010.

23

44. <u>Between</u> the press releases heretofore described, the <u>EE Times</u> interviewed AST's

first CEO Hinman, **7/02/08**; a) Hinman <u>described AST strategies</u> embodied in the par.34

EETimes article :

### 7/2/2008 11:08 PM EDT

SAN JOSE, Calif. — A group of 11 high tech companies that have combined their clout to buy, license and sell strategic patents may point the way for more patent pools to come in a maturing market for intellectual property.

Allied Security Trust I came out of stealth mode this week following a report Monday (June 30) in the Wall Street Journal. In an interview with EE Times Wednesday (July 2), the group's chief executive, a former vice president of IP and licensing at IBM, provided the most detailed disclosure to date about the group's goals and operations.

The group aims to lower the rising costs of patent litigation by proactively acquiring key patents as they come on the market. An increasing number of companies are asserting patents as part of their business, many of them so-called trolls who have no other products than the patents they buy, license and litigate.

"We are fundamentally a defensive agency procuring patents on behalf of our members," said Brian Hinman, chief executive of Allied. "We are not an investment vehicle, and our objective is not to make money," he added.

"I think this will start a trend of further pooling and other new models being created to address the troll threat," said Mike McLean, a vice president at Semiconductor Insights, a division of TechInsights which publishes EE Times. "It's good to see companies taking creative action to address this challenge to their businesses rather than just complaining about it being unfair," he added.

Allied's members include Cisco Systems, Ericsson, Google, Hewlett-Packard and Verizon and six other companies who do not want to be named. As many as three other companies are expected to become members in the next 30 days, said Hinman.

"I am interested in only the patents that are strategic or potentially problematic for a subset of our members," said Hinman, who refused to disclose the number of patents he has bought or sold since the group was formed with four members in March 2007.

Each company puts $5 million into an escrow account used as working capital to buy patents that members can then license.

b) Allied works with a network of 38 patent brokers who compile a weekly list of available patents that Allied circulates to its members. They can choose to contribute any amount they wish to buy any number of the patents on the list. Allied eventually re-sells the patents with proceeds going back to the companies who paid to buy them.

"It's a catch-and-release formula handled on an opt-in basis," said Hinman.

24

"Patents have to be gone is a fixed amount of time," he added. "The objective is to recoup a portion of the cost of the investments because we are not a patent-holding company."

Allied's name was deliberately generic to provide a degree of confidentiality. The company creates an independent legal entity when it buys and sells patents to further obscure its identity so that buyers and sellers do not realize its big-company backing and raise or lower prices accordingly.

"To keep its costs low, Allied operates on something of a shoestring with a chief technologist and finance officer and small administrative staff but all legal and IT functions outsourced. It does plan to expand its technical staff to increase its capability for handling due diligence on patents. [by] Rick Merritt (C36, Reuters.comarticle 13-Aug-2008 *supra*.); Cf. C 118-122, third cause of action herein.

45.     Hinman in referring to AST told Evan Coblentz at *Wireless Week*, **8/19/08**, he would rather it stayed secret, in an article entitled "Tech Patent Alliance Recruits Heavyweights to Fight Trolls" "This started back in March 2007," said Hinman. "The concept was developed by the four founding companies," which were Hewlett-Packard, Motorola, Sun Microsystems and an undisclosed member. Hinman hopes to recruit another half-dozen companies by the end of this year ['08] but said "he has already acquired a few sizable patent portfolios. We tried to keep this thing as secret as long as we could. So we'd been preparing for damage control for some time," he said.

46.     a) Earlier in the **8/19/08** *Wireless Week* article, author Coblentz noted:     "Brian Hinman likes secrecy. As CEO of the vaguely named Allied Security Trust, his job is to acquire potentially valuable patents on behalf of some of the world's largest technology companies while garnering as little attention as possible." Hinman said "We don't want companies to know that it's the Allied Security Trust buying the patents. We have a structure that we present which keeps our identity anonymous, …", with his picture above the caption: "Hinman: *Members of the Allied Security Trust pay for protection*." Buying up of wireless patents followed for 18 months, with low-price licenses to members, followed next by an AST notice as to wireless patent license pricing, and purchase pricing, by AST early in 2010. c) The current AST "Team" speaks to the patent marketplace :



**DanielP.McCurdy**
**CEO**

Mr. McCurdy has more than twenty years of experience in intellectual property positions at highly regarded technology companies including ThinkFire, Lucent Technologies and IBM. Mr. McCurdy received his B.A. *summa cum laude* from the University of North Carolina. He also serves as CEO of PatentFreedom, an online community providing companies comprehensive information and networking capabilities to better manage patent assertions from Non-Practicing Entities.



AST's process of acquiring patents begins with a worldwide network of over 170 brokers, operating companies, law firms, academic institutions, individual inventors and other patent holders with patents for sale. We receive portfolios ranging from a single patent to thousands of patents and applications.

AST performs a preliminary analysis on each patent portfolio to ensure we understand the current assignee, and relationship of any involved selling agent. We then search for family members and foreign counterparts, and ensure that the patent is within the technology areas of interest to AST's member companies. AST then performs an initial analysis, classifying each patent by (i) the types of products an adversarial patent holder may try and target with the patent (e.g., cellular handsets, routers, digital cameras, web-browsing technologies); (ii) the technology represented by the patent (e.g., antennas, imaging, liquid crystal, power supplies, graphical interfaces), and when the patents are of potential interest to one or more member companies, (iii) the quality of the patent using indicative characteristics (e.g., how early in time is the invention relative to other similar inventions, how easy is the invention to detect, how easy to avoid, how likely is it used in a standard, how broad are the claims).

With this knowledge, AST is able to help its members better focus on patents of potential interest to them. Because AST is governed by its members, all patents, AST analyses and marketing materials supplied by the seller are securely distributed to members via a web-based application called f-AST IP. The decision of whether to pursue a patent through AST is the decision of each member. For an annual fee of $200K (which decreases as additional companies join AST to help defray the costs of gathering, analyzing and conducting bid activity on patents), operating companies are delivered a wealth of information on thousands of patents annually (we estimate more than 10,000 patents will be presented to AST members in 2010). Fortunately, our process allows companies to focus, generally, on less than 5 percent of these patents that meet their specific technical, product and quality interests. For patents of interest, unless AST has learned of a patent sale in confidence (which occurs rarely), unless or until an AST member has informed AST of its intent to bid through AST, that member can pursue the patent alone, through other organizations in which they might participate, through AST, or not at all.

When AST members choose to bid, they inform the AST CEO and deposit sufficient funds to cover their bid, in an escrow account held by Wells Fargo. AST helps foster collaboration among members by identifying common interests and communicating potential interest among members without divulging which members in AST may have interest or pricing information among members. This helps similarly-situated companies to more rapidly identify patents of interest while still fully protecting their anonymity while ensuring every member is solely responsible for deciding whether to bid and the amount of any bid. AST is committed to paying the full market price for patents we purchase. We are not interested in a bargain, and believe patent owners should realize the full market value for their patent in a competitive, transparent marketplace. We also believe that a fully transparent sales process, whereby all interested parties are informed of a patent sale and have the opportunity to participate in it, is in the best interest of the patent seller and all potential buyers, including AST. Because we are buying for defensive purposes (freedom of action) versus purchasing for the purpose of enforcement (the primary objective of non-practicing entities), our due diligence is primarily focused on the integrity of the chain of title, assuring that the seller has the right to sell the patents, and on the completeness of the portfolio (ensuring all family members are included in the sale). We require clear title to the assets we purchase and an understanding of previous licenses or other encumbrances, but otherwise asks very little in representations and warranties of sellers compared to other buyers. For this reason, AST closes quickly, usually within a few days following an accepted offer.

For each acquisition, AST forms both a Series pursuant to the Delaware Statutory Trust statute, and a Limited Liability Corporation (LLC) under each Series. This enables us to accurately account for the finances and activities of each portfolio purchased, since AST can purchase a patent portfolio if one member has interest, or if many

members are participating in the acquisition. A list of all portfolios AST has acquired and their associated LLCs can be found here.

d)Patents Acquired so Far: Portfolio status is current as of Aug 11, 2010. For current availability, please contact us.

| | Name | Status | Summary |
|---|---|---|---|
| ✚ | Black Maple, LLC | Sold | Computer systems which monitor or scan for system configurations and automatically initiate software updates. |
| ✚ | Meerkat Technology LLC | Sold | Method is practiced by web applications/sites. Method for creating an interactive web page that holds multiple objects; the objects have associated behaviors that are triggered when events occur; a behavior causes an action to occur when an event triggers. Eg.,clicking a star on a webpage to indicate importance and the star turns red. |
| ✚ | Ringsoft, LLC | Currently owned by AST, available to new AST members for license | Bundling and moving files between storage formats |
| ✚ | Shiftlink, LLC | Sold | International telephone routing information, status, and availability network |
| ✚ | River Road Technologies, LLC | Sold | Technologies related to mobile messaging and geolocation |
| ✚ | TurnBridge Wells, LLC | Currently for sale on open market through Red Chalk, nstablnsky@redchalkgroup.com, available to new AST members for license | The portfolio contains 4 US Patents related to location based mobile messaging. The system described in the patents allows a user to post messages for other persons at specific coordinate way points and to retrieve the messages when they enter or are near the coordinate way point. This pioneering portfolio, consisting of over 100 US claims, represents innovations believed by many to be fundamental to the future of mobile social networking. |
| ✚ | Haystack Alley, LLC | Sold | The portfolio relates to a range of technologies such as integrated circuits, logic circuits, Very-Large-Scale Integration (VLSI) circuits, thin film transistors, clocking, memory, semiconductor design and processing, system bus architecture, and power management. |
| ✚ | Overland Enterprises LLC | Sold | The portfolio contains 1 US Patent which relates to a dynamic, self-modifying graphical user interface for use with relational or object-oriented database management systems. Users are able to search and edit the contents of a relational database as well as modify the structure of the relational database tables. Users are also able to import and export batches of data, and the interface of the system provides schematic representations of the physical locations of the relational database contents. |
| ✚ | Twister Investments, LLC | Currently owned by AST, available to new AST members for license | A distributed network cache system |
| ✚ | Full Spectrum Technologies, LLC | Sold | |

| | | | |
|---|---|---|---|
| (+) | Red Acre, LLC | Currently for sale on open market through NextTechs carlos.gorrichategui@nexttechs.com, available to new AST members for license | Advertising markup language |
| (+) | Crescent Moon, LLC | Currently for sale on open market through Red Chalk, nstabinsky@redchalkgroup.com, available to new AST members | Numerous computer technologies including enclosure, graphics and display Misc. microprocessor memory technologies including cache management, memory controller, memory architecture, DMA etc. Misc. computer input technologies including keyboard, graphics tablet, mouse and GUI Assorted direction speaker, video conferencing, and broadband television systems and methods Assorted network related devices and methods Audio, Video and Image processing, enhancement and communications technologies Audio, Video and image coding and decoding technologies Methods and devices for increasing power efficiency in electronic circuitry Various electronic circuits |
| (+) | Seven Circle, LLC | Sold | These patents cover Open Source Software, including but not limited to, operating systems, desktop applications and browsers. |
| (+) | Bollinger Lane, LLC | Sold | System and method for automatically detecting neutral expressionless faces in digital images |
| (+) | Peripheral Vision, LLC | Sold | Automated capture of technical documents for electronic review and distribution |
| (+) | Stature Ventures, LLC | Currently for sale on open market through Patent Profit International, LLC, will@patprofit.com, available to new AST members for license | Method and apparatus for initiating telephone calls using a data network |
| (+) | Lady Kensington, LLC | Currently for sale on open market through Patent Profit International, LLC, will@patprofit.com, available to new AST members for license | Technology for providing call muting on a conference call when noise exceeds a certain level |
| (+) | Hawthorne Heights, LLC | Currently owned by AST, available to new AST members for license | Patents relating to GPS-enabled mobile phones configured to provide location based services such as wireless E-911 |
| (+) | Rooster Row, LLC | Currently owned by AST, available to new AST members for license | High-performance, server blade and computer cluster related technologies including: distributive processing, network attached storage, distributed resource management, data fail over and long-range USB |
| (+) | Tudor Empire, LLC | Sold | Technology for storing and referencing an application user's preferences, possibly including the use of browser cookies |
| (+) | Liberty Lane, LLC | Currently owned by AST, available to new AST members for license | Parallel processing Java VM |
| (+) | Abraham Lane, LLC | Currently owned by AST, available to new AST members for license | Method and apparatus for managing power usage in a portable device |

| ⊕ | Red        Fern Valley, LLC | Currently owned by AST, available to new AST members for license | Electronic apparatus comprising a display screen, and method of displaying graphics |
|---|---|---|---|
| ⊕ | Sage Technology, LLC | Currently owned by AST, available to new AST members for license | This lot relates to voice mail and telephone exchange systems, specifically disclosing a switching system that interconnects a number of telephone switching systems to a single voice mail system. |

47.    AST issued a press release **1/26/10** at alliedsecuritytrust.com titled "Allied Security Trust Announces Availability of Major Patent Portfolio: Providing Opportunity for Anyone To Take a License Prior to the Upcoming Portfolio Sale". "Source: Allied Security Trust ... January 26, 2010.

a)    "Allied Security Trust (AST) announced today that Crescent Moon LLC, a company affiliated with AST, will sell 286 patents it purchased in 2009 from NEC Corporation. AST operates under a 'catch and release' model that is unique among defensive patent organizations. AST members purchase patents for defensive purposes, secure the necessary licenses to ensure freedom of operation, and then return the patents to the marketplace for sale. These sale proceeds help to reimburse AST members for their investment in acquiring a license. Under the rules of Trust, AST or its affiliated companies seek to sell all acquired patents within one year of the date of acquisition."

b)    b) The press release was misleading in several respects: first AST did not always catch, then release the patents that they acquired, as will be demonstrated herein; and secondly, while they sold a portion of the patents, in at least some instances, the purchaser was a patent pool which had the avowed purpose of controlling patents for its members and making every effort to end, or at minimum, to stifle small patent owners licensing and enforcement business--thereby assuring further assistance in the AST restraint of trade. This quote suggests a new AST propaganda method.

48.    The 1/26/10 release then states: " This is the first time since our formation that we will make licenses available to companies outside AST before instituting a portfolio sale", said Dan McCurdy, CEO of AST. "This is a special case...but given the unique size and scope of this portfolio [ 286 patents

29

bought from NEC in mid '09], AST and its members decided it was appropriate to give others in the industry an opportunity to 'inoculate' themselves."

49.     "We are making the patent license available at a price significantly less than the highest price paid by a contributing AST member company to demonstrate the purpose of AST—to enhance freedom of action and minimize patent threats, rather than to profit from patent purchases. That said, there are other members of AST that paid significantly less for their license than the price now being made available to outside companies," continued McCurdy." "We are hopeful AST's actions will encourage other companies to consider joining AST"... *ibid.* The AST website now states: "New members of AST pay a onetime initiation fee of $150,000, and all members pay a $200,000 annual fee. This amount will be reduced over time as AST's membership grows. AST members each have an escrow account, with no minimum standing escrow amount required (previously, AST had a standing escrow requirement of $5 million, which has been eliminated)...

Allied Security Trust currently has 18 members, from Europe, North America and Asia. Some members include:

- Avaya
- Ericsson
- HP
- IBM
- Intel
- Motorola
- Oracle
- Philips
- Research in Motion
- Verizon

...If you are an operating company with annual revenues of $500M/yr or more and are interested in learning more about AST membership, contact us."

50.     a) The **1/26/10** press release continues: "..Licensees can obtain a license for a price of US $1 million per lot, or US $3 million for all four lots [ 286 varied patents are being licensed at approx. $10,000 per patent]..Licenses will be available beginning immediately through April 15, 2010..and the portfolios will be sold on or before July 31, 2010." *ibid.* AST said in this release "To date, it [AST] has invested US 40M to purchase 400 patents". b) Much of the publicity surrounding these transactions was illusory and intended to serve as false propaganda promoting the idea that AST

was radically reducing the price of licensing of telecom patents, thereby discouraging others from independently approaching NPEs, for purchase or licenses, since inevitably the technology would eventually be made available at reduced prices. Thereby Def. were indirectly manipulating the market prices downward, while discouraging direct dealing with small NPEs, with a hoped for similar effect.

51.     Of the 400 patents AST purchased through 1/ 26/10 –a) 308 (77%) came from buy-ups from two AST "friends"--22 from Microsoft (MSFT) and 286 from NEC Corporation (NEC). b) The 22 from MSFT were resold to a Linux-Open Invention Network (OIN) 9/09. The NEC patents being licensed, then auctioned by July 31, 2010 are being sold through an AST broker-adviser, RedChalk.com. No announcement of such sale has yet appeared on the AST website or elsewhere.

52.     A Patent Hoax by VZ Connections a) NEC is one of Japan's largest industrial companies. NEC is a significant supplier to VZ and other AST members. NEC gave a Technical Achievement Award to VZ, 10/21/09, with a joint public release. NEC America is one of VZ's key US suppliers. NEC is respected for its inventions and patents. AST's buy-up from NEC was not an arms-length transaction, and NEC is not an NPE. The list of NEC patents (on AST's website) appear as a jumble from a discard pile, that few large companies would buy except at giveaway prices. And they apparently have not been sold as yet, despite the propaganda. They appear as an AST patent sales inventory that could not be sold.

b) AST says in the release 1/26/10 "… 82% of the money originally invested by Trust members to purchase patents is returned to them at the time patents are sold, making the Trust by far the most economical collaborative mechanism in the world for members to obtain licenses to patents that may otherwise fall into the hands of an adversarial party".. This collaborative mechanism appears as a deceitful collusion tactic as well.

53.     Other VZ Connections to carry out the Plan, omitted from the AST press release: Microsoft (MSFT) was also an ally using the 22 Linux patents as "partial currency" in a $650 mm.

31

investment to assist VZ and not incidentally, sell MSFT behavioral marketing ads to companies in the mobile telecom industry, i.e. AST members, replacing Google who had been in a similar discussion with VZ (and since returned to collaborate). The payment in kind in July 2009, for VZ "contract favors" was camouflaged by reducing the patent purchase price to AST; thus AST's transaction with MSFT was not an arms-length purchase, and MSFT is plainly not an NPE-- because it is global leader in design and marketing of its own inventions. Not coincidently, MSFT is now a vendor-source of handsets to both VZ and its 45% wireless partner VOD.

54.     AST patent purchases from unstated sources: At least 92 were made at an average purchase price of $100,000 each, as part of the 400 disclosed patent purchases listed on AST's webpages ( cf. Hinman at C 45, speaking August '08 without correction). SITI-MLR's current general license price is $1 mm.+ and is rising steadily as the market for licensing of its patents explodes globally, into an estimated $500 billion market for licensing alone, but for a license market devaluation effect of the AST Plan, doing its unlawful best.

55.     VZ Connections to carry out the AST Plan

a)      In July '09 AST bought ownership from MSFT of the described bloc of 22 software (Linux-open source) patents. They were invented at Silicon Graphics Corp, a small company, with a $70 mm. enterprise value at 12/09/09. MSFT had paid a publicized $63 mm. for them in 2002, buying from a vendor named Seven Circle, LLC. ( whose name is on the AST website. The list of 22 formerly MSFT-owned, Linux patents is on the AST.com website under "Portfolios that AST has Purchased/Owned at one time" ). MSFT had sued a few Linux user companies for infringement, and after inconclusive results, dropped its infringement project.

b)      MSFT sold them to AST in July '09 at a $61 mm. loss, embodied in a larger concurrent marketing transaction with VZ (par. 47, 50). c) Back in 1/26/09 AST agreed to buy the

32

Linux patents from MSFT finally paying just $2.2 mm. for them in July '09, in a private MSFT auction, ($100,000 per patent, " one more 'sweetheart deal' on review of the AST 2010 release.

56. VZ had to approve use of AST funds to make the purchase, by the rules of its Trust, and because it was not an AST arms-length transaction. b) VZ also needed Linux patent licenses on patents bought from MSFT (in July '09) for its secret new "Droid" ™ phones, a "game-changing" new handset being jointly designed and made for VZ by Motorola (MOT), an AST member needing a license. But VZ used AST (C47) as its "handy" purchase/re-licensing vehicle for the Linux patents, as the "most economical collaborative mechanism in the world for members", thereby killing two birds with one stone, again by creating an appearance of low purchase price and enhancing the appearance of market position, which was all an illusion intended to manipulate the market price for IP.

57. Interlocking VZ Connections MSFT is a contract partner of VZ. MSFT, upon information and belief, is also an undisclosed partner or friend to AST in future "behavioral marketing" for all AST members and affiliates, by targeted ads and sharing of ad revenues. A database advertising contract for VZ occurred in the same month as MSFT's "bearish" loss of $61 mm., on sale to AST (at $2.2 mm.) of its 22 Linux patents, with VZ's required approval under the rules of the AST. MSFT thus paid VZ and AST in order to replace and supplant competitor Google ( a powerful AST member) in VZ's behavioral marketing, which was a topic of publicized Google discussion with VZ in early '09. This was the VZ "contract favor" to MSFT identified at .

58. The proximity of the MSFT ad marketing 7/09 deal with VZ, to the MSFT sale of Linux patents to AST 7/09 at a large loss, raised questions of "reality" to a Cnet.com reporter, when he noted that "Microsoft..claims the patents were not important" after AST's resale in 6 weeks to the Linux-Open Invention Network (OIN). Cnet.com Newsman Matt Asay also said, 9/9/09: "Did the OIN get value or garbage? ... If Microsoft didn't care about the patents, why should OIN?" His cynicism parallels IP tech-

scholar Moore's at C 62. SITI submits the purchase story also sounds like "a pack of lies, agreed upon" [with credit to Voltaire's definition of "history"].

59.     AST Licenses:   In six weeks, AST had licensed the 22 Linux patents from MSFT to undisclosed AST members, on a variable "most-favored nation" (MFN) basis at extra-low prices first revealed in AST's 1/26/10 press release.

60.     VZ-Motorola (MOT) designed the VZ Droid handset with special new features in early '09, trying to improve upon the AT&T-Apple "iPhone" invention (2007), giving rise to VZ's $100 mm. marketing effort for "Droid" vs. the AT&T-iPhone. This first major selling effort for the secret Droid was launched in September '09 and focused largely in 2009. MOT-VZ needed the MSFT-Linux licenses; and AST complied on request in July '09 before reselling the Linux patents to OIN as a new owner. AST members MOT and VZ appear to be the most immediate beneficiary of the AST purchase; other AST members and cartel affiliates may be licensees too.

61.     MOT also licensed the latest MLR-SITI patents, purchasing a renewed and extended MOT license.  MOT signed it, late February '09, and paid MLR-SITI the agreed-upon license fee, adding their newest patents to an existing SITI-MLR license to MOT dating from 1997. The license from MLR-SITI was consummated by MOT in early '09, after an MLR-SITI infringement action was well under way against MOT.  Then MOT either granted to VZ "pass-through" rights for its Droid marketing, or otherwise met such goal, as a part of their joint designer-supplier relationship on the Droid handset.

62.     MFN Treatment six weeks after purchase  AST had licensed the 22 Linux patents from MSFT to AST members, at low prices, subject to adjustments downward on a "most-favored nation" (MFN) basis--a fact revealed in AST's 1/26/10 press release aimed at non-members, showing (par. 42-43) insider AST members were granted a price-fixed Linux license at much less than $10,000 per patent.

63.     Six weeks after its purchase of Linux patents from MSFT, AST resold them (9/09) to a Linux patent licensing agent, the Open Invention Network ( OIN.com), which is a network of 6 more

telecom giants ( 3 of whom, promptly joined AST paying in $15.8 mm. in capital ). OIN had publicly protested: Why as a Linux open-source specialist (a patent aggregator ), was it not even invited to MSFT's "auction"? The answer was a quick AST sale on unrevealed terms; "Pro-Linux Group nabs Microsoft patents" ( news.cnet. com 9/08/09).

64. OIN's hostility to NPEs was publicly stated on its website, and affirmed by its CEO in his public statement as the resale deal with AST was closed. With others, AST's "collusion base" by late 2009 has 18 members; (a $210 mm. 2009 ultimate budget for 40 members)+ a members' hurdle of "over $1 billion in product revenue", and $5.25 mm cost ($250,000 to join, plus $5mm. paid in for IP purchases).

65. Despite Hinman's saying AST had no intent to make money on patent buy-ups, AST did not charitably "catch", or charitably "release" the Linux or the NEC patents to the marketplace--it raised capital for its business. AST also was paid an undisclosed amount by OIN, while linking AST with OIN, and receiving $15.8 mm. in new investment capital from 3 new AST members derived directly from OIN. Hence that sale was, in part, tied to an AST membership buy-in, by three OIN members.

## AST'S COLLUSIVE INTERLOCKS FOR PURCHASES AND PATENT LICENSES

66. IBM, ERICSSON and Sun Microsystems ("Sun") were AST members in 2009. IBM, Sony (an ERICSSON partner) and Sun are also members of OIN. The three new AST members from OIN, are giants Royal Philips Electronics NV of Holland (" Philips"); Research in Motion("RIM"), Canada; Avaya Inc.(" Avaya" ); and Sun's new owner—huge software maker Oracle, which by merger in 2010, acquired membership *de facto* in both AST and OIN. AST's collective Market Power (cap. value., revenues, subscribers-users) is fairly easy to add-up online as to disclosed members, and it is very imposing for just 2/3rds of all 18 members, plus secret members, without counting the cartels for 1/3 to 1/2 the world's subscribers added-in.

a)      Kobe v. Dempsey Pump 198 F.2d 416 (10th Cir.1952) is an instructive buy-side case of market rigging, abuse of market power, and separate AT enforcement rights awarded to a small

new company, tried as a defensive counterclaim against Kobe's artificial claim of patent infringement. The decision treats the AT laws and the patent law as two separate bodies of law available to parties injured under either class of statutory tort. Dempsey prevailed on its Sherman-Clayton Act AT claims.

b) In order to become a member of AST and to qualify for the best price for the patent licenses you must be a company and have annual revenues in excess of $500,000,000. The AST website provides: "If you are an operating company with annual revenues of $500M/yr or more and are interested in learning more about AST membership, contact us." Hence, under the terms of its published guidelines, the small technology company is to be discouraged from using the acquired patents in developing new ideas and competing technologies to those already owned and controlled by AST and its membership. Indeed, the patents could only be licensed in lots at substantial dollar amounts, requiring well financed backing or encouraging infringement and future claims of ownership of new ideas.

c) AST and its members and interlocking owners/cartels are the principal licensors (as well as licensees) for the IP property which is the subject of Siti/MLR's patents and other similar NPE patents. As such AST pretty much dictates the "legitimate" use and licensing of patents in the Internet-wireless field and they, in combination with other similar patent pools, with whom they clearly have interlocking relationships, have deliberately publicized their purchases of patents "in the field" --which, upon examination, discloses few, if any useful patents bought by AST, and discloses that they are not legitimate purchases from NPEs. They are subterfuges in order to depress the market, and these same Def. have made it clear that they do not intend to honor Siti's patents and those of other similarly situated licensors. This was amply demonstrated in the 2008-2009 court struggle between Motorola and MLR, until it became critical for a timetable connected with introduction by VZ/MOT of the Droid handset. The disclosed failure of the MOT/VZ venture to recognize and honor MLR/SITI's patent growth extensions (particularly since MOT had a license for the older patents and knew that MLR's newer patents were valid), without protracted litigation, was clear evidence of the overall AST plan--not to license NPE's

technology, and/or a manifestation of the conspirators' efforts to drive down the price and minimize the importance of that technology.

d)      Indeed, this refusal to recognize and license MLR/SITI technology by the members of AST for over a two year period coincidentally occurred during the period commencing with ASTs existence. This was a period in which Apple, who did recognize and honor the MLR/Siti patent licenses that it held, used those licenses to "leap frog" the competition in the wireless handset business, and certainly makes it appear that the refusal to engage by AST and its members with MLR/SITI was not in their competitive interest.

67.      AST CEO Hinman said, back on **8/19/08** (C 45), that "he has already acquired a few sizable patent portfolios" –Upon information and belief, AST has bought more than the first "few" portfolios, licensed them to AST members, cartel allies, and resold them to interlocked allies 2007-2010. Neither NEC, MSFT, ERICSSON, nor OIN are NPEs. Nevertheless AST has grouped these transactions with their 23 % of purchases from, presumably 92 independent owners, and have listed all of them on ASTs' webpages—with the clear intention of making it appear that they have effected a reduction in the market value of 3G and 4G mobile wireless IP. But each of the listed entities is a VZ/AST ally in the transactions described at C40-59--it was talking to old and new allies on the Web.

68.      AST's Plan was recognized and criticized as an abuse of Market Power on **7/5/08**, just after AST's first press release, by critic Jim Moore, at Harvard Law School, who said: "Allied Security Trust [AST] formed by large companies as a way to crush small companies and individual inventors.. "Large companies use these pools to keep small, emerging companies out of their markets and/or to force small companies to sell out to large companies before becoming a threat ... Patents are a way for a small company to protect itself from predatory large firms while the small company remains small..Eventually, the well-protected small company grows to the point that it can sustain market attacks from large ones. This is the nightmare scenario for large firms. The motivation of ...the Allied Security Trust [AST]...is to

protect the oligopoly positions of their large member firms. The largest firms in the IT space... They are not in competition with existing firms so much as with 'companies unborn' who may–and probably will–disrupt their markets as profoundly as they disrupted their predecessors'...What large companies are afraid of is innovation by small companies and individual inventors...Allied Security Trust..are mechanisms invented by large companies to make them safe from small, disruptive newcomers..[that] enable large companies to buy up patents that might pose potential threats, and get them out of the hands of small firms and individuals ...The great fiction is that large companies mostly compete with each other. Not true. Large companies work out arrangements with each other. " by Jim Moore; "Innovation..Public Policy," blogs.law.harvard.edu/jm/2008/07/05; emph.supp.

69. Market Power; and the Global Players in Licensing and Purchasing Patents

a) There is an active private and public market in wireless patent licensing and sales, with many sources of information, and auctions. But it is far away from the New York Stock Exchange, NY commodity markets or the Chicago Board of Trade. Patent trading is still in its "Wild West" environment, but it is still active. It is Big, but not transparent, nor ethical, nor monitored by any regulatory agency, and it can be manipulated and deceived by traders who wish to drive down prices and corner valuable technology, and/or insure that certain patents are not licensed.

b) Cf. activities at the public auction-patent valuation advisory house "Ocean Tomo. com". (C 18c)) At its website, activities are listed; and also at auctions, seminars, and gatherings where OceanTomo experts lecture on "Best Practices" for buying, selling, licensing patents. Patent Broker and Litigation Support firm, Red Chalk Group in Illinois and Munich, Germany, manages sales and licensing activities for the AST needs to look more influential than it really is in fact. It is a second such advisory-litigation support firm to McCurdy's own PatentFreedom.com with the same outlook. Twister (C 98) does the same thing for AST.

38

c)    On the Internet, "Spectrumbridge. com.spec.ex" is also an emerging exchange facility for spectrum-sharing, a key subject of SITI-MLR's patents. Cf. the list at Google.com/search, "Results 1-10 of about 46,400 for "Brokers and advisors in licensing or selling wireless patents", a disparate group, akin to small realtors in the US. The Internet has more sources of license-sales and royalty data and tactics, but is not an organized, regulated commodity market. Read with C26 defining the market herein, AST's members with trained engineers are patent "pros", using weaknesses in emerging markets as they share their industry and litigation knowledge, useful for their price fixing, strategy and collusion. They hold US and global market power far beyond the smaller NPEs. Each AST member can sit on its board of directors; and "as such makes all major decisions about the AST operating model," says Alliedsecurity trust.com at p.1, membership.

d)    AST also works by 68 brokers' to act against patent owners plus Twister's semi-secret brokers and "catch and release" price-fixing controls and beneath this surface there is the propaganda of AST, PatentFreedom.com and the structure of AST, designed to make normal license and sales pricing go downward for all NPEs including SITI-MLR. It is a relatively easy market to "fix".

70.    Other Collusive Affiliations: CEOs McCurdy and Hinman are both IP alumni of AST member IBM. McCurdy was also President of IP at Lucent (born from Western Electric-Lucent, as old Bell system spin-offs ), by which Lucent, and AST members ERICSSON (plus Sony) and MOT, each obtained access (1997-2010) to SITI-MLR's book of wireless patents as three licensees, paying for licenses after lawsuits and negotiation, easily keeping tabs on its public, and its recent PTO portfolio. In concert with other VZ/AST members owning SITI-MLR licenses, they have knowledge + networking links, informal (e.g. CTIA. com, a Wireless Association group), PatentFreedom.com, and formalized in AST, for action in concert alleged herein. Thus, "catch and release" seems to mean release to another patent pool which will insure that the patents are used for and by large entities to the exclusion of small patent owners who wish to compete with the established telecom/internet giants. The flavor of McCurdy's campaign in

39

AST against NPEs speaks volumes on his PatentFreedom.com website where he is still CEO:

"a) Because they do not sell products or services (other than the licensing of intellectual property), NPEs almost by definition do not infringe on the patent rights contained in most patent portfolios. They are, therefore, essentially invulnerable to the threat of counter-assertion (see tab: A Brief History of Patent Licensing) and instead are able to attempt to enforce their patents without fear of reprisal. As a result, a patent held by an NPE is often far more threatening to industry participants than the same patent held by a competitor. The inability to counter-assert is a tactical disadvantage facing operating companies that is difficult to overcome. It should not be a surprise, therefore, that the patent enforcement activities of NPEs are a large and growing phenomenon with serious implications, including undermining the very basis in public policy for the creation of the patent system. Operating companies face a growing number of assertions and litigations brought by a growing number of NPEs, often with tens or hundreds of millions of dollars at stake. To make the problem worse, the existence and activities of NPEs are often difficult to discern. Typically, they are small, private entities that employ shell companies and other (perfectly legal) strategies to hide their activities and gain an advantage in their interactions with operating companies. As operating companies seek to assess and respond to often veiled allegations of patent infringement, they struggle to know even basic information about the party making such allegations:

- Who are they?
- What have they done in the past?
- Are we the only company being approached now or one of many?
- How large and significant is their patent portfolio?
- Have they been successful to date?
- Are they well funded?
- Are accomplished law firms and other advisors supporting them?

"This information asymmetry is a disadvantage that can be overcome, which is what PatentFreedom was established to do (see tab: Service Offerings)." McCurdy and his PatentFreedom team elaborate:

b) " what is an NPE In seeking to enforce their patent rights, non-practicing entities (NPEs), sometimes called patent trolls or worse, differ in several crucial respects from even the most aggressive operating companies. The most important of these is that *NPEs do not practice their inventions in products or service*, or otherwise derive a substantial portion of their revenues from the sale of products and services in the marketplace. Instead, NPEs seek to derive the majority of their income from the enforcement of patent rights. This is, of course, perfectly legal, but it has significant and troubling implications for the makers and sellers of products and services (see tab Why do NPEs matter?). Simply put, if an entity does not sell products or services, it is essentially invulnerable to counter-assertion. It is therefore immune to one of the most important stabilizing forces present in most patent disputes.

While it is important to know where NPEs source their patents (i.e., whether the patents were acquired from others or invented by the entity) or other aspects of their *modus operandi* (e.g., the use of shell companies and a bias for secrecy, etc.), PatentFreedom does not consider these elements in determining whether an entity is classified as an NPE."

SITI submits that ASTs relationship with OIN and other like minded patent pools also assist in achieving its aims because it gives the appearance of "releasing" their acquired patents, while insuring that the IP does not get into the hands of small independent companies that may someday pose a threat to the AST membership or the large entities that make up OIN and the like minded pools. While these entities operate as Trust or other "independent patent aggregators', it is their membership which is determining who gets access to the technology and on what terms.

71.    VZ is managing a Plan within the AST by Hinman, and AST's CEO McCurdy, replacing normal arms-length licensing by a 4-firm oligopoly (see the WSJ chart, C 27a) ). a) The two 68 % leaders VZ +AT&T have price fixing power because of their subscriber size. b) VZ has 37 % on its own, without counting the 18 AST members' individual size, or the four cartels' market power. AT&T is also facing an exodus, about to lose many subscribers to VZ over capacity-quality problems.

72.    Motivation, Much of the anticompetitive activity of VZ arises from its need for more wireless patent rights. "Carriers Eye Pay-As-You-Go Internet Amid Government Push to Open Networks—"Some See Cover for Pricing Based on Usage" VZ spent $350 mm. in '08 to get a few licenses from Nathan Myrhvold's "Intellectual Ventures" (IV, a patent aggregator, cf. C 85). "The big patent players see … [ patent pools like IV ..] as a very inexpensive way to protect themselves"; spawning.. "defensive patent aggregators looking to take good IP off the open market". Another critic says : "High-tech titans are banding together to fight trolls—or are they just building fortresses?...the result is that the tech giants reinforce their dominant positions in the marketplace".." Nerac.com, by Kevin Closson, in 9/08, p. 2.

73.    Yet at 12/28/09, global cell phone titans rush to sue one another, "..as competition has intensified, companies are trying to put up barriers to protect their positions.." NYT 12/28/09 B3. "nearly all cell phone makers are suing or being sued over their patents..As cell phones become more like tiny computers, intellectual property will take on increasing importance to equipment makers in their quest for

41

market advantage." E.g. "Apple sues Nexus One maker HTC" NYT 3/3/10 B1 on "touch screen" devices, actually aiming at HTC's customer Google, who gave its design and business to HTC for its new touch screen handsets to compete with Apple. VZ did it too, designing the touch screen "Droid" handset as a new business for busy MOT, restructuring with its older, unappealing products ( C 60); cf. the Paul Allen campaign vs. 11 large infringers at once. ( Cf. the WSJ 8/31/10B-1 about his lawsuit that "Renews Patent Debate"). This is the same debate with NPEs that AST is trying to win with its alleged AT violations against SITI-MLR and others, submitted in this forum.

74.     Injury to SITI-MLR and the Public Interest  VZ/AST admitted "private patent police" intentions in Fortune Magazine. A VZ spokesman said, referring to law firms and others that pursue settlements and license fees rather than develop products, "the intent is to dry up this whole practice", (Money.cnn.hu/ 2008/06/30/ technology/patents.Fortune/index.Htm.). AST CEO McCurdy's PatentFreedom.com 2008 website p.4-10, and his 2009 version, admits his hostility towards small patent competitors, listing wireless NPE targets in 2009 that his website identifies. The websites of AST new colleagues RedChalk. com and OIN boast of similar enemies. Their published policy is to "to obtain licenses to patents that may otherwise fall into the hands of an adversarial party". "Catch and release" can be made to appear workable, but not without flexible allies like MSFT, NEC, OIN (C 40-67) plus adroit price-fixing in multi-tiers, used by VZ/AST to attract members and capital. SIT submits the sources of injury to SITI-MLR are clearly what Congress and the case law had in mind as AT injury to Competition.

75.     Industry Trends; Wireless Market Subscribers

a)     Two former Baby Bell networks (VZ leads, then new AT&T) in a two firm oligopoly. VZ and AT&T aim for the feature rich, more profitable parts of wireless, by advanced handsets--e.g. press-on icons using special "Apps" on a tiny screen on both the Apple-AT&T "iPhone", and VZ-MOT's Droid, using giant Google's "Android" system. Apple now has 250,000 application packages (Apps), growing daily, to reach out from the iPhone.  Google already has 30,000 new Apps

running on its comparable Android system (WSJ 3/30/10 B-4) that VZ-MOT have embraced, with strong Internet reviews and $100 mm. in '09 ads. The press-on feature by one finger, avoids need for a PC "mouse" to navigate the Internet for short messages, games and entertainment. NYT 12/14/ 09 B1 states "People will look back on the iPhone as a turning point in the industry.. remembered as the first true handheld computer".

      b)    All makers, networks and users want handsets and Apps that work on others' operating systems--e.g. GSM, CDMA, TDMA, AMPS or ANDROID (cf. SITI-MLR's patents at par. 28-31). NYT and WSJ, 12/14/09, both say a revolution is at hand, and a plethora of new competing products is in process in 2010, but circulating on a first look basis to VZ and AT&T, because they own dominant Market Power.

      c)    But new AST member Oracle, taking over member Sun Microsystems by purchase, along with its Linux open-source patents, quickly sued AST member Google thereon (WSJ 8/13/10 B-1), demonstrating the great patent power and market power that AST members have and use, against any firm in their cross-hairs. The AT laws are the last refuge.

    76.    "Creating a Phone, Google takes on Apple", the "Nexus One", Google's competing "game changer" of its own design. NYT B1, 4/28/09. a) "Apple's Game Changer, Downloading Now" NYT B1, 11; 12/06/09 by Jenna Wortham. b) Google's own new phone as game changer, NYT 12/14/09 B1,11; WSJ 12/14/09 A-1,6. c) Next MSFT and Nokia join ("To vie in Smartphones, Tech Giants Start Anew", NYT 2/16/10 B1) to blunt the advance of Apple and Google. VZ and cartel VOD are joined in supporting MSFT's new "Pink" handsets expected in 2010, NYT 2/13/10 B5. d) Intel, long MSFT's preferred source, has teamed up with Nokia against MSFT. e)"New Sony Gadgets [handsets] Take Aim at Apple" WSJ 3/5/10 B-1,8 *ibid.* f) Cf. "Software Directs Mobile Industry", at recent Barcelona mobile telecom conference; the giants are colliding; "there is no love here", reports the WSJ 2/16/10 B-6.

77.     MLR-SITI and Network Competition for Spectrum  a)  Spectrum is a useful "pearl of great price". Most US spectrum is owned by telecom, and TV cable, networks or is reserved for US, state, local-legal use. But barely 12% of spectrum available is actually used. Cf.. "Buried Treasure In Your TV Dial" NYT 2/28/ 10 B7 by Professor Richard H. Thaler, in Economics, University of Chicago urging the FCC to require small, local TV channel groups to surrender their outdated federal spectrum leases (cheaply replaced by cable and satellite TV) for better public use by the Internet. He says it would raise $100 bn. in FCC auctions held to re-allocate and better use spectrum in the public interest. Respected WSJ op-ed analyst L. Gordon Crovitz says nearly the same in the WSJ, 3/22/10 A-19--Spectrum is going to waste in unused government (state, local and federal) and TV hands, stating the history. Issues of "data guzzling", and network blockages multiply. The FCC encourages markets for sale or leasing of spectrum. But spectrum trade-offs on a real-time, short term basis, have hardly begun. MLR-SITI's patents (C 34-39) feature spectrum-sharing, just coming into its own in the new markets.

"TV Stations in Venture For Mobile Programming...Preparing to follow as television migrates to portable devices", a venture with NBC, Fox News Corp. and 10 other local groups, "The companies said they would contribute broadcast spectrum for the service." NYT 4/14/10 B5     b) Defendant Internet leader CISCO (and AST member) stated "Today, a market transition toward consumer-driven technology is spurring CISCO to focus on developing seamless IP support for data, voice, and video across the 14 billion devices CISCO expects will connect to the internet by 2010... "Although you seem to be connecting to one network, you're actually rolling seamlessly from one network to the next." Cisco CEO Chambers, Harvard Business Review (HBR) interview, 11/08 p.75. CISCO gets into homes by wireless networks, TV cable boxes, routers and infra-structure network servers.

78.     Infringement Rising as 3G becomes 4G

a)     With each generation (G) of wireless, new inventions for seamless operation have been patented. b) Few messages now go through VZ (or elsewhere) that do not require wireless (by cell

44

towers, mobile 'blue-tooth", wi-fi, wi-max ) at either the sending or receiving end, and in-between. "..
New Systems to Supplement Wi-Fi, Cellular Signals.." are on the way. All wireless needs spectrum,
whether owned or leased, long-term or leaping radio band with boundaries on a brief real-time basis—
with fair payment, respect for lessors' needs, and brief movement into unused radio spectrum open
spaces, then withdrawal, all under the watchful eye of the FCC. The Crovitz-WSJ article, C72a), cites
Nobel Laureate Ronald Coase (Chicago University, Professor of Economics) as authority for these
principles back in 1960. SITI-MLR patents on spectrum-sharing are at C 34-38.

79.     The old network concept changes with new Internet user sites and Apps.  VZ and cartel
partners make wireless site transmissions in the billions, expanding as they evolve into multi-sided
marketing platforms—MSPs (e.g. VZ, Google, Cisco, Ericsson).  New users are sidestepping older
internet carrier networks, for direct handset links to multiple website connections "rolling seamlessly from
one network to the next" by pushing an icon button on the screen of their smart handset, with less need
for existing networks' presence, cf. "For Wireless Carriers, iPad Signals Further Loss of Clout" WSJ
1/28/10 B-6 "Apple wrested away control over handsets with the iPhone.  Now, another of its hot
devices [the new iPad] could diminish carriers' control even further.." describing Apple's inventor and
maker "..coup that further erode the wireless.. carrier-centered model.." The Ronald Coase theorem "says
that in the absence of transaction costs or regulatory barriers, resources will flow to their most valuable
use."

80.     New social websites as license candidates for MLR-SITI increase. All social websites had
750 mm. global participants in 2008. But Facebook alone now has nearly 500 mm. regular users, NYT
3/7/10 B4 updated, with over 100 mm. in the US. The 4/13/10 en.Wikipedia.org/wiki/ "List_of social_
networking_ websites" (11 pages) has approx. 3 bn. global users.  The users often live in exotic foreign
places with multiple languages. But for example, DirectTV satellite service (affiliated with VZ), is replete
with European and Asian countries having their own language stations, catering to immigrant

communities in the US and EU, and others likely in most of the world's population centers, with subtitles in English or other major languages, where immigrant groups have congregated. TV cable stations make similar offerings.

   a) But global growth of social websites in multiple languages makes carriers less useful, and Internet access bills easy to avoid by direct calls and handset designs. If foreign language stations broadcast, e.g. into the US, UK or Germany, they want to sell local ads too. Thus they need to comply with local Internet and Patent laws, i.e. buy licenses. Their world, often focused on language issues in the first generation users, needs its own advertisers+familiar products for sale transitionally.

  81. "Smart Phones as Modems..help consumers turn..[ Apple's iPhone, and Google's Android] into modems [transformers] for their computers, a function many smart phone owners want but U.S. mobile phone carriers have been reluctant to allow…The function.. 'tethering' takes advantage of a smart phone's always-on Internet connectivity. When the device is tethered to a laptop or desktop PC a user can surf the Web via the phone's wireless connection,". Inter-linked networks, Modem, App, Browser makers (e.g. NYT 4/14/10 B5); and Cable/Satellite TV networks are all SITI-MLR license candidates.

  82. The basic control by networks are long-term contracts from a subscriber for a bargain handset with cost penalties for leaving. The FTC is investigating carriers' penalty systems, for basic unfairness, or "sham charges by mistake". WSJ 6/19/09 B-4; NYT 9/07/09 B1; WSJ 12/05/09 B-6 "Verizon Wireless Fees are Probed by FCC"….Wireless carriers say they need to charge the termination fees to help recoup the costs of offering free or discounted handsets to subscribers..The fees help them hold on to consumers..loath to pay extra to get out of a contract early.." But economic facts of 3G-4G life go far beyond market power "retention" ideas now being applied by VZ/AST.

  83. McCurdy at his 2008 website PatentFreedom.com (p.10) listed most of the wireless NPEs, 35 with 167 families--I.e. a likely 1,600 patents are still under AST's assault. Will AST assault billionaire Paul Allen's 300 NPE patents too? (C27) The collateral damage from Defendants' AT violations extends

46

to the many new items for mobile telecom that may otherwise be introduced, being subject to delay or permanent obstruction until surrender to the AST.

84.     Proximate Cause of SITI's Damages:   Licensing just the SITI-MLR patents in C 34-39, to large network users with billions of current infringements lasting many years, is a potential aspect of SITI-MLR's business; other new potential licensee groups are listed below. The mobile telecom industry is full of large and mini-networks and cartels needing licenses, but AST doesn't want licenses for itself. Its Plan is to buy any useful patents outright for VZ and its other members, then to dispose of the technology as it sees fit, either by selling non-exclusive licenses, or by trading it to an enforcer/adviser/ agent of its choosing ( OIN, Twister, Red Chalk.com, Crescent Moon, PatentFreedom.com), with built in price protections, then discriminatory rebates for licensed members ( C42). It is market allocation-price fixing in the long tradition of the Addyston Pipe cases (Chatanooga Foundry v. Atlanta 203 U.S.390 (1906) through Reiter v.Sonotone Corp. 442 U.S. 330, 339-340 (1979). In this VZ/AST controlled atmosphere, SITI-MLR have approx. 150 global licensees in waiting, with an estimate of $ 250 mm. in license fees to each at risk, well before new users of great variety take root in an expanding marketplace for licenses. VZ/AST have orchestrated multiple devices to exert their Market Power.

85.     Scope of the 2010 market emerging:  The above definition of "who" would be infringers, applies to many potential MLR-SITI licensee groups:

     a)     Each global wireless, cable or satellite, carrier network or handset maker;

     b)     any search/portal/software or other network; c) AST, CISCO, ERICSSON and other infrastructure titans that supply and make linked networks work together and need spectrum-sharing ; and to d) "free" social networks, really "gated Internet communities", with clients messaging directly by wireless "Wi-Fi or Wi-Max" signals, or direct Internet transmissions, and with millions of users ready to accept ads for free, or cheap access to the Internet. (NYT 9/21/09 B6).

47

86.     The retail market for social website users alone, amounts to hundreds of millions in MLR-SITI patent license value. As social networks grow--75 sites, 750 mm. users in late 2008; and by early 2010, grown to approx. 3 billion users; they will try to bypass old media, and their telecom or cable carriers. E.g. Facebook, Twitter and others supply photo news feeds into Canada and the US direct from riots in Iran, without a telecom carrier. Wireless hot-spots that go right onto the Internet exist at many hotels, bars, cafes, airports. In business recessions, all users young and old want reduced telecom overhead.

87.     VZ CEO Seidenberg admits "We don't look any different than Google... eliminating central offices and call centers", C31. AST members CISCO and ERICSSON, and other technology leaders are now in the same MSP category, as AST member Google. Each is reaching out from a marketing platform in many directions. A Harvard Business Review (HBR) article in April, 2009 discusses website merchandise-service vendors and other Internet operators based on MSP Google, and by inference, other Multi-Sided Platforms : The article states "An MSP can use its power to take control of your customers, greatly reducing your ability to extract value." at p.78, HBR 4/09 ..."Think twice before you join a popular platform..MSPs are moving targets ..today's player can become tomorrow's platform. Until the iPhone was invented [ by Apple], most cell phone companies were players on.. platforms of cellular networks". (Co-Author David Yoffie is Professor of International Business Administration; Sr. Associate Dean, Harvard Business School) The VZ network and MSFT are trying hard to "catch-up" with Apple and Google, as are CISCO, ERICSSON, and all new marketers in the "mobile Internet space" within a 3G-4G renewal process.

88.     By normal licensing, SITI-MLR would still own their patent properties and business as new groups arise, build hot-spots, attract millions of visitors, or link globally with or without current carriers. VZ's efforts to drive down Market Prices for licensing or sale by fixing low-prices as alleged, is Conversion, by Market Tampering--the 'but for' cause of SITI's injuries through VZ/AST agents.

89.   <u>VZ has "Unclean Hands"</u>  VZ was born in the 1984 AT breakup of the Bell Trust.

a)   VZ's wire line business is evaporating according to several published reports/opinions. Though committed primarily to wireless, VZ spent <u>$350 mm.</u> in 2008 for wireless licenses ($100 mm.), coupled with a "right" to invest ($250 mm.) in their owner, Intellectual Ventures' (IV) and its huge portfolio largely <u>unrelated</u> to wireless, and <u>not relevant to VZ/ AST's key business</u>. See NYT <u>"Turning Patents Into an 'Invention Capital' Market"</u> 2/18/10 B1,10). IV is solely a business licensing patents, and deserves the respect it enjoys. IV is listed by McCurdy (2008 Patent Freedom.com website) as a "non-practicing entity" (NPE). IV owns 30,000 diverse patents, investing $5 bn. from giant supporters, returning $1 bn. to investors, and gaining in license fees and 650 employees. (NYT *ibid.*) IV was founded by Myrhvold as a distinguished former chief technologist at MSFT--his investors include <u>VZ, MSFT, Intel, Nokia, Sony</u>. IV is independent, but its relationship with VZ adds to VZ's market power, which is at the core of the AT case herein. As shown at C 34-66, VZ/AST have played fast and loose with anybody's wireless patents that can be maneuvered into their partial control (MSFT, NEC, OIN). The purpose is to drive down their market value, affecting NPEs adversely by repeatedly demonstrating low valuation.

b)   <u>Connections to AST:</u>  Myrhvold was mentor and partner (and likely still a partner) in two patent infringement defense firms that AST CEO McCurdy helped found and finance; one is still run by McCurdy, a "patent police unit" PatentFreedom.com. aimed at NPEs.  c) <u>"Tech Guru Riles the Industry By Seeking Huge Patent Fees</u>".."Myrhvold ..facing resistance from companies he targets for licenses, but his inventory gives him leverage to extract settlements..."

c)   VZ invested in Myrhvold's IV in 2008 ($250 mm. + its $100 mm. for useful patent licenses). IV is the largest NPE, while VZ/AST led by CEO McCurdy is trying to destroy all other NPEs. The hypocrisy of an embrace, investing $250 mm. in an ownership interest in one NPE, while seeking destruction of most others, stems from VZ/AST's ultimate aim of "drying up value" of independent

wireless patent owners, in order to exert even more control over the future development and practice of wireless IP. This market power control+abuse was demonstrated by AST with Twister ( authorized by Hinman, McCurdy and VZ), in the Limelight Networks example at C 98 *infra.*, in March, 2010.

90.     The latest twist for VZ/AST is that affiliate IV is now litigating to market its licenses, just like all small NPEs. IV is using shell companies to acquire IV patents, to then sue for infringement and induce licensing.

        a)      McCurdy has now disclosed that AST has appointed "Crescent Moon LLC, a company affiliated with AST" to handle sales of 286 eviscerated patents from NEC ( first licensed to AST members only, and then even strangers, C 49-50 ). Allied Security Trust I.com lists the Crescent Moon-NEC IP as AST owned.

        b)      AST is now copying IV's enforcement system. IV and investors (like VZ) retain a share in any proceeds of the IV shell owner's efforts, by licensing or litigation, Law.com. 9/1/09.

        c)      Crescent Moon must do the same for its client AST, and AST Trust members. Thus VZ and AST are each NPE patent enforcement sponsors with their left-hand, and crusaders vs. small NPEs with their right hand. Hypocrisy (as inequitable behavior ) has become a trusty weapon. d) While it is apparent that no single entity can control all wireless IP, collaboration between large amalgamators can result in the degree of control necessary to VZ/AST for partial control of the wireless space, in order, e.g. to impose differing charges on users for high-volume data transmissions, and for heavy use of spectrum-sharing IP).

        e)      The extent of VZ's relationship with IV and its implications was exposed on 2/26/10: "..for the first time [IV] assigned one of its members a patent to use as ammunition in a lawsuit. Verizon..., which agreed to pay IV as much as $350 mm. in a 2008 deal, is using one of IV's patents to strike back at Tivo in a patent fight," described as a "First for Intellectual Ventures", Z. Elinson, at Law.com 2/26/10. Without buying the patent it needs, VZ borrows it as a litigation weapon. Meanwhile

VZ makes proposals to the FCC and FTC to undercut Internet equality, with tiered discriminatory pricing to big data transmitters. AT&T concurs therewith. The ongoing abuse of VZ/AST market power makes its own rules, with intentions becoming more transparent as the interlocking relationships are exposed.

91.     The Economic Driving Force for The AST   The main business of the Internet is evolving into support for consumer marketing businesses. A business much larger than selling handsets, and heavy internet use through a network carrier, underlies the AT violations described herein.   a) VZ, AST, its members+the cartels ("AST & Co.") have databases that are marketing assets worth billions—They are a "basket of golden apples" for all vendors in the public's quest for new networks, search, Internet entertainment, leading to focused marketing tools based on style, taste, schools, jobs, social nets--called "behavioral marketing".   Revenue potentials multiply.   Harvesting this value drives VZ and AST & Co's Plan to first monopolize all wireless patent IP, or at least exercise a high degree of control of the IP, in order to discourage other Apple iPhone (game-changing) surprises. As leader VZ/AST upgrades to 4G heavy-duty networks (e.g. using MLR-SITI + other NPE patents), they widen their markets for ad clients, and ultimately control an increasing share of the flow of information and data on the Internet, including huge markets for ads and sale of goods/services to billions of targeted customers.   To that end, VZ/AST are, in fact, creating a Wal-Mart type chain, but of "virtual" stores, selling everything, and operating online globally.   The economics herein transcend cheap patent purchases or licenses.

92.     Profit logic to VZ/AST, MSFT, Yahoo and Google is all positive by "Metcalfe's Law" -- VZ/AST/ members +linked cartels, know this "law" of networks--As Internet "nodes" (user clusters) grow, indexed by purchases, habits, age, economic class, ailments, nations, religions, regions, languages, music, then each transaction and user App online compounds into geometric growth by more transactions closing.   It works like travel terminals, TV, radio-Internet networks, and shopping or medical centers, but on a global Internet basis.   AST members cannot pass-up chances to refine and monetize their databases,

51

in linkage by advertising "pros", new Apps and database business from other giants. Recent reports/analyses are extensive; MSFT has spent hundreds of millions with VZ and Yahoo just to start it.

93. Damages; Trend of Licenses is Sharply Down. The trend of NPE licenses since 2006 is downward since the announcement of the AST Plan. a) Specifically, the pace of licensing transactions has dwindled by 84 % in the 36 months since March, '07, the start-date of the AST Plan, not publicly announced until June 6, 2008. b) Before 6/08/08, MLR-SITI had accrued a total of 38 licenses on their portfolio of patents. 18 of them occurred after the SA in February, 2006 (par. 13-16); thereafter MLR-SITI were working to help each other wherever possible. c) Between the dates 6/08/08 and 4/30/10, as AST's battery of announcements and publicity against NPEs was ramped up, just 7 licenses were signed for a revised total of 45 licenses. Of the 7 in the heavy decline period, only two were with large company users of the patents; 7 in a total of 45 is merely 15.6 %, representing an 84% decline. Despite continuing efforts, no licenses were concluded in the eleven months May, 2009 until March 20, 2010. The decline in frequency of licenses, and their falling secular trend, is a "material adverse" reversal in SITI and MLR's license business at the height of the global 3G to 4G expansion of mobile broadband wireless. d) VZ/ AST is impairing a market for SITI-MLR patents, after conducting 20 years of a lawful licensing business by "drying up" the business of NPEs'. License charges are a function of use, and multi-billion transaction "users". Actual and potential patent use ( items produced, or Internet messages covered by the patents) also raise the reasonable license price substantially. e) Losses To generate Proceeds under the SA, SITI and MLR each had to spend millions in separate costs and legal fees—and injury continues from the MLR-SITI licensee prospects (a "hockey stick" declining curve) impaired by the VZ/AST Plan.

94. But for the AST actions since March, 2007, SITI would have earned considerably more on its Clayton Act "property interest or business". The patents are worth hundreds of millions for SITI's share in an outright sale. Licensed 150 times to large and small users-infringers, then spread over new license prospects, continuing damage to SITI is much greater, because licensing over time, with claims

made on a heretofore reasonable schedule (with legal costs) means greater revenues. With MLR's claims, overall damages nearly double, plus costs, and potential recovery in equity of Defendants' and Affiliates' illegal gains from AT violations.

95. The facts alleged embody several *Per Se* violations of the AT laws. They are also not reasonable under the AT *Rule of Reason*, established by proof if required.

96. Injury to Competition The Plan in the anticompetitive agreements described, establishes tactics for price-fixing, circulating negative data to condition a market downward in buying or license transactions, concerted refusals to deal on patent licensing, the deception of patent sellers, and spoliation of licensing at arms-length fair market valuations.

97. Defendants' restraints of trade have affected commerce within and outside the United States. The injury and damages to Plaintiff SITI is continuing, and is without adequate remedy at law.

## Recent Market Power Abuse by AST with its agent, Twister Investments

98. Forced licenses AST has recently demonstrated its intention by embarking on a campaign of intimidation of emerging Internet companies by making unlawful threats to compel them to buy licenses from AST and its new patent depositary Twister Investments LLC. (Twister ) a) Limelight Networks, Inc. (Limelight), based in Tempe, Arizona, is publicly traded and has about $133 mm. in annual revenues. It owns a content delivery network adaptable to all new mobile telecom, cable or TV devices, streaming videos, movies, TV shows, etc.)—it was contacted by a broker engaged by AST and/ or Twister, to induce Limelight to buy four AST patents assigned and sold to Twister in April, 2009, or if not, to license them. The marketing "pitch" was made along with a presentation on the AST broker's website, claiming Limelight was an infringer and would owe Twister large damages. Limelight provides Internet content delivery services by a "robust content delivery network" ( in competition with VZ and AST), for "entities with the need to transmit large amounts of content over the Internet quickly, efficiently and reliably." b) AST and Twister allowed their broker to make an Internet presentation, saying that the

seller of its patents had by April, 2009 filed infringement suits against several large Internet caching and content delivery networks ( corporations Akamai, Novell, Volera, Cacheflow and Inktomi ), and to boast of significant settlements, including one for $1.1 mm. for a license to Inktomi Corp. c) When Limelight refused their demand for payment, AST and Twister stated that they would assert the patents against Limelight, or sell the patents to a Limelight "litigious competitor". The series of threats occurred in February-March, 2010. Limelight brought a declaratory relief action vs. AST and Twister. The VZ/ AST broker's "persuasive devices" also included a website presentation publicizing the claimed infringements by Limelight on the Internet. d) Limelight eventually bought a license to settle the case, and repeated Internet comments ensued on allegations in the suit and the settlement with AST and Twister. e) AST and Twister controlled by VZ are in horizontal competition with NPEs like MLR-SITI and small new software developers like Limelight or Brightcove ( see Google.com/Limelight and Brightcove as competitors in video management software). f) Twister's portfolio being invoked by AST has 15 US patents all in the area of "caching" (storing online) and Internet operations technologies. It is the most apparent manifestation of VZ/AST's overt competitive position vis-a-vis plaintiff SITI-MLR, other NPEs and small company inventors—This portfolio serves as a clear demonstration of Defendants' Plan to acquire patents for the sole purpose of exercising control in the telecom patent market by AT churning activity, selling out cheaply and enforcing AST patents by suing thereon with neither "Catch nor Release" intended.

## AS AND FOR A FIRST CAUSE OF ACTION

### Collusion With Allies to Achieve Devaluation of SITI-MLR Patents

99. SITI realleges and incorporates by reference each allegation in paragraphs 1 through 94 with the same force and effect as if set forth in full herein.

100. MSFT cared about the price of its Linux patents as did <u>AST</u>. But AST deliberately structured the transaction as low price "patent activity"--"churning" a market by interlocking AST press releases.

a) Concurrent announcement of an AST <u>patent licensing offer</u> to non-members, of four blocs of NEC patents at $10,000 each, for 286 patents, and their summer 2010 auction announced (with results, if any, kept secret), are evidence of systematic sham activity by VZ/AST, in continuous process for unlawful gain since March, 2007. AST was kept secret for 16 months, and its actual operations largely kept secret through 2010 (C40-65). c) Antitrust conspiracies are "self-concealing", <u>In re Mercedes-Benz Antitrust Litig.</u> 157 F. Supp 2d 355,371(D.N.J. 2001). New causes of action accrued with each AT violation; a four year AT limitation was therefore tolled, when prices were set (fixed) repeatedly by a cartel, <u>U.S. v. Therm-All</u> 373 F.3d 625 (5th Cir., cert.den. 2004). Fraudulent concealment by itself tolls the AT statute of limitations, <u>In re Beef Industry Antitrust Litig.</u> 600 F.2d 1148,1169 (5th Cir. 1979); <u>In re Issuer Plaintiff IPO Antitrust Litig.</u> 2004 US Dist.LEXIS 3892 (SDNY 2004), 2004-1 CCH Trade Cases par.74,348. A protracted scheme of repeated price-fixing, bid rigging or other glaring AT violations deserve the benefit of such equitable principles for tracing, disgorgement and other relief, so no violator profits from his own wrongs.

101. The concurrent, July '09 <u>sale to</u> and <u>purchase from</u> MSFT is analogous to what Stock Exchange and SEC rules call "painting the tape", a manipulative device to depress a stock near the closing bell—market rigging by a few strategic low price sales. The cheap NEC license offering to non-members of AST to lure them into membership is taken from the same play book--AT "market tampering", tending to depress the overall market price for telecom patent properties, which is <u>an announced goal and strategy for AST</u>, C 67.

a) But <u>AST has not built a patent ownership-resale business of substance in</u> its 36 months of existence. As of 1/26/10 VZ/AST's steady, deceptive publicity is simply a form of market

pressure to devalue the overall price of telecom patents by using suppliers, allies and brokers as AST pawns. The facts reveal that 77% of the "catch and release" trades in AST wireless patents at low prices between 2009-2010 are simply displays of the VZ/AST's market power, intended to discourage NPEs (mostly small, like MLR-SITI) from licensing patents, and discourage AST members and non-members from seeking arms-length licenses by their negotiations with NPEs, in court or outside court.

102.    A lesser motivation is that AST needs to demonstrate patent buying activity in order to raise money from new members and hold onto its existing members' escrowed investments--Hinman and McCurdy are IP executives at bay, who must now perform. The quick sale to OIN of Linux patents brought in $15.8 mm. from three new members, and a measure of AST control over the OIN group in any resale to others. Allies condemning the same business enemies is useful to AST, and their manipulation is cheap and easy because "no decent person likes NPE 'Trolls' ". Whatever fairy tale drives AST, McCurdy or Hinman on any given day, the effect is the same--a devalued and depressed market for MLR-SITI's and other NPEs license efforts.

103.    Current license values  A value comparison between typical AST licenses to date, and those of SITI-MLR is useful: a) AST values each of its licenses issued at almost $10,000 each —400 licenses to its giant members 2007-2010 at a total price of $4 mm. b) SITI-MLR's license price was in a zone of $ 500,000 to $ 2.5 mm. per license for each one issued to small and large users (mostly mobile handset makers selling their products in the US), comparable to some AST members, over the period of 1997 until 2010.

a)    Almost every large user 1997-2010 is larger in 2010, because of the growth of mobile telecom, and there are many more large global patent users ( C 27-31) charging more for licensed devices.

b)    The foregoing analysis of free-market licensing, at competitive pricing, does not include other users of omni-modal and spectrum-sharing patents, such as: e) The newly emerging router,

server and special chip makers; the new laptop-reader-handset devices with press-on icons ( e.g. WSJ 4/01/10 D-1 by Walter Mossberg, "iPad Is a 'Game Changer' That Makes Browsing and Video a Pleasure; Challenge to the Mouse") at higher prices than a handset alone.

   c)  there are multiplying social websites, and next, d) the cable and satellite TV networks absorbing the video streams available through 3G-4G handsets onto subscriber TV sets, and their feeders of new software. The time it takes for 3G-4G migration, or minor license charges incurred do not matter, because if the arms-length license market is re-opened by injunctive relief, there is much new MLR-SITI licensing business ahead. e) AST's motive is to cause devaluation of SITI-MLR's properties and business, and that of other small-scale innovators.

  104. 3G Wireless systems do not work that well in 2010. "Overall customer satisfaction with cell phone services have been rising, but it varies between cities and carriers. VZ customers [US] tend to be happiest with their service, while AT&T and Sprint customers were less satisfied.."; "3G Phones Exposing Networks Last-Gen Technology", and now--"Customers [are] Angered as iPhones Overload AT&T". All smart phones are big city 'data guzzlers' eating up capacity with 'dropped calls, spotty service, delayed text and voice messages and glacial download speeds … the world is changing…' 'We're just starting to scratch the surface of these issues that AT&T is facing'". (NYT 3/14/09 B1 by Matt Richtell; NYT 9/03/09 B1; Cf.-WSJ 12/29/ 09 B-1 "IPhone Snafu Stirs Network Concerns"; AT&T, VZ, Sprint, T-Mobile are facing "the limit of spectrum" since 2009.

  105. Forced sales The AST Trust is demanding full patent ownership only, resisting traditional licensing with the express intention of forcing outright patent sales at reduced prices, then licensing to members, cartels and new IP market entries. The patent licensing and sales market is dramatically undermined by Defendants' efforts to impose low prices on IP from many directions. The AST Trust is enforcing its demand by use of the interlocking relationships of its members, their influence over affiliates/partners throughout the global market and the US, and their power over cheap sub-licenses,

through giant cartels, with AST post-sale control of the IP through allies by agreement on patent resales, or licensing.

106. Market Power Barriers   The AST activity, disclosed and evolving, is a formidable barrier with patent market devaluation effect on SITI-MLR. Mounting Damages   As a result of Defendants' collusion, price fixing and market rigging, MLR and SITI have suffered and will continue to suffer damages in an amount to be determined at trial, but in no event less than $ 500 mm. All the violations alleged are *Per Se* violations of the antitrust laws, but they also are not reasonable under the AT *Rule of Reason*; implicit collusion is alleged, to be established by further proof as required. Recapture of unlawful gain (equitable tracing) from the Defendants is implicit in each cause of action herein.

## SECOND CAUSE OF ACTION

### Concerted Refusals to Deal and VZ Control of Dealings with Licensors

107.   SITI realleges and incorporates by reference each allegation in paragraphs 1 through 106 with the same force and effect as if set forth in full herein.

108.   AST emphasizes that it will not buy licenses from targeted NPEs. Yet McCurdy admits that NPEs selling licenses "*is perfectly legal*" (See Patent Freedom.com; caption "Background"; "What is an NPE"). Refusal to "deal" however, by license, backed by 18 AST members+4 cartel affiliates is never "perfectly legal" particularly when AST members, each with AST director status, have also signed on and expect to receive cheap sub-licenses from AST, under AST's Plan. Market power alone makes their statements suspect, and open to discovery as to intentions, further acts and market manipulations.

109.   AST member ERICSSON prefers only licensing in its patent license pool. It decided to push for 'fair, reasonable and non-discriminatory" (FRAND) license terms for patents related to next generation [4G] wireless networks. FRAND is an EU efficiency concept, for large manufacturers on products (chips, devices) for several patents needed in one fabricated item, Gigaom.com/2008/04/14— subject to a *Rule of Reason* analysis because potential competition enhancement may outweigh anti-

58

competitive implications. But the AST members, each with AST director status, also know the system and expect cheap sub-licenses from AST, in lieu of total ownership under AST's Plan.

110. The 286 NEC patents recently offered for license by AST at \$10,000 apiece are 4 unrelated, odd lots of NEC patents, apparently "old-stock", items for e.g. conventional TV sets, far removed from wireless network carriers, Internet infrastructure makers, or 3G-4G handset makers in AST—They would go to radically different users, and be difficult to sell or license, judged by the descriptions and prices in AST's 1/26/10 press release, and the disconnected lists at AST's website under agent "Crescent Moon, LLC". So AST through McCurdy now licenses them to non-members in separate lots, or licenses the total at fire-sale prices--\$3 mm. for a license on 286 NEC patents, i.e. less than \$10,000 each. The mix of NEC patents (listed by type and name, under affiliated AST owner Crescent Moon) is diffuse and barely applicable to the needs of 3G-4G wireless expansion. SITI sampled the list by the patent names. AST resembles a NYC "job-lot trading company" licensing or selling distressed goods, and there is no published evidence it was able to sell its "closeout" NEC patents. (C 46-54)

111. Boycotts continue - Control sanctions are built into the AST plan.

a) Foreseeable AST barriers to negotiations prevent undercutting AST price-fixing, by a "maverick member" ignoring it, or handling his own license, or paying "too much" for his license. Use of unlawful bargaining heft over members, and any patent sellers, is a required part of the AST conspiracy, as per Hinman in his 2008 admissions (C 44-46). Selective use of boycotting power against small patent owners is in AST's template. "Financial persuasion" of members-allies stays in VZ/AST's control. Even a very large member does not what other members aligning against it; e.g. Google is certainly not happy about Oracle's lawsuit.

b) AST also has optional pressure to apply by claims on a \$5 mm. escrow for patent purchases per member, at risk for any member's refusal to abide by an AST Plan or its fixed price, or

selectively tightening of the rules on ability to pay on the new members who cannot meet the required showing of financial ability, C 40-46.

          c)      There is little motive for licensees to deal directly or to complain, if they can afford to wait for the AST to buy patents cheap, and distribute similar licenses.

        112.     Defendant AST member CISCO is a leader in internet backbone--routers, switches and servers (the plumbing, and traffic lights of the world's Internet), and WLAN (wide/local/area networks). VZ is an important customer to CISCO. CISCO has a stock market cap.of $140 bn., more than VZ (at 10/23 /09 ). It too is a Multi-Sided Platform (MSP, par. 83), acquiring "Starent" and "Tandberg" in October '09 for $6 bn. The US based Starent makes software and equipment to manage data traffic for wireless devices, and Norway's Tandberg makes small multiple video conferencing set-ups, that work on PCs. Both are typical SITI-MLR license candidates. a) CISCO's MSP strategy is in an interview with CEO John Chambers ( Harvard Business Review 11/08): His 1990s advice to two major telecoms was that their revenues from wirelines would vanish: ".. We thought everything would converge to the internet ...the network was capable of changing everything...from health care to education to how you connect with ... friends... watching a sports event, even if you're hundreds of miles apart. We saw...we could tie disparate networks together architecturally.. " CISCO is now another emerging MSP network, acquiring innovative equipment makers, needing more patents, and competing as to licensing directly with VZ/ AST. CISCO warned VZ of the loss of its mobile wireless network edge, just as it lost its former wire line network advantage. b) But VZ's competitive view is remembered: "What isn't so good..is the prospect of.. reconstitution of the former Ma Bell. That monopoly was notorious for high prices, stultified thinking and an aversion to changes that would spur competition... customer service, support and innovation will not be as robust", USA Today, Money 2/14/05.

        113.     Yet AT injury to SITI-MLR and to Competition arise by AST boycott in a converging tide of new MSP networks, "smart" handhelds, "readers" or "notebook" mini-PC's, for travel, offices, schools,

hospitals, social groups; pre-paid wireless; and for new TV sets as smart as AT&T iPhones or VZ's Droid, by App. "widgets", made downloadable by cable/satellite networks. SITI-MLR, and other NPE patents, would normally be in the thick of this wireless convergence of telecom and TV, licensing patents as needed; instead their business is down.

VZ/AST seek convergence control by its patent buy-up Plan, because with key patents in hand, infringement claims ahead, then VZ as an MSP network, can create a complex bill, sue for infringement, rebuff all NPEs or "reach an arrangement".

114. Convergence of telecom and TV technologies erodes networks, and further motivate the boycotts by VZ/AST of MLR-SITI and other NPEs. a) SITI knows that some Def. are familiar with its patents, and eager to force a sale of them to AST, because they need them now, not after a lengthy infringement case that they lose or finally settle (e.g. MOT at C 61). b) Def. want to force these patents into the open market at low prices, so they can more easily compete against one another, and freely advance the technology as they see fit, or design questionable patent "work-arounds" without big liability exposure. Hinman really was trying to sell protection, describing it from his limited perspective that "all small NPEs are enemies". This holds true for other global makers of all the new designs of handsets in the wind, that need omni-modal efficiency selection features, and real-time spectrum-sharing on a chipset—without paying MLR-SITI every time they try to invent around its patents, regardless of how reasonably its licenses may have been sold.

115. Def. AST member ERICSSON with Sony is fourth in the MSP cabal --two world leaders in 3G-4G devices. ERICSSON is already VZ's choice for some of its new 4G handsets. VZ is a significant ERICSSON customer in several areas. ERICSSON with 76,000 employees, makes equipment and routers powering 85% of all wireless networks, +handling operations for several networks--another CISCO type MSP supplying Internet plumbing and operating skillsets, branching out. Interlocks:

ERICSSON is VOD's agent for network management. ERICSSON will try to hold VOD clients linked to VZ ( TEF, CHL, CHU) as VZ goes more global.

116.    Special SITI-MLR SA history—ERICSSON had to assign certain of its key patent claims to MLR, recognizing SITI's early priority rights, in omni-modal and spectrum-sharing patent rights, in order to obtain a 2003 MLR license, after losing a PTO priority case, based on SITI-MLR's patent rights in 1998. The prevailing patents began at SITI (Spectrum) back in 1998. The PTO Interference success won by MLR in 2003 was settled--by an ERICSSON cash payment, + its "assigning valuable conflicting patent claims" to MLR. Such claims are now in SITI's "proceeds-sharing list" with MLR under the SA, Sec. V, par.C.1., "all patents and patent applications purchased from Siti-Sites, …the Ericsson patent,.. and all US and foreign patents claiming priority therefrom..". ERICSSON-with Sony, also bought a reasonably priced cross-license from MLR-SITI c) While joining AST, ERICSSON has its own patent license pool operating solely in a licensing format with partner Sony; Siemens and Nokia have since joined this ERICSSON pool. These two global giants are in the midst of buying Motorola's consumer handset division, and despite expert advice, they may not be able to transfer the SITI-MLR license without some cost for a new license from SITI-MLR. d) Yet ERICSSON was one of the founding members of AST, joining a conspiracy to drive other IP holders into a position of relinquishing their license business through use of various artifices, and by encouraging a boycott or infringement of SITI-MLR IP. Each member of AST has its own brand of hypocrisy to defend—such as inequitable behavior between parties to an executory contract, obligated to fairness and good faith dealings in any such contract. A party to the contract cannot injure his co-party by contractual misbehavior. ERICSSON'S license from MLR-SITI is a valuable bundle of contract rights. e) There is no rule of law requiring a victim of AT violations to first offer a license to infringers, before his federal AT trust remedies are viable. It is like asking the victim of a passing truck to try and convince it to get out of his path, before he can sue for being run down. It is one more false premise permeating the Def. attitude in a recent legal submission. Tort remedies under AT law

are a separate body of rights and remedies, separate from patent rights and a claimant need not offer up his patents for sale at pre-arranged giveaway prices to conspirators, in order to invoke sec. 4 of the Clayton Act. That is worse than a border guard asking for your passport and then running away to resell it, or use it himself.

117. As a result of Def's concerted refusals to deal with NPEs, MLR-SITI property interests and business have suffered considerable damages in an amount to be determined at trial, but in no event less than the amount in issue in the first two Causes of Action, increasing as long as concerted refusals to deal and other violations of Sec. 1 of the Sherman Act continue, with unlawful gains therefrom.

## THIRD CAUSE OF ACTION

## Deceptive Price-Fixed Bids "at much lower costs" are in process vs. MLR-SITI and NPEs.

118. SITI realleges and incorporates by reference each allegation in paragraphs 1 through 117 with the same force and effect as if set forth in full herein.

119. CEO Hinman admitted on 7/3/08 that VZ/AST planned to deceive each patent seller (NPE) with respect to the identity of the actual bidder on the purchase of IP --scores of broker-buyers are lined-up; a list of patents are first circulated to AST members and brokers who then rig prices and persuade patent NPEs to sell their IP at reduced prices in accordance with the AST "fixed" market price, in feigned confidence, without giving the actual buyer's name, making low buy-out bids consistent with the prearranged price. Indeed, some of the 92 small scale sellers reflected on AST's website ( if not fictitious shells) are likely victims of this AST deception.

120. Hinman admits that selection of AST's name is "to obscure AST's identity...so that.. sellers do not realize big-company backing and raise.. prices accordingly". Hinman's remarks amount to admission of a corporate intent to defraud sellers in the defined patent marketplace. It is unlawful for a dominant buyer/bidder in a market to deceive sellers through agents' concealed identity with gross

conflicts of interest. Each misled seller or licensor is dealing with a type of economic government (VZ/AST, members, and four cartels), as the "friendly" commission broker-secret AST agent, deceives it.

121.    "Acts done to give effect to the conspiracy may be in themselves innocent.. "Yet if they are part of the sum of the acts relied upon to effectuate the conspiracy ...the statute forbids, they come within its prohibition". The VZ/AST buy/license, resale of eviscerated property, is "part of the sum of the acts", permeating the AST.

122.    Hinman admits that another, second name is used for actual purchase of each patent: "The company [Allied] creates an 'independent legal entity' when it buys and sells patents to further obscure its identity".   Hinman's secrecy from March 2007 forward to June 2008 manifests a deliberate deception which occurred for 15 months before, as expressed by Hinman: "We tried to keep this thing as secret as long as we could. So we'd been preparing for damage control for some time.". Inequitable behavior under the patent laws can justify AT sanctions. But purchase results after nearly three years of deceit in lockstep by various purchase shells, still had to be recorded in the US PTO or in foreign patent offices, all in fictitious names.   Given Hinman's 2008 and AST's 2010 admissions, SITI has to presume that this "ghost buyer" device continues.   Each "catch and release sham" needed to recover the patents into AST's name later for accurate licensing to members, then resale with a good title for use and registration by a new owner.

Apart from the AT violations in which this artifice is used, it is also likely that many NPEs have been duped by the AST brokers, that the AST's deception continues and is mutilating US PTO and global patent records. b) The Def. have stated in an earlier filing herein that they have a right to deal with small patent holders by deception, as a useful technique in their trade, primarily to avoid their own buy-side competitors at auctions, without citing a case for a claimed custom supporting deception of a patent seller or licensor, face-to face or at an auction. The Supreme Court in Blue Shield v. McReady 457 U.S. 465,472 (1982) dealing with "standing to sue" cites Mandeville Island Farms v. American Crystal Sugar 334

64

U.S.219, 229-236 and ftn. 9, 15-17(1948) for the principle that the Clayton Act, Sec. 4, "statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers...the Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they are perpetrated." At ftn.9, "consistent with the congressional purpose, we have refused to engraft artificial limitations on the [sec.] 4 remedy."

123.  "Ethics in the PTO.." The PTO requires stating under oath who is the real patent owner and real inventor. Both must consent for patent family filings, or changes in title or liens. "The US PTO imposes a duty of candor and good faith on the applicant and the patent attorney, including an obligation of full disclosure of information material to patentability...an examiner can request information about the development of the invention and prior activities of the inventor and others related to the invention," ("PLI Patent Prosecution Workshop '09", 7/23-24/09). Concealed ownership evades the PTO's system of truthful inventors and owners in a proof of "non-obviousness", "predecessor patents", "priority of invention", and "existence of licenses" as to value. It, of course, bars false statements to US, foreign patent offices or courts where AST owned patents are on file or in litigation. The US Dept. of Justice (DOJ) 4/6/1995 Antitrust Guidelines for Licensing Intellectual Property 5.1 states that horizontal restraints often will be evaluated under the rule of reason. In some circumstances, however that analysis may be truncated; additionally, some restraints may merit per se treatment, including price fixing, allocation of markets or customers,..and certain group boycotts" *ibid* 5.4, "if the [arrangement] anticompetitively forecloses the exploitation and development of, or otherwise constrains competition among, competing technologies.", *ibid* 5.5 citing cases with examples.

124.  VZ/AST by Hinman, admits to a system of PTO business that is "inequitable", a key term of art in patent prosecution or litigation. Abuses often lead to patents held unenforceable, cancelled or losing priority. E.g. D. Del. Action re Rambus memory chips: "patents were unenforceable because ... [owner] destroyed documents... 'conduct obstructive' at best, misleading at worst". [ But Rambus has

65

strong patents, and in 2010 settled one case with a disclosed $ 900 mm. payment by Samsung.] Yet the rules of fair play for infringement and trial proof must still be upheld, regardless of substantive merits.

125.    PTO/SEC disclosure duties of the AST giants are US duties; most have US patents or licenses and stock market listings in the US. They owe duties of good faith and fair dealings assumed in listing, for the right to be traded here. Use of 2d layer "ghost entities" by brokers, to create deniability for a real buyer, or in post-fraud "lulling" is anticompetitive, if used in a sham. The DOJ's recent $1.6 bn. US fine, and earlier, similar EU fines, against Intel for kickbacks and bribery practices on chip purchases by customers to prevent competition from Sun Microsystems, is a complete answer to such practices.

126.    Price-fixing alone, but with deception too, is a *Per Se* antitrust violation. a) When the exclusive license is to a horizontal competitor of SITI-MLR, e.g. like the AST, "members of the pool have to share their successful research and development and each of the members can free ride on the accomplishments of other pool members", p. 29, 1995 DOJ AT-Guidelines, supra.. The "free riding" herein is more extensive than the 1995 Guidelines, because the AST so often connives its way into purchases from NPEs by ghost-buyers, to sell cheap licenses to members. b) *e.g.* AST fosters more pressure on legitimate licensors like MLR-SITI by starting a license or sale offering to non-members, bolting more market power onto the AST, during a liquidation sale rigged for members-potential members only .

127.    DOJ Guidelines as public policy. The landscape of US wireless telecom IP cannot be left to two former Baby Bells at 67 % US market share, with VZ at 37% gaining in leadership. Each patent purchase is made to be followed with low-cost AST sub licenses. AST even boasts (C 52) about its cheaper licenses to some old members to raise money from new members, or to sell licenses to non-members, saying "the group... isn't a profit-making venture and its members don't actually own patents--they just grant themselves a license to use them"—i.e. patent market deception used by a group too large and powerful. b) Publicly held companies are fiduciaries for shareholders. But VZ/AST fixes a low buy-

out price by broker deception, engages in a ghost-buyer sham, and falsely poses publicly as a tax-free foundation. AST's methods in its conspiracy are "illegal means", designed to reach "illegal ends". AST then takes the benefits of illegality, paying the lowered fixed price, licenses the IP property to members and cartels, leaving a devalued, hollow shell for controlled resale. Any business that needs a license has to come to AST or Twister to get one, hopefully before the sale, or go to an affiliated successor owner like OIN. d) The result is approx. 150 global sub-licenses within 4 cartels (countries where VOD, TEF, CHL and CHU operate), then to many new Internet players/social websites, each of which get contracts no more reliable as licenses, than AST's deceptive purchase contracts. Conversion does not yield a good title to anyone in the chain of ownership and licenses; and the price of conversion is an injured bystander tracing its illegal gains.

128.    AT case law cited at C 118 says: An organization cannot "buy a good..in which the buyer was..a sham organization seeking only to combine..buyers…to suppress their otherwise competitive instinct to bid up price." The AT violation has targeted the unique patented property of MLR-SITI and others for buy-out. Cf. IIIB Areeda-Hovenkamp, 2008 AT Treatise (par. 768b5 p.173), *supra*. which recognizes the market power abuse implicit in gathering up a bloc of patented software: "..particularly useful for foreclosure [cornering a market], because … licenses can always be infinitely expanded to take up the entire market".

129.    Defendants' actions are intended to foreclose entry and participation in the broadband licensing arena, corralling much of the global market, and resulting in damages to MLR/SITI in an amount be determined at trial, but in no event less than amounts in the three Causes of Action. All violations alleged are *Per Se* violations of AT laws, but also are provably un-reasonable under the *Rule of Reason*.

## INJUNCTION AND DAMAGES FOR VIOLATION OF THE SHERMAN ACT

130.     SITI realleges and incorporates by reference the allegations of paragraphs 1 through 129 hereof with the same force and effect as if fully set forth herein.

131.     The facts alleged in each cause of action are a) that there was, and is a contract in writing (The AST Trust, and its Rules of Trust (formal and informal), a combination underlying it of 18 members and 4 related global cartels working together to effectuate the purposes of the AST, and a conspiracy among all AST members, officers and affiliates ( who invested large sums, sit on its board of directors, and receive complete information about AST activities, published publicly or not), and such contract, combination and conspiracy interferes with US and foreign commerce, in violation of Sec 1 of the Sherman Act. b) There is further, price-fixing in each purchase of patents from NPEs, each license to AST members or prospects, each resale by auction or otherwise, and in each illusory "painting the tape" transaction among AST,VZ and each ally therein (MSFT, OIN, NEC and others unknown). c) There is a concerted refusal to deal with NPE competitors on patent licensing, in violation of the case law under the Sherman Act. d) There is a clear pattern of inequitable behavior under such case law, and the IP Guidelines of the antitrust division of the DOJ, in violation of the Sherman Act. e) Finally, there is active participation and illegal monetary and other business benefits received by each Defendant herein, each member of the AST, and each other person herein named, and described, as a co-conspirator.

132.     Injury to Competition The Plan in the anticompetitive agreements described, establishes tricks and devices for price-fixing, circulating data to condition a market downward in buying or in licensing, concerted refusals to deal on patent licensing, deception of patent sellers, and spoliation of licensing at arms-length fair market valuations. Defendants' restraints of trade have affected commerce within and outside the United States.

**WHEREFORE**, Plaintiff SITI demands (1) judgment declaring that Defendants engaged in a contract, combination or conspiracy which is a _Per Se_ violation of Sec. 1 of the Sherman Act, or is Unreasonable in its effect under such law; and demands (2) a permanent injunction, prohibiting the Defendants from continuing the AT violations; (3) a judgment in favor of Plaintiff SITI and against all Defendants, for actual and treble damages in an amount to be determined at trial, including a just and equitable recovery by SITI of a share of Defendants' and affiliates' unlawful gains; (4) an award of pre-judgment interest in favor of Plaintiff SITI against Defendants, jointly and severally; (5) judgment in favor of SITI for its attorneys' fees, expenses and costs, and such other relief to as the Court shall deem.

Date: September 3, 2010

Respectfully Submitted

By: _____

LAWRENCE M. POWERS (LMP 9068)
Lead Counsel for plaintiff
SITI-SITES.COM, INC.
47 Beech Road,
Englewood, N.J. 07631
201-567-4904
Fax 201-567-4904
lmp2@bellatlantic.net

COOPER & MCCANN, LLP

By: _____

GARY G. COOPER (GGC 4942)
Attorneys for Plaintiff
SITI-SITES.COM, INC.
197 Coligni Avenue,
New Rochelle, N.Y. 10801
914 636-5824
FAX 646 355-0169
gcooper13@hotmail.com

Verification

Lawrence M Powers Chief Executive Officer of Plaintiff, Siti-Sites.Com Inc., hereby affirms under penalty of perjury and pursuant to NY Civil Practice Law and Rules section 2106, That I have read the contents of the attached amended complaint and the contents are true of my own knowledge, except those things therein stated on information and belief and as to those things I believe them to be true.

Dated: New York, New York
      September 3, 2010

Lawrence M. Powers, CEO